# 5

Leslie Patterson
July 24, 2019

1 (Pages 1 to 4)

## Page 1

VOLUME: 1
PAGES: 1 - 193
EXHIBITS: 39 - 64

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 1:18-CV-10792

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JANE ROE,                          *
    Plaintiff,              *
                                        *
    vs.                            *
                                        *
LINCOLN-SUDBURY REGIONAL SCHOOL   *
DISTRICT, BELLA WONG, AIDA RAMOS, *
and LESLIE PATTERSON,       *
    Defendants.              *

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF LESLIE PATTERSON, a witness called on behalf of the Plaintiff, taken pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Jacqueline M. Curran, Registered Merit Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Law Offices of TORRES, SCAMMON, HINCKS & DAY, LLP, 35 India Street, Boston, Massachusetts, on Wednesday, July 24, 2019, commencing at 10:00 a.m.

CURRAN COURT REPORTING
21 Rowe Hill Road
Stoneham, Massachusetts 02180
(781) 279-8400 (tel.)   (781) 279-8488 (fax)

## Page 2

1            A P P E A R A N C E S
2
     Representing the Plaintiff:
3
        TORRES, SCAMMON, HINCKS & DAY, LLP
4       By:  Kristen Schuler Scammon, Esq.
        35 India Street
5       Boston, MA 02110
        (617) 307-4426
6       kscammon@tshdlegal.com
7
8    Representing the Defendants:
9       PIERCE, DAVIS & PERRITANO, LLP
        By:  Seth Barnett, Esq.
10      10 Post Office Square, Suite 1100N
        Boston, MA 02109-4603
11      (617) 350-0950
        sbarnett@piercedavis.com

## Page 3

           I N D E X

WITNESS:  Leslie Patterson

Examination By:  DIRECT CROSS REDIRECT RECROSS
  Ms. Scammon         6

           E X H I B I T S

No.    Description                         Page

No. 39, Discipline Report                   24

No. 40, E-Mail from Leslie Patterson        32
dated 1112/13,

No. 41, Harassment Prevention Order         34

No. 42, E-Mail from Leslie Patterson        40
dated 12/2/13 with letter dated 12/2/13
from Leslie M. Patterson

No. 43, E-Mail from Leslie Patterson        44
12/2/13

No. 44, E-Mail, Letter dated 12/4/13 to     46
Mary Ellen Sowyrda, Esq. from David R.
Yannetti, Esq. with Attachments

No. 45, Incident Report                     51

No. 46, Letter dated 12/6/13 from Leslie    53
M. Patterson

No. 47, Defendant, Leslie Patterson's       62
Answers to Plaintiff's Interrogatories

No. 48, E-Mail to Jim Berry from Leslie     98
Patterson dated 11/13/13

No. 49, E-Mail to Jeffrey Mazza and MJ      99
Walsh from Sue Leichtman dated 11/15/13

## Page 4

No. 50, E-Mail Chain                        100

No. 51, E-Mail to C▓▓▓▓ from Leslie         103
Patterson dated 11/18/13

No. 52, E-Mail to Jane Young, Danielle      104
Weisse, Alfonso Abadia, Jim Berry,
Jeffrey Mazza, Joseph Hicks from John
Flynn dated 12/17/18

No. 53, E-Mail to Alfonso Abadia,           109
Danielle Weisse, Jeffrey Mazza, Jim
Berry, Joseph Hicks, Jane Young, John
Flynn, Leslie Patterson, Aida Ramos,
C▓▓▓▓▓, Sue Leichtman, and Greg
Gammons from Lynn Carlson dated 12/2/13

No. 54, E-Mail to Eleanor Burke from        112
Charles Despotopulos dated 12/11/13

No. 55, E-Mail to C▓▓▓▓ from Leslie         113
Patterson dated 12/11/13

No. 56, E-Mail Chain                        119

No. 57, E-Mail Chain                        127

No. 58, E-Mail to Leslie Patterson, John    130
Flynn, MJ Walsh, Danielle Weisse, Jane
Young, Jeffrey Mazza, Jim Berry, and
Joseph Hicks from Donna Cakert dated
1/22/14

No. 59, E-Mail from Lynn Carlson to John    132
Flynn dated 1/22/14

No. 60, E-Mail Chain                        137

No. 61, E-Mail Chain                        141

No. 62, E-Mail to Aida Ramos, Anne          150
O'Reilly, Donna Cakert, and Leslie
Patterson from Lynn Carlson dated 5/7/14

No. 63, Data Request OCR Complaint No.      153
01-14-1155 Lincoln-Sudbury Regional
School District Student: ▓▓▓▓▓▓

Leslie Patterson
July 24, 2019

3 (Pages 9 to 12)

Page 9

1  Q. And are you prepared to testify
2  about topic two today?
3  A. Yes.
4  Q. And are you prepared to testify
5  about topic three today?
6  A. Yes.
7  Q. And are you prepared to testify
8  about topic seven today?
9  A. Yes.
10  Q. And are you prepared to testify
11  about topic eight today?
12  A. Yes.
13  Q. And are you prepared to testify
14  about topic nine?
15  A. Yes.
16  Q. And topic ten?
17  A. Yes.
18  Q. And topic 11?
19  A. Yes.
20  Q. And topic 12?
21       MR. BARNETT: That may have
22  been a codesignation with Ms.
23  Tavares as to some of them.
24       MS. SCAMMON: Right.

Page 10

1  A. To some extent.
2  Q. And topic 16?
3  A. Yes.
4  Q. And topic 17, which is on the next
5  page?
6       MR. BARNETT: That
7  designation is as to her
8  communications.
9  A. Uh-huh. Yes.
10  Q. And finally, topic 19?
11  A. This -- yes. Okay.
12  Q. Thank you. Thank you for bearing
13  with my lawyer thing. So I'd ask you to state
14  your full name for the record, please.
15  A. Sure. Leslie Marie Patterson.
16  Q. Where do you live, Ms. Patterson?
17  A. 71 Taylor Road in Stow, Mass.
18  Q. Could you briefly tell us about your
19  educational background?
20  A. Sure. Graduated from Williams
21  College in 1994 with a bachelor's degree in
22  math and music, and then from there, I went
23  into Harvard Graduate School of Education,
24  one-year program. Graduated from there in

Page 11

1  1995 with a master's in education and
2  credential to teach. Then I returned to
3  Harvard Graduate School of Education in 1999
4  for a two-year program, and I got my
5  certificate of advanced study in
6  administration planning and social policy, got
7  my administrator's license through that
8  program. Then I just returned to get my
9  doctorate from Boston College School of
10  Education in 2015 and graduated from that in
11  2018, so I now have my EDD in educational
12  leadership.
13  Q. Great. Busy.
14  A. Yes.
15  Q. Now, I think you said after Williams
16  -- go NESCAC -- you got your master's and got
17  a teaching certificate.
18       Did you teach in the classroom
19  before you went back to school?
20  A. So right from college, I went to
21  Harvard, and there was a student teaching
22  component of that program, so I student taught
23  at Dorchester -- sorry -- student taught at
24  Dorchester High School during that year. Then

Page 12

1  right after that -- graduated from there in
2  1995. Taught at Newton North High School from
3  1995 and 2001. Then I was at Lincoln-Sudbury
4  from 2001 to the present.
5  Q. So when you started at
6  Lincoln-Sudbury in 2001, what was your job?
7  A. Associate principal. We were called
8  housemasters at the time, but it's the same
9  role; different name. A name change.
10  Q. And have you held that same position
11  ever since?
12  A. I have.
13  Q. Including in the 2013/'14 school
14  year?
15  A. Yes.
16  Q. Can you just describe for us the
17  general job description of the associate
18  principal/housemaster?
19  A. Sure. So we are a member of the
20  admin -- administrative team, so as a result
21  of that role, we are part of a team that's
22  overseeing a building of 1500-plus students,
23  140-ish faculty and staff, so just helping the
24  building run smoothly, so all sorts of

Page 13

1  logistical matters to more big picture issues
2  around safety climate, et cetera.
3         As an associate principal, I'm
4  specifically responsible for, I think, about
5  300 students that are placed in East House
6  right now, somewhere under 400, and so for
7  those students, the associate principal acts
8  as their kind of primary administrative point
9  person, so we tell them kind of like a --
10 we're their principal.  So I oversee
11 discipline for those students.  I work closely
12 with their counselors and so forth, their
13 social emotional well-being.  I evaluate a
14 caseload of approximately 30 faculty members,
15 so I am in and out of the classroom doing
16 observations.  I take on different committee
17 work.  I'm a cochair for the Racial Climate
18 Task Force.  I chair hiring committees.  I
19 work on curriculum development.  I liaison
20 with different academic departments, so it's
21 full -- it's a full job.
22    Q.  How many houses are there --
23    A.  There are four houses --
24         THE STENOGRAPHER:  You have

Page 14

1  to wait for the question to be fully
2  asked.
3         MR. BARNETT:  You'll get
4  there in a few.
5     Q.  Okay.  We'll get there.  How many
6  houses are there now?
7     A.  Four.
8     Q.  Have there always been four since
9  you've been in the housemaster's job?
10    A.  No.  Down to three at one point.
11    Q.  In 2013, 2014 were there four, if
12 you remember?
13    A.  I cannot remember.  There was two
14 years when it went down to three.  I do not
15 remember at the moment which years.
16    Q.  Now, as you know, this case is
17 brought by ▮▮▮▮▮▮▮▮▮▮, a former student who,
18 I believe, was in your house; correct?
19    A.  Yes.
20    Q.  Do you recall when ▮▮▮▮ as a
21 student, first came to your attention?
22    A.  I know for sure I interacted with
23 her over disciplinary incidents her 9th grade
24 year.  I may have met her prior to that.

Page 15

1     Q.  What were the disciplinary incidents
2  in her 9th grade year?
3     A.  There was one involving a text
4  message that she had sent to -- I believe what
5  happened is she sent a text message to a
6  friend.  Within that text message, she said
7  some negative -- some negative remarks about
8  students in our METCO program.  That friend
9  shared the text message, so that text message
10 circulated around the student body, and there
11 were many students in the METCO program who
12 were upset by the text message, so I
13 interacted with her around that.
14    Q.  And did any discipline result from
15 that?
16    A.  She had a two-day suspension.
17    Q.  Were there any other disciplinary
18 incidents?  I think you said in her 9th grade
19 year?
20    A.  Yeah.  The other incident involved a
21 math class, which didn't -- I can't remember
22 the details, but she didn't give her phone
23 right away, and then when she gave it, I think
24 she took it back before she should have, so

Page 16

1  the teacher wasn't happy with her, so I talked
2  to her about that.
3     Q.  Did any discipline result from that?
4     A.  I believe it got resolved through
5  the teacher.
6     Q.  The phones will kill us all, I
7  swear.  Now, do you know ▮▮▮▮ mother,
8  C▮▮▮▮▮?
9     A.  I do.
10    Q.  How long have you known C▮▮▮?
11    A.  I don't recall the exact year that
12 she came to LS.
13    Q.  Did she come after you were already
14 working in LS?
15    A.  I was there in 2001.
16    Q.  And do you recall if C▮▮▮ was
17 already there before you arrived?
18    A.  I don't recall.
19    Q.  And did you -- I believe you said
20 you supervised 30 faculty?
21    A.  Approximately.  Yeah.
22    Q.  Yes.  Was C▮▮▮▮▮ ever somebody
23 you supervised?
24    A.  She was, prior to her daughter

Leslie Patterson
July 24, 2019

5 (Pages 17 to 20)

Page 17

1   arriving.
2      Q.  And is she still somebody -- a
3   faculty member that you supervise?
4      A.  No, she is not.
5      Q.  Why not?
6      A.  When her daughter came to LS, she
7   opted to have her daughter in East House,
8   which meant she could no longer be in East
9   House.
10     Q.  Is that a policy of the school?
11     A.  Uh-huh.  Yes.
12     Q.  So at the time of the incident that
13  we're here to talk about, Mrs. [redacted] was not
14  in your house --
15     A.  Correct.
16     Q.  -- anymore?  Okay.  Whose house was
17  she in at the time, if you remember?
18     A.  I don't remember.
19     Q.  And was Mrs. [redacted] in your house up
20  until right before her daughter became a
21  student?
22     A.  Yes.
23     Q.  So the reason she moved from your
24  house was because --

Page 18

1      A.  Uh-huh.
2      Q.  -- of the policy that she couldn't
3   be in the same house as her child?
4      A.  To the best of my recollection, yes.
5      Q.  Did you have a positive relationship
6   with C[redacted]?
7      A.  Yes.
8      Q.  Did you ever have to give her any
9   negative reviews?
10     A.  No.
11     Q.  Now, focusing on the time when the
12  incident involving [redacted] came to light, did
13  having her mom as a teacher in the school, did
14  that make it more difficult to deal with
15  [redacted] situation?
16          MR. BARNETT:  Objection.  You
17  can answer.
18     A.  Can you ask the question again,
19  please?
20     Q.  Sure.  Did having [redacted] mom as a
21  faculty member at LS, did that make it more
22  difficult to deal with -- let's start with
23  [redacted] disciplinary issues as a 9th grader?
24     A.  No.

Page 19

1      Q.  And how about did it make it more
2   difficult to deal with the sexual assault
3   incident that occurred in her sophomore year?
4      A.  Yes.
5      Q.  In what way did it?
6      A.  There was an awkwardness knowing
7   that she wasn't happy and then also being
8   present with her.
9      Q.  So let's focus on the incident that
10  occurred in November of 2013.
11         When did you first hear about the
12  incident [redacted] reported?
13     A.  On that Friday, November 7th.
14     Q.  How did you hear about it?
15     A.  I was notified by Sue Leichtman.
16     Q.  And who is Sue Leichtman?
17     A.  She was the clinical counselor for
18  East House at the time.
19     Q.  What did Sue tell you?
20     A.  Initially, she told me just to come
21  to her office, and to the best of my
22  recollection, she shared the notes that she
23  had taken while she had been speaking with
24  [redacted] and so reported a summary of what

Page 20

1   [redacted] had reported to her.
2      Q.  And was [redacted] present?
3      A.  Yes.
4      Q.  And so what did you do in response
5   to receiving that summary from Sue?
6      A.  Spoke with [redacted] spoke with
7   [redacted] mother, called the police.
8      Q.  And what did you tell [redacted] and her
9   mother when you spoke with them on that
10  Friday, November 7th?
11     A.  That we would need -- from what I
12  remember, that we would need to tell the
13  police, suggested that they take [redacted] to the
14  doctor.  Those are the two things that stand
15  out.
16     Q.  Did you personally call the police?
17     A.  I did.
18     Q.  And who did you talk to at the
19  police department?
20     A.  I don't remember.
21     Q.  Now, had you ever, in your -- in the
22  years preceding 2013, had any other students
23  ever reported a sexual assault?
24     A.  I don't recall.

Leslie Patterson
July 24, 2019

6 (Pages 21 to 24)

Page 21

1  Q. So to the best of your recollection,
2  is the incident involving ▇ the first
3  time you'd had to deal with an incident
4  involving a student --
5  A. On campus.
6  Q. -- sexually assaulted on campus?
7  A. (Witness nods head).
8  Q. And at the time of ▇
9  incident, did Lincoln-Sudbury have a policy in
10 place about how you should handle such a
11 report?
12 A. There were practices in place.
13 Q. And were those practices in writing
14 anywhere?
15 A. There's a discipline code generally
16 speaking to how to respond to harassment
17 cases.
18 Q. Did you ever receive any training on
19 how to respond to sexual assault reports?
20 A. Through LS?
21 Q. Yes.
22 A. There was training, and I'm blanking
23 on the year of it, but I know it's in the
24 interrogatories.

Page 22

1  Q. Maybe we can talk about it when we
2  get to those then.
3      MR. BARNETT: We'll get to
4  them.
5  A. Okay. I'm sorry. It's also in our
6  -- we do mandated trainings every fall. It's
7  also there too.
8  Q. So after you spoke with ▇ and
9  her mother and informed the police, what was
10 -- what did you do next in response to the
11 report of the incident?
12 A. In what time period, I guess?
13 Q. So did you do anything else on that
14 Friday?
15 A. I notified the superintendent.
16 Q. And who was the superintendent at
17 that time?
18 A. Bella Wong.
19 Q. And how did you notify her?
20 A. I called her.
21 Q. And did she tell you to do anything?
22 A. I don't recall.
23 Q. Did you talk to anyone else within
24 the school?

Page 23

1  A. I don't recall.
2  Q. I think maybe this will make it
3  easier.
4      MS. SCAMMON: We're off the
5  record for a second.
6      (Off the record)
7      MS. SCAMMON: Back on the
8  record.
9  Q. So Ms. Patterson, of the two male
10 students involved in the incident, which one
11 was in your house?
12 A. W▇.
13 Q. W▇. Okay. And I believe that he,
14 in everything that we've been talking about
15 before, is Perpetrator 1 --
16     MR. BARNETT: I believe so.
17 Q. -- or Student 1. And the other male
18 student's name was -- do you remember his
19 name?
20 A. N▇.
21 Q. N▇. Okay. And which house was
22 N▇ in?
23 A. South House.
24 Q. South. Okay.

Page 24

1      MS. SCAMMON: Mark that as
2  Exhibit 39.
3      (Deposition Exhibit No. 39, Discipline
4  Report, marked for identification)
5  Q. Ms. Patterson, you have Exhibit 39
6  in front of you. Take a few seconds to look
7  at it, and let me know when you've had a
8  chance to review it.
9  A. Sure.
10     (Pausing)
11     MR. BARNETT: She can point
12 you to specifics if you want.
13 Q. I wanted you to feel comfortable if
14 you want to review something, but typically
15 with a document that's more than a page, I'll
16 ask you about only certain parts of it.
17 A. Sure.
18 Q. If you ever feel like you need to
19 review anything, just feel free. Do you
20 recognize Exhibit 39?
21 A. As a discipline report that gets
22 printed from our system, I do.
23 Q. Can you describe the discipline
24 report system?

Leslie Patterson
July 24, 2019

7 (Pages 25 to 28)

Page 25

1    A.  Sure.  So if a teacher reports an
2  incident or if, honestly, if anyone reports an
3  incident, at this time it was iPass, they can
4  type in the report into the system, and then
5  the administrator who deals with the student
6  will receive a copy of it and then will follow
7  up, kind of complete the report after doing
8  follow-up and then it gets e-mailed home.
9    Q.  It gets e-mailed home?
10   A.  (Witness nods head).
11   Q.  In every instance, it gets e-mailed
12 home?
13   A.  No.  Sometimes, the administrator
14 might decide to not send it to the family.
15   Q.  So the teachers have access to the
16 system to enter their own reports?
17   A.  Right.  But they can't -- they can
18 see -- they can see the reports that they have
19 entered.  They can't see reports entered by
20 any other teacher.
21   Q.  And who else has access to it?  I
22 think you said you, as the housemaster, would
23 have access to it?
24   A.  Yes.

Page 26

1    Q.  Would the principal have access to
2  it?
3    A.  That's a good question.  I don't
4  know.  I don't know.
5    Q.  I want to direct your attention on
6  the second page of the document to the entry
7  dated 11/26/2013.
8    A.  Uh-huh.
9    Q.  I think I'm reading it right that
10 says this was put in by you --
11   A.  Yes.
12   Q.  -- your name is there.  And so the
13 "Reporting Comment," is that something that
14 you wrote?
15   A.  Yes.
16   Q.  Okay.  So the incident was reported
17 to you on November 7th; correct?
18   A.  Yes.
19   Q.  So why did you wait until the 26th
20 to put it into the system?
21   A.  That was at the end of the
22 investigation.
23   Q.  Okay.  Is that your standard
24 practice, to not enter anything into the

Page 27

1  disciplinary system until an investigation is
2  complete?
3    A.  It depends on the situation.
4    Q.  Can you elaborate on that?  What
5  sort of circumstances would make you wait
6  until the end of an investigation to enter a
7  report into the system?
8    A.  So I'm rarely the one who enters the
9  reports.  I'm usually the one who receives
10 them and follows up, so in this case, there
11 had already been communication with the
12 family, so this is more a formality than
13 communication.  That was already going on with
14 the parents.
15   Q.  And I think this reflects that as of
16 November 26th, a decision had been made to
17 suspend W▮ for two days, November 27th and
18 December 2nd?
19   A.  Yes.
20   Q.  And so I believe this to be the
21 case, if you remember, so you got to do this
22 on the 26th.  Was the 27th the day before
23 Thanksgiving?
24   A.  I do not remember that.

Page 28

1    Q.  I think it might be.  Okay.  Then
2  you go on to state, "I will be back in touch
3  with you on Monday, December 2nd, with more
4  information regarding the extent of
5  consequences for W▮"?
6    A.  Uh-huh.
7    Q.  Who are you referring to that you
8  would be back in touch with?
9    A.  The parents.
10   Q.  The parents.  Okay.  So this entry,
11 yours and others on this report, are intended
12 to go to the family as drafted?
13   A.  At this point, if you have -- if
14 this is a completed report, yes, this is what
15 would have gone.  If it was sent home, this is
16 what the parents would have seen.
17   Q.  Then if we look to "Admin Comments,"
18 I think you write, "See above comments"
19 because, as established, this one was written
20 by you, which was not typical, but in this
21 case it was.
22        MR. BARNETT:  Just instead of
23    "Uh-huh," if you could --
24   A.  Yes.  Yes.

Leslie Patterson
July 24, 2019

10 (Pages 37 to 40)

### Page 37

1  classes with W▇, so the other potential
2  would be the cafeteria as a place where they
3  would interact, and at that point, she was not
4  concerned about that 'cause she said she did
5  not eat in the cafeteria.
6      Q.  Okay.  So ▇▇▇ expressed to you
7  that she wasn't concerned about the
8  cafeteria --
9      A.  Yes.
10     Q.  -- that she would just not go to it?
11 Okay.  What about -- I think you said the
12 potential to cross paths is something that you
13 looked at.
14         Did you look at that with regard to
15 ▇▇▇ and W▇?
16     A.  We didn't have a formal -- a formal
17 plan for that.
18     Q.  But you do now?
19     A.  More so.
20     Q.  Well, was that something that was
21 considered for ▇▇▇?
22     A.  Yes.  So when she -- there was an
23 incident where she had seen someone, and so
24 from that point forward, we made sure that we

### Page 38

1  had talked through all potential for paths to
2  cross as soon as she brought that to my
3  attention.
4      Q.  So only after it had happened?
5      A.  The first incident.
6      Q.  And I'm guessing if she crossed
7  paths with somebody in the hallway, that they
8  were not 50 yards away from her as the order
9  required?
10     A.  They crossed paths.  Yes.
11         MR. BARNETT:  Objection.
12     Q.  So at the time this was entered,
13 there was no formal plan in place to avoid the
14 crossing of paths?
15     A.  Right.  And I will say that the
16 police do tell us that there will be times
17 when the two people cross paths, and if that
18 happens, just have the students continue
19 walking.  Don't make eye contact.  Don't talk.
20 So they do say there could be a time in your
21 school building where the students will cross
22 paths even given this.
23     Q.  So did you personally have a
24 conversation with W▇ after reviewing this

### Page 39

1  Harassment Prevention Order?
2      A.  I was not allowed to speak with
3  W▇.
4      Q.  So how was it communicated to W▇
5  how he should handle it if he saw ▇▇▇?
6      A.  He has the order.  The police spoke
7  directly with him.
8      Q.  Do you know what the police told
9  him?
10     A.  I don't know.
11     Q.  Why were you not allowed to speak
12 with him?
13     A.  His attorney told me that I could
14 not speak with him.
15     Q.  When was that?
16     A.  I do not have the date of that.
17     Q.  Did you inform his attorney of what
18 W▇ should do to comply with the Harassment
19 Prevention Order?
20     A.  I do not recall speaking with the
21 attorney directly.
22     Q.  We may come back to this one, so I
23 don't know if you want to make it a different
24 way.

### Page 40

1          MS. SCAMMON:  The next one.
2          (Deposition Exhibit No. 42, E-Mail
3  from Leslie Patterson dated 12/2/13
4  with letter dated 12/2/13 from Leslie
5  M. Patterson, marked for
6  identification)
7      Q.  Ms. Patterson, Exhibit 42 is an
8  e-mail from you attaching a letter, which
9  appears to be to W▇'s parents on
10 December 2nd of 2013.  Do you recognize this
11 correspondence?
12     A.  Yes.
13     Q.  If you go to the letter -- the
14 letter component, you write to W▇'s parents,
15 "This is a follow-up letter to the e-mail I
16 sent you earlier today.  It is to officially
17 notify you that the school's investigation
18 into the incident at the football game on 11/1
19 has led us to the decision that we will need
20 to hold a discipline hearing per the L-S
21 Program of Studies and Policy Handbook."  And
22 then after the parenthetical, "Given the
23 information I currently have, I am
24 categorizing W▇'s offenses as physical

Page 41

1  assault and inappropriate sexual behavior."
2      What information did you have at
3  that time that led you to conclude that W▇
4  had engaged in physical assault and
5  inappropriate sexual behavior?
6      A.  The text message exchanges.
7      Q.  And when you say "the text message
8  exchanges," you're referring to the text
9  messages that ▇▇▇ provided to you?
10     A.  Yes.
11     Q.  You then go on to state, "W▇ is
12 suspended pending this hearing.  He will
13 return home immediately following the hearing,
14 and I will get back to you shortly thereafter
15 with the determined consequences.  W▇ has
16 the right to bring advocates to the hearing;
17 please let me know as soon as you know, who
18 will be attending."
19     Do you recall who attended the
20 hearing for W▇'s disciplinary hearing?
21     A.  I know the attorney was there, but I
22 don't remember who, if there was someone
23 additional with him.
24     Q.  W▇'s attorney was there?

Page 42

1      A.  Uh-huh.  Yes.  Sorry.
2      Q.  And so the school's attorney was
3  also there; is that true?
4      A.  Yes.
5      Q.  And who else from Lincoln-Sudbury
6  participated?
7      A.  It would have been the associate
8  principals at the time.
9      Q.  So was that the policy, that all of
10 the associate principals would be involved in
11 each disciplinary hearing?
12     A.  When we can all make it, we all
13 attend.  There are times when not all of us
14 can make it.  In which case, we have them
15 without all four or if there were three.
16     Q.  And is it those associate principals
17 who are present at the hearing that make the
18 final decision of the discipline for the
19 student?
20     A.  Yes.  And the route of appeal for
21 the family is through Bella Wong.
22     Q.  You go on to state, "An additional
23 meeting is required by Special Education Law,
24 and we would like to hold that meeting, (the

Page 43

1  Manifestation Determination meeting)
2  immediately preceding the Discipline Hearing."
3  So was W▇ a Special Ed student?
4      A.  He had the rights of a Special Ed
5  student 'cause he was in the process of being
6  evaluated, I believe.
7      Q.  So if W▇ had not been a Special Ed
8  student or entitled to those rights, this
9  additional meeting wouldn't have been
10 necessary; is that correct?
11     A.  Correct.
12     Q.  What's your understanding of what a
13 manifestation determination meeting is?
14     A.  It's a meeting held to assess
15 whether or not the student's disability caused
16 whatever the behavior was.
17     Q.  And did you participate in that
18 meeting for W▇?
19     A.  I would have been present.
20     Q.  Do you recall the conclusion of
21 that?
22     A.  I don't recall --
23     Q.  So you don't remember if --
24     A.  -- the conclusion.

Page 44

1      Q.  -- if it was determined that his
2  disability caused the behavior?
3      A.  I don't remember.
4      (Deposition Exhibit No. 43, E-Mail
5      from Leslie Patterson 12/2/13, marked
6      for identification)
7      Q.  Exhibit 43 appears to be an e-mail
8  from you.  Do you know if this is the e-mail
9  that you referred to in the letter that we
10 just talked about?
11     A.  I don't know.
12     Q.  The e-mail from you, I'm guessing,
13 to W▇'s parents also to
14 law@davidyannetti.com.
15     Do you recall that was W▇'s
16 lawyer?
17     A.  It does sound familiar.
18     Q.  Okay.  And the subject is "RE: Text
19 messages."
20     Had you shared the text messages
21 that ▇▇▇ gave to you with W▇'s parents
22 and his lawyer prior to the hearing?
23     A.  I don't recall.
24     Q.  You have a bcc to Eleanor Burke.

Page 49

1  information as far as whether they agreed to
2  meet, what they were planning, does that
3  coincide with your recollection of the facts
4  you learned?
5      A.  That is now sounding familiar.
6      Q.  He states in his last sentence here
7  or second to last, "There was consensual
8  touching of the groin area but nothing inside
9  the pants."
10         Does that coincide with what your
11 investigation had shown?
12     A.  I wouldn't have seen that through an
13 investigation.  It would have just been
14 through seeing this letter.
15     Q.  Okay.  Do you recall that that was
16 the -- that was W███'s version of events?
17     A.  Something like it.
18     Q.  If you go to the next page, Attorney
19 Yannetti states, While the above incident on
20 the bench was happening, blank was on FaceTime
21 with her friend blank who, as a result, heard
22 everything and saw some of the interaction.
23 Do you recall that fact?
24     A.  I do recall that fact.

Page 50

1      Q.  And do you know who was on FaceTime?
2      A.  I do.
3      Q.  And who was on FaceTime?
4      A.  Her name is A███ or something like
5  that.
6      Q.  With ███?
7      A.  Yes.
8      Q.  And did you ever speak with A███?
9      A.  I did not.
10     Q.  Why not?
11     A.  She's not in East House or she was
12 not an East House student.
13     Q.  Did anybody speak with her about
14 this incident?
15     A.  Yes.  I believe Eleanor Burke did.
16     Q.  And did Ms. Burke tell you anything
17 about her conversation with A███?
18     A.  The best that I can remember is that
19 she didn't -- that it was hard to know what
20 A███ had seen and not seen.
21     Q.  Do you remember any other detail
22 that Ms. Burke provided you about her
23 conversation with A███?
24     A.  I believe she said that A███ said

Page 51

1  that ███ was laughing at some point during
2  the video.
3      Q.  If you go to the next paragraph,
4  Attorney Yannetti states, I have enclosed
5  herein a screenshot of blank's Facebook page,
6  wherein she "chats" with blank.
7         And I will confess that I cannot
8  tell you what it says, but I'm just -- so
9  that's why I'm asking you if you remember the
10 Facebook issue, vis-a-vis, this investigation,
11 if you remember anything about what W███ was
12 contending?
13     A.  I don't remember a Facebook.  I just
14 remember the text messages.
15         MR. BARNETT:  Let's take a
16 quick break.  I got to use the
17 bathroom.
18         MS. SCAMMON:  Sure.  Go
19 ahead.
20     (Recess was taken)
21         MS. SCAMMON:  This will be
22 next.
23     (Deposition Exhibit No. 45, Incident
24 Report, marked for identification)

Page 52

1         MS. SCAMMON:  We marked the
2  next one while you were gone.
3      Q.  Ms. Patterson, you have Exhibit 45
4  before you.  At the top, it says Incident
5  Report Provided at December 5th Discipline
6  Hearing.  Do you know whose handwriting that
7  is?
8      A.  That's my handwriting.
9      Q.  Did you prepare this report?
10     A.  Yes.
11     Q.  This was prepared for W███'s
12 disciplinary hearing; correct?
13     A.  Yes.
14     Q.  And was this report accurate at the
15 time you prepared it?
16     A.  Yes.
17     Q.  I know you've had a chance to look
18 at it.  Do you believe it to still be accurate
19 today?
20     A.  Yes.
21     Q.  And this disciplinary hearing on
22 December 5th, who was present, as far as
23 housemasters?  Were all four present?
24     A.  I don't remember.

Leslie Patterson
July 24, 2019

16 (Pages 61 to 64)

Page 61

1    Q.  You state, "Finally, we would like
2    W▮ to receive some education from our
3    mentors in violence protection prevention
4    group."  What was that group?
5    A.  Sure.  It's a group of adults and
6    students, and I assume, in this case, I was
7    referring to the adult leaders, but they work
8    with helping students develop healthy
9    relationships is probably the easiest way to
10   talk about it, so students model for other
11   students.
12   Q.  So these would be other LS students?
13   A.  It's a student group, but there are
14   several adults who are the facilitators for
15   that group.  In cases that are more sensitive,
16   we ask the adults to work with students as
17   opposed to doing a peer to peer.
18   Q.  Do you recall if W▮ ever
19   participated in this?
20   A.  I believe he did with an adult who
21   was also a coach, but I can't remember the
22   specifics.
23   Q.  Now, focusing on ▮▮▮▮ and what was
24   going on with her, from the time of the

Page 62

1    report, what was ▮▮▮▮ doing on a day-to-day
2    basis?
3    A.  She had the opportunity to attend
4    the classes.  If she felt like she could not
5    be in classes, she had the opportunity to be
6    in East House in the clinical suite in the
7    learning center with her liaison doing work or
8    seeing a counselor.
9            MS. SCAMMON:  Mark this one.
10           (Deposition Exhibit No. 47, Defendant,
11           Leslie Patterson's Answers to
12           Plaintiff's Interrogatories, marked
13           for identification)
14   Q.  Ms. Patterson, showing you what's
15   been marked as Exhibit 47.  And do you
16   recognize Exhibit 47?
17   A.  I do.
18   Q.  And what do you recognize it to be?
19   A.  The interrogatories that I responded
20   to.
21   Q.  If you go to the last page, is that
22   your signature?
23   A.  It is.
24   Q.  So did you review these

Page 63

1    interrogatories before you signed them?
2    A.  I did.
3    Q.  So the answers are accurate, to the
4    best of your knowledge?
5    A.  Yes.
6    Q.  As probably expected, we'll go
7    through them.  So if we go to Interrogatory 1
8    and your answer 1, and I'll sort of try to
9    direct you to what I'm trying to ask you
10   about.  It states, "To the best of my
11   recollection, on November 7, 2013, I spoke
12   with plaintiff and plaintiff's mother, with
13   Clinical Counselor Sue Leichtman after
14   plaintiff reported the incident."
15        A couple sentences down, "On this
16   date, I was also sent a series of text
17   messages from plaintiff regarding the alleged
18   incident."
19        Were those the text messages between
20   ▮▮▮▮ and W▮ that we discussed?
21   A.  Yes.
22   Q.  So you received those also on
23   November 7th?
24   A.  Yes.

Page 64

1    Q.  Then further down, in answer one,
2    you state, "On November 21st and 25th, I
3    received e-mails of the screenshots of text
4    message exchanges between plaintiff and the
5    alleged perpetrators."
6        Were those different from the ones
7    you received on November 7th?
8    A.  There may have been additional.
9    They definitely were -- they were the same,
10   and also there might have been additional ones
11   there.  I don't remember.
12   Q.  You go on to say, "To the best of my
13   recollection, Plaintiff's parents were
14   consistently updated on the steps of the
15   investigation, via e-mail, phone, or in
16   person."
17        Did you have any in-person meetings
18   with C▮▮▮▮ during the investigation?
19   A.  I don't believe anything formal.  I
20   cannot remember if she stopped by my office
21   and might have checked in in a nonformal way.
22   Q.  So you don't remember if that
23   happened or not?
24   A.  Right.  Sorry.  That's between just

CURRAN COURT REPORTING

Page 77

1   Q.  Okay.  Is there like a reception
2   area?
3   A.  There's no reception area.
4   Q.  And so when you discussed with
5   ▮▮▮ that she was welcome in the learning
6   center at any time, where did you discuss that
7   she would go in the learning center?
8   A.  Her liaison, MJ Walsh.
9   Q.  So MJ's office was in the learning
10  center?
11  A.  Yes.
12  Q.  And how did that limit the
13  possibility of her interacting with the
14  perpetrators?
15  A.  She could just stay in that one area
16  and not have to circulate around the building.
17  Q.  Do you know if either of the
18  perpetrators used the services of the learning
19  center at this time?
20  A.  I can speak to W▮ did not.
21  Q.  W▮ did not.  So his Special Ed
22  liaison's office was not in the learning
23  center?
24  A.  I honestly don't recall the date at

Page 78

1   which he became a Special Ed student, and when
2   he did, he was in ACE, which is a different
3   area of the building.
4   Q.  So ACE was in a different area?
5   A.  Yeah.  The learning center is in A
6   building, and ACE is in C building, so there's
7   A building, B building, C building, so totally
8   opposite ends of the school.
9   Q.  And with regard to N▮, do you know
10  if he used the learning center?
11  A.  I don't know about N▮.
12  Q.  Did you remember discussing that
13  with Ms. Burke at all?
14  A.  I remember that he wasn't in school
15  much at all, so I don't remember what was
16  decided.
17  Q.  Okay.  The next sentence, you state,
18  "After the one instance that plaintiff
19  notified me that she crossed paths with one of
20  the perpetrators, plaintiff and I discussed
21  what classes she would be attending to ensure
22  that they would not cross paths again."
23         Which one of the perpetrators did
24  she cross paths with?

Page 79

1   A.  I think it was N▮, but I don't
2   remember for sure.
3   Q.  You go on to state that you
4   discussed what classes she would be attending
5   to ensure that they would not cross paths
6   again.
7         How did determining what classes
8   ▮▮▮ would be attending ensure that she
9   wouldn't cross paths with one of the
10  perpetrators?
11  A.  So 'cause she told me she was going
12  to class A, I then could see whether or not
13  the perpetrator was going to be going in that
14  same area at any given time.
15  Q.  Did you do that analysis?
16  A.  It was a day-by-day basis 'cause she
17  didn't have a set schedule.  She was coming in
18  and saying, today I'm going to go to this
19  class, so it had to be in that moment.
20  Q.  Okay.  And did that happen?
21  A.  I do remember working with her.  I
22  don't remember details of it.
23  Q.  You do remember her saying I'm going
24  to go to class here.  And you would -- did you

Page 80

1   then determine if one of the perpetrators was
2   likely to be in that vicinity?
3   A.  I don't remember any details.  My
4   memory of her is being in East House a lot.  I
5   don't remember her going to many classes.
6   Q.  And as far as W▮ and N▮, were
7   they restricted in any way on where they could
8   go in the school as a result of the Harassment
9   Prevention Order?
10        MR. BARNETT:  Objection.
11  Q.  You can answer.
12  A.  I don't remember what I told N▮'s
13  -- sorry -- what I told W▮'s attorney during
14  their overlapping days.  He needed to stay
15  away from ▮▮▮ but I don't remember about a
16  certain space in the building.
17  Q.  And what did you tell his attorney
18  about staying away from ▮▮▮?
19  A.  Again, I don't remember any details.
20  Sorry.
21  Q.  That's fine.  I'd rather you not
22  guess.  If you go to 13.  Interrogatory 13
23  asked you to "Describe the steps You took to
24  ensure that Plaintiff's education continued

Page 133

1  this, I just want to ask you if you're
2  familiar with some of what's mentioned.  So it
3  appears to be that Donna sent an e-mail and
4  that John may have commented.  Donna sends an
5  e-mail about -- I believe about the e-mail we
6  just talked about where she sent the grades to
7  [redacted] teachers for their consideration.
8      Then she goes on to say, "Ginny and
9  I were thinking that based on our revised
10 transcript process, the gym, health, and
11 elective credits will either appear as EDCO
12 credits on her transcript or not appear at
13 all."
14     Do you know what "revised transcript
15 process" she's referring to?
16     A.  I don't, but again, assuming it's in
17 response to what was decided at that December
18 20th meeting.
19     Q.  Okay.  And do you remember an issue
20 around [redacted] wellness credit during her
21 time at EDCO?
22     A.  No, but I can offer that wellness
23 meets by the quarter as opposed to the
24 semester, so wellness, most likely, would have

Page 134

1  been a class that she didn't have any LS
2  contact with while she was at EDCO, so there
3  was no sharing of that course.
4      Q.  Okay.  Understood.
5          MS. SCAMMON:  I show you
6  what's been previously marked as 16.
7  I do have an extra --
8          MR. BARNETT:  Oh, cool.
9          MS. SCAMMON:  -- of this one.
10 I don't know why.
11         MR. BARNETT:  I brought it
12 too.
13     Q.  Again, Exhibit 16 is an e-mail that
14 you're copied on regarding, as it says in the
15 first line, "the plan for Spanish for [redacted]."
16     Were you involved at all in coming
17 up with a plan for [redacted] to continue with
18 Spanish while she was at EDCO?
19     A.  I don't remember being directly
20 involved.
21     Q.  Is Alfonso her Spanish teacher?
22     A.  Yes.
23     Q.  Is he somebody who's -- somebody
24 who's under your supervision in your house?

Page 135

1      A.  No.
2      Q.  No?  This one has been previously
3  marked as 17.  I have an extra of those too.
4  So Exhibit 17 is an e-mail that appears you
5  are brought into the chain a couple e-mails in
6  regarding [redacted] visiting Lincoln-Sudbury
7  while she was at the EDCO program.
8      And so the first time you're brought
9  in, Lynn Carlson writes to you and Ms. Ramos,
10 "Leslie and I just talked about this.  I
11 wanted you to see C[redacted]'s e-mail and my
12 response in case she contacts one of you about
13 this given how much [redacted] was struggling just
14 last week.  I am concerned about moving too
15 quickly.  Lynn."
16     Do you recall discussing with Lynn
17 Carlson whether or not it was too soon for
18 [redacted] to visit the school?
19     A.  I do not recall the conversation
20 with Lynn.
21     Q.  Okay.  Do you recall any
22 conversations about that topic of [redacted]
23 coming to visit?
24     A.  I remember being -- I remember

Page 136

1  sitting with her for that one class during
2  that day, so there had to have been
3  conversations that allowed me to get to that
4  point.  Do I remember the details of those?
5  No.
6      Q.  So if you look further up at Aida's
7  response, she states that she was concerned
8  that the parents are making the assumption
9  that [redacted] will be back at LS when the team
10 has yet to determine her placement.
11     Do you recall any conversations with
12 Ms. Ramos about that issue?
13     A.  I do not.
14     Q.  Did you have any concerns at the
15 time about [redacted] coming to visit
16 Lincoln-Sudbury?
17     A.  I don't remember knowing the details
18 about what was happening with [redacted] at EDCO
19 to have concerns or not have concerns.
20     Q.  Okay.  So let's talk about that a
21 little bit.  After [redacted] started at the EDCO
22 program, did you get any updates about how she
23 was progressing?
24     A.  It was -- I was at at least one

Leslie Patterson
July 24, 2019

35 (Pages 137 to 140)

Page 137

1  meeting, so I would have heard that, like a
2  summary update, but I wasn't getting regular
3  updates about how things were going with the
4  exception of the transcript issue and her
5  grades.
6       Q. Okay. Did you have any
7  conversations with C▇▇▇ during that
8  time?
9       A. I do not believe she was talking to
10 me at that time.
11      Q. So as far as ▇▇▇ when she came to
12 visit while she was at an outplacement, is
13 that something that any other student had done
14 that you know of?
15      A. I have not been involved with any
16 other students going to classes while they
17 were still at an out-of-district placement.
18         (Deposition Exhibit No. 60, E-Mail
19         Chain, marked for identification)
20      Q. So Exhibit 60 is an e-mail chain
21 that you're part of. It appears to be on the
22 day that ▇▇▇ visited the school on
23 January 31st of 2014.
24         Thinking back to before that day,

Page 138

1  were you involved in any conversations about
2  planning for how to handle her visit to the
3  school?
4       A. Again, I must have been if I was
5  involved in observing one of her classes.
6       Q. Now, when you found out that she was
7  going to be visiting, did you take any steps
8  to determine whether either of the
9  perpetrators were going to be in school at
10 that time?
11      A. For -- I can speak to W▇ I don't
12 recall for W▇ what I -- what I did on that
13 day.
14      Q. So you don't recall --
15      A. I think -- I think he was in ACE by
16 this time.
17      Q. So if he was in ACE, he would have
18 been in the building; correct?
19      A. If he was in school, yes. He came
20 back from the suspension January 1st.
21      Q. So do you recall taking any steps to
22 determine where he would be on the day that
23 ▇▇▇ was visiting?
24      A. I do not remember.

Page 139

1       Q. Okay. If we go to -- it's very hard
2  to tell whose e-mail -- there's an e-mail that
3  appears to be from John Flynn, which is on the
4  second page, but a conversation he had had
5  with Mrs. ▇▇▇ where she asked that the
6  teachers not call on ▇▇▇ that day.
7          Do you recall that request from
8  Mrs. ▇▇▇?
9       A. I don't.
10      Q. Now, Mr. Flynn was the guidance
11 counselor; correct?
12      A. Yes.
13      Q. So would he have sent an e-mail like
14 this directly to her teachers, or would that
15 have been something that you would have had to
16 do?
17      A. No. John could send it just as well
18 as I could. Yeah.
19      Q. Okay. If you go to the first page,
20 there's an e-mail appears to be from you where
21 it says, "Hi. ▇▇▇ just asked her English
22 teacher if she could leave class. Once Dani
23 told me this, I also left the classroom, but
24 am not sure where ▇▇▇ was heading.

Page 140

1  Hopefully, she will end up with one of you in
2  the next couple of minutes. Please let me
3  know."
4          Do you recall being in ▇▇▇
5  English class?
6       A. I do.
7       Q. And do you recall her leaving that
8  class?
9       A. From this e-mail. And it's calling
10 a memory of her getting up and me writing
11 this.
12      Q. So do you recall -- so you were
13 sitting -- when you were sitting in that
14 class, did you sit next to her, or did you sit
15 in the back?
16      A. I most likely sat in the back, but I
17 do not remember actually where in the room I
18 was sitting.
19      Q. Do you have a recollection of her
20 getting up leaving?
21      A. Vaguely.
22      Q. Do you remember going to any other
23 classes with ▇▇▇ that day?
24      A. No.

Page 157

1  incidents on November 1, 2013 constituted
2  sexual harassment, sexual assault, physical
3  assault, and/or consensual sexual activity."
4      So "Male Student #1," I believe, was
5  W▮▮. Did W▮▮ personally make a report of
6  the incident?
7      A. He did not file it -- at the school?
8      Q. I mean --
9      A. No.
10     Q. -- did he personally speak with you
11  about what happened?
12     A. No. Not that I remember.
13     Q. And do you agree that the school did
14  not feel that it had enough evidence to
15  confirm whether the incidents on November 1,
16  2013 constituted sexual harassment, sexual
17  assault, physical assault, and/or consensual
18  sexual activity?
19         MR. BARNETT: Objection. You
20     can answer.
21     A. We landed after -- I don't know the
22  timing of this, but by the time of the
23  discipline hearing, we landed on categorizing
24  it as physical assault and sexual harassment.

Page 158

1      Q. But it goes on to state, "The
2  Sudbury Police Department, who were
3  immediately notified and delayed the
4  school-based information, also declined to
5  bring any charges against Male Student #1 or
6  Male Student #2 due to conflicting
7  information."
8      In your conversations with the
9  Sudbury Police Department, did they ever tell
10 you that the reason that they didn't bring any
11 charges was due to conflicting information?
12     A. I don't remember the details of why
13 they didn't bring charges.
14     Q. Go to page five. On the paragraph
15 -- third full paragraph that starts on
16 November 20th, it states, "On November 20,
17 2013, the Sudbury Police informed
18 Lincoln-Sudbury that staff could proceed with
19 school-based investigation of the incident.
20 On approximately November 22, 2013, ▮▮▮▮
21 family provided Lincoln-Sudbury with
22 screenshot images of text conversations
23 between ▮▮▮▮ and Male Student #1 on the
24 night of the alleged incident; between ▮▮▮▮

Page 159

1  and Male Student #1 after the alleged
2  incident, and between ▮▮▮▮ and Male Student
3  #2 after the alleged incident."
4      But the screenshots of at least some
5  of those conversations were provided on
6  November 7th --
7      A. Yes.
8      Q. -- is that your recollection?
9      A. Yes.
10     Q. But that's not mentioned here?
11     A. Unless I'm missing it.
12     Q. Go to the next page, six. The
13 second full paragraph, "Since approximately
14 November 13, 2013, Lincoln-Sudbury had been
15 attempting to schedule a reconvene of ▮▮▮▮
16 Team to discuss the impact of the alleged
17 sexual assault on ▮▮▮▮ functioning. On
18 November 22, 2013, ten school days after
19 ▮▮▮▮ initial report, Lincoln-Sudbury
20 managed to reconvene."
21     Do you recall any difficulties in
22 setting up a meeting of ▮▮▮▮ team after
23 this incident?
24     A. I don't recall.

Page 160

1      Q. Why don't we turn to -- I only
2  pulled out a few of the attachments. We're
3  going to go to the one that has a cover sheet
4  that says 3A. It's not the first attachment,
5  but the second one to this. See 3A has a
6  title, "Conversation/Report 11/7/2013." Is
7  that your handwriting?
8      A. Yes.
9      Q. It says, "Transcript provided by
10 Clinical Counselor Sue Leichtman."
11     So I'm guessing that means what it
12 says, that Sue provided you with this
13 transcript?
14     A. Yes.
15     Q. How did she provide it? Did she
16 e-mail it to you?
17     A. No. She had handwritten it, I
18 believe.
19     Q. Who typed it?
20     A. I, likely, typed it.
21     Q. I want to direct your attention --
22 so I don't want to belabor going through the
23 whole transcript of the incident, but when you
24 joined the meeting between ▮▮▮▮ and Sue, did