**6**

Aida Ramos
June 27, 2019

1

```
 1                                          Volume: I
                                            Pages: 1-130
 2                                          Exhibits: 1-38

 3                  UNITED STATES DISTRICT COURT

 4                   DISTRICT OF MASSACHUSETTS

 5                     CIVIL ACTION NO. 1:18-CV-10792

 6    * * * * * * * * * * * * * * * * *
      JANE ROE,                             :
 7                      PLAINTIFF           :
                                            :
 8     v.                                   :
                                            :
 9    LINCOLN-SUDBURY REGIONAL SCHOOL       :
      DISTRICT, BELLA WONG, AIDA RAMOS and  :
10    LESLIE PATTERSON,                     :
                      DEFENDANTS            :
11    * * * * * * * * * * * * * * * * *

12


13


14        DEPOSITION OF AIDA RAMOS, a witness called on

15    behalf of the Plaintiff, pursuant to the provisions of

16    the Federal Rules of Civil Procedure, before Lisa

17    McDonald, (CSR #130093), a Registered Professional

18    Reporter, Certified Realtime Reporter, and Notary

19    Public in and for the Commonwealth of Massachusetts,

20    at the Offices of Torres, Scammon, Hincks & Day, LLP,

21    35 India Street, Boston, Massachusetts  02110, on

22    Thursday, June 27, 2019, commencing at 10:08 a.m.

23


24
```

CURRAN COURT REPORTING

Aida Ramos
June 27, 2019

11

1      director of student services?

2   A.   2012-2013, yeah.  July of 2012, I think.

3   Q.   Is that the same job you have today?

4   A.   Yes.

5   Q.   What are your responsibilities as the director of

6        student services?

7   A.   I supervise special education, Section 504,

8        nurses, guidance counselors, clinical counselors,

9        interventions, student interventions, Title I,

10       Title IX.

11           I'm trying to think if I'm missing something

12       else.  I think that's about it.

13  Q.   Okay.  Most of that, I think I know what it is.

14       Can you just briefly, Section 504, what is that?

15  A.   So Section 504 is for students that they may have

16       disabilities but they don't need direct services

17       in special education.  So it's only

18       accommodations.

19  Q.   So just accommodations, okay.

20  A.   Yeah.  And you can have it in the workplace too.

21  Q.   When you say "student interventions," what did you

22       mean by that?

23  A.   So we have an intervention for struggling ninth

24       graders.  So the middle schools will let us

Aida Ramos
June 27, 2019

26

1   Q.   Okay.

2   A.   That's what I recall.

3   Q.   And I believe you said that Leslie Patterson was

4        also there when you first learned.  Did she have

5        any additional information that she passed on to

6        you?

7   A.   No.

8   Q.   Okay.  So what was your response when this was

9        reported to you?

10  A.   So Leslie needed to do the disciplinary component

11       and investigate.  It was stopped by the police, so

12       Leslie couldn't continue with the investigation.

13       Neither do I, by default.  And they did the

14       disciplinary action.  The associate principals do

15       the disciplinary action, and I only get involved

16       if the student is on a 504 or IEP, and they have

17       been suspended or they are afraid they will be

18       suspended more than 10 days.

19  Q.   Okay.  So at this first meeting where you first

20       learned about this incident, did you get involved?

21       Did any of those criteria apply to these

22       perpetrators?

23  A.   Yes, I did.

24  Q.   Okay.  And were the perpetrators on IEPs?

Aida Ramos
June 27, 2019

38

1        on IEPs, it will be strategic skills, and history

2        class, English class, or psychology class.

3    Q.  And who decides if a student is going to

4        participate in the Ace program?

5    A.  The program manager at that time.

6    Q.  Okay.  And do you recall discussing with the

7        program manager whether this particular student

8        should be in the Ace program?

9    A.  Not with the program manager.

10   Q.  Okay.  Did you discuss that with anyone?

11   A.  The parents.

12   Q.  Okay.  And do you recall why the school didn't

13       agree to place him in that program?

14   A.  Because we felt that he needed more supports than

15       the program -- that this program can give him.

16   Q.  Okay.  Do you recall this student asking to be

17       moved to a different house in the school?

18   A.  I don't remember that.

19   Q.  Okay.

20           MS. SCAMMON:  Mark this as the next one.

21           (March 24, 2014 letter marked 5 for

22            identification.)

23   Q.  You have Exhibit 5 in front of you.  Take a look

24       and let me know when you've had a chance to review

Aida Ramos
June 27, 2019

40

1          decision, and when they make the decision, then

2          they need to come back to me so I can put services

3          in place either way.  Does that make sense?

4     Q.   Yes.  It does.

5     A.   Okay.

6     Q.   And so --

7     A.   So it was part of the manifestation determination.

8          Then they do it usually back to back.  So

9          manifestation first, I leave, the same team stays,

10         and then they do the disciplinary action.

11    Q.   Okay.

12    A.   Or most of the team members stay.  Yeah.

13    Q.   And so for this particular situation, the

14         manifestation determination meeting, was everybody

15         in agreement on the conclusion?

16    A.   I don't recall.

17    Q.   And the next sentence of that second paragraph,

18         Ms. Burke writes, "We believe that there is

19         sufficient evidence that an interaction of an

20         egregious nature did occur on the evening of

21         November 1st, and that" -- blacked out -- "role in

22         the incident was one that substantially violated

23         one of the core values of LS."

24              Did you agree with that conclusion?

Aida Ramos
June 27, 2019

41

1   A.   Yes.

2   Q.   Further down in the letter, Ms. Burke informs the

3        family of -- that they can appeal to Ms. Wong.  Do

4        you recall if this decision was appealed?

5   A.   I believe so.

6   Q.   And were you involved in that appeal?

7   A.   No.

8   Q.   Do you remember what the outcome was?

9   A.   I don't.

10            MS. SCAMMON:   That's the end of the

11       Attorneys Eyes stuff.

12            MR. BARNETT:   Okay.

13  Q.   So while we've been going for a little bit, we've

14       been talking about IEPs?

15  A.   Yes.

16  Q.   Can you just describe for me generally the process

17       of putting an IEP in place for a student?

18  A.   So if a student is suspected of having a

19       disability -- and that can come from anyone; the

20       parents, the student, their teachers -- the

21       districts are responsible for doing child find,

22       what they call child finds, and it is to outreach

23       to those families that they feel that the student

24       may have a disability.  And we do testing.  Then

Aida Ramos
June 27, 2019

45

1          (Document marked Exhibit 7 for

2           identification.)

3   Q.  Have you had a chance to review Exhibit 7?

4   A.  Yes.

5   Q.  And what is Exhibit 7?

6   A.  So it is a recommendation to send ███ to an

7       extended evaluation.

8   Q.  Go to the second page under the box where it says,

9       "Narrative Description of School District

10      Proposal."  Who drafted that?

11  A.  Probably Lynn Carlson.  Although it says MJ,

12      because MJ Walsh was at that time the liaison for

13      the case.

14  Q.  What do you mean by "liaison"?

15  A.  The special education teacher.

16  Q.  Okay.  If you look at the first paragraph, what

17      action is the school district proposing to take?

18      The last sentence says, "At this time, the team is

19      recommending a 45-day interim placement for

20      ███

21  A.  Correct.

22  Q.  And that's crossed out, and "extended evaluation"

23      is put in its place?

24  A.  Yes.

Aida Ramos
June 27, 2019

46

1   Q.   Do you know whose handwriting that is?

2   A.   That's mine.  Those are my initials.

3   Q.   And why did you cross out --

4   A.   Because the law changed, and it's not called a day

5        interim placement anymore.  It's not a placement,

6        so we need to put the correct.

7   Q.   So the incorrect terminology was used in this?

8   A.   That's right.

9   Q.   Is an extended evaluation a 45-day placement?

10  A.   It's not a placement.  It's a 45-day program.  So

11       the placement remains, in this case, LS.

12  Q.   So the placement was LS?

13  A.   Yes.

14  Q.   But the recommendation was for an extended

15       evaluation?

16  A.   That's right.

17  Q.   And who was going to perform the extended

18       evaluation?

19  A.   So at that point, we asked the parents to give us

20       consent to send packets to different placements,

21       programs that they can do this out of district,

22       and then the parents and the student go and visit,

23       after the packet is reviewed, and they say we have

24       a space and we think that we can service the

Aida Ramos
June 27, 2019

47

1      student.  They do an intake with the parents and

2      with the student, and then the parent chooses

3      which one they like the best.

4  Q.  Look at number three on the narrative, "What

5      rejected options were considered and why was each

6      option rejected?"

7  A.  Um hmm.

8  Q.  Says, "The team discussed the possibility of home

9      tutoring."

10  A.  Correct.

11  Q.  And, "At this time, the team feels that staying at

12      home will not be in ███████ best interest."

13  A.  Correct.

14  Q.  Do you recall if anyone in the team was supportive

15      of the home tutoring option?

16  A.  I don't recall.

17  Q.  Do you recall if any other options were discussed

18      that aren't reflected on this document?

19  A.  I don't.

20  Q.  Did you agree that staying at home would not be in

21      ███████ best interest?

22  A.  I do.

23  Q.  And why did you conclude that?

24  A.  So after the alleged incident, ██████ was having a

CURRAN COURT REPORTING

Aida Ramos
June 27, 2019

48

```
 1        tough time coming into the building, and that
 2        could create a school phobia.  So if a school
 3        phobia becomes -- you place a kid in tutoring,
 4        that prompts that school phobia even more.
 5             So -- and she needed to be with other kids.
 6        It's very restrictive to be, you know,
 7        home-schooled tutor at home.
 8    Q.  So I think you said that once this happened, the
 9        next step was to give the parents a choice of a
10        few different programs?
11    A.  Correct.
12    Q.  And did that happen with ██████?
13    A.  Yes.
14    Q.  Did she ultimately end up in a program?
15    A.  Correct.  At EDCO.
16    Q.  EDCO?
17    A.  Yeah.
18    Q.  And were you familiar with EDCO at the time ██████
19        was placed there?
20    A.  Correct.  Yes.
21    Q.  Had you ever had another Lincoln-Sudbury student
22        go to EDCO?
23    A.  Yes.
24    Q.  How many?
```

Aida Ramos
June 27, 2019

49

```
 1   A.   No.  Not -- not Lincoln-Sudbury.  Other students
 2        from other places that I worked.
 3   Q.   Okay.  So you had experience from your prior
 4        employment with students going to EDCO?
 5   A.   Because this is my first year at Lincoln-Sudbury.
 6   Q.   Can you just generally describe what EDCO is?
 7   A.   So it's a program where students can go for their
 8        evaluation period.  It's kind of revolving door
 9        because they can come in at any time or leave at
10        any time.  They don't all come in at the same time
11        or leave at the same time.
12             The students are able to complete credits,
13        so they don't miss their credits for graduation,
14        especially the older kids, and they do a lot of
15        small class instruction to address students'
16        disabilities, especially those that they have
17        learning disabilities, which in this case ████
18        did, and they do a lot of counseling and group
19        therapy and support for the students.
20   Q.   And did you agree EDCO was an appropriate
21        placement for ████████ evaluation?
22   A.   It was one of them, yeah.  Her parents chose EDCO.
23   Q.   So while she was at EDCO, she would take classes,
24        is that right?
```

CURRAN COURT REPORTING

Aida Ramos
June 27, 2019

66

1  A.  I don't recall, to be honest.

2  Q.  Was it your final decision whether or not to

3      provide a tutor?

4  A.  Or to provide the tutor, yes.

5  Q.  And you had the authority to make that decision?

6  A.  Yes.

7          (Document marked Exhibit 16 for

8            identification.)

9  Q.  You have Exhibit 16 before you, which is an email

10     dated January 24 of 2014 from Lynn Carlson to the

11     ███████ and Alfonso Abadia, and you're copied on

12     that, about Spanish for ████████

13         And the second sentence, Lynn states, "As

14     you know, her tutor will be Zac Vennard."

15         Whose job was it to locate the Spanish tutor

16     for ██████?

17  A.  It's in my office, so my office is responsible to

18     do that.

19  Q.  And do you recall who, which individual in

20     particular was responsible for locating ████████

21     Spanish tutor?

22  A.  I don't.

23  Q.  Did you maintain a list of tutors for various

24     subjects in your office?

Aida Ramos
June 27, 2019

68

```
 1       and copying Leslie Patterson, where you state,

 2       "The response is okay.  However, I am concerned

 3       that the parents are making the assumption that

 4       ▆▆▆▆▆ will be back at LS when the team has yet to

 5       determine her placement.  Allowing for ▆▆▆▆▆ to

 6       start coming back without finishing the eval is

 7       not a smart idea.  I would not recommend it."

 8            So when you say, "without finishing the

 9       eval," are you referring to the extended

10       evaluation?

11  A.   Correct.

12  Q.   And aside from this email, did you discuss ▆▆▆▆▆

13       coming back to visit Lincoln-Sudbury with Lynn

14       Carlson?

15  A.   Yes.

16  Q.   And what were those discussions?

17  A.   She came to LS I think two different times and sat

18       in a couple of classes.  Anne was with her.

19  Q.   If you could just direct your attention to before

20       she came back, did you discuss with Lynn whether

21       it was something that should be allowed?

22  A.   I don't recall.

23  Q.   Did you have the authority to say no, she can't

24       come back here?
```

Aida Ramos
June 27, 2019

69

```
 1   A.   No.

 2   Q.   Okay.

 3   A.   Because they put still LS.

 4   Q.   So her placement was still LS at this point?

 5   A.   Correct.

 6   Q.   And why did you think it wasn't a smart idea for

 7        her to visit the school?

 8   A.   Because she was still very fragile even in a very,

 9        very structured, small setting, at EDCO, so

10        managing 16 kids versus 600 kids might be

11        challenging for her.

12   Q.   You also state that you're "concerned that the

13        parents are making the assumption that ████ will

14        be back at LS when the team has yet to determine

15        her placement."

16   A.   Correct.

17   Q.   Was the plan to determine a placement after the

18        evaluation?

19   A.   So first you determine reeligibility again for

20        services, then you determine services that she

21        might need, and then you determine if those

22        services can be provided at LS or not.  And if

23        not, then you determine the placement.

24   Q.   Did you communicate your concern about ████
```


Aida Ramos
June 27, 2019

74

 1   Q.   Do you have any recollection of this issue coming

 2        up in February of 2014?

 3   A.   I vaguely remember having conversations about

 4        grades and how they will look at the transcript,

 5        but I cannot tell you when or where on -- mostly

 6        with Lynn Carlson, were my conversations.

 7   Q.   Right.  Do you recall a conversation with Bella

 8        where you told her what she says you told her

 9        here?

10   A.   I don't remember that conversation.

11   Q.   All right.  And the subject line of Bella's email

12        is called " ███ Trail."  Do you know what that

13        means?

14   A.   No idea.

15   Q.   Okay.

16             (Document marked Exhibit 21 for

17              identification.)

18   Q.   Have you had a chance to review Exhibit 21?

19   A.   Yes.

20   Q.   Okay.  And is this the school's recommendation as

21        a result of the --

22   A.   Extended evaluation.

23   Q.   If you go to the Narrative Description of School

24        District Proposal, what was the school proposing

Aida Ramos
June 27, 2019

75

1     for ███ at this point?

2  A.  A therapeutic day program.

3  Q.  And would that have been in a placement as opposed

4     to an evaluation?

5  A.  Correct.

6  Q.  Number three, about what rejected options were

7     considered, why was each option rejected, "The

8     team discussed ███ previous eligibility based

9     on a learning disability and determined that she

10    no longer qualifies for special education services

11    under this category.  The current proposed IEP

12    addresses her special education needs based on an

13    emotional disability."

14       Do you know why ███ was no longer

15    eligible for learning disability services?

16  A.  The tests didn't show that she had a learning

17    disability.

18  Q.  Is this part of the testing that was done as part

19    of the extended evaluation?

20  A.  Correct.

21  Q.  Do you remember if her parents agreed with that

22    conclusion?

23  A.  I don't recall.

24  Q.  Okay.  The second bullet, "The team considered how

Aida Ramos
June 27, 2019

76

1      to meet ██████ needs in the least restrictive

2      environment.  Given her need for small group

3      classes and access to clinical supports throughout

4      the day, the team determined that LSRHS did not

5      have an appropriate program and that she required

6      a therapeutic day school setting."

7          Was that the recommendation of the EDCO

8      evaluation?

9  A.  Of the team that was reviewing those evaluations,

10     yes.

11  Q.  And did anyone at the meeting disagree with that

12     conclusion?

13  A.  No.

14  Q.  Did ██████ parents agree with that conclusion?

15  A.  Yes.

16  Q.  And this placement -- this meeting occurred in

17     February of 2014?

18  A.  Correct.

19  Q.  So the placement at EDCO, was it for the rest the

20     school year?

21  A.  No, the placement at EDCO school, not the extended

22     evaluation, is for a whole year, the length of the

23     IEP.  So it was not to finish the school year only

24     there.

Aida Ramos
June 27, 2019

79

1      driver made some comments to her, so we contacted

2      the transportation company, whatever it was at

3      that point, and they interviewed the bus driver,

4      and the information -- there were two stories to

5      the alleged incident.

6  Q.  And do you remember what the two stories were?

7  A.  I remember that ████████ alleged that the bus driver

8      said something to her, that she felt it wasn't

9      appropriate.  I don't remember the language.  And

10     I remember the bus driver reporting that ████████

11     was kissing another student on the bus and that

12     the bus driver asked them to stop.

13 Q.  Did anything -- did you take any action as a

14     result of that report?

15 A.  I don't remember.  Other than investigating?  We

16     investigate it, yeah.

17 Q.  Do you know if the transportation company took any

18     action in response to that?

19 A.  I have no idea.

20          (Document marked Exhibit 22 for

21           identification.)

22 Q.  You have Exhibit 22, which is an email from you to

23     C████ ██████ Lynn Carlson, and Leslie Patterson.

24     Subject:  ████████ placement at EDCO.  It's dated

Aida Ramos
June 27, 2019

83

1       ████      for next year.  Aida will look into this."

2              Do you remember a discussion at this meeting

3       about  ██████  attending another public school?

4   A.   Yes.

5   Q.   What was the discussion?

6   A.   That we could -- the parents wanted us to see if

7        another public school could support  ██████  in

8        their setting.

9   Q.   So is it fair to say that they were looking for an

10       alternative to EDCO that was a public school?

11  A.   Yes.

12  Q.   And did you look into that option?

13  A.   Yes.

14  Q.   What did you do to look into that?

15  A.   I called to see if they had a similar program that

16       we were recommending in their school district.

17  Q.   Which public schools did you call, if you

18       remember?

19  A.   Wayland might have been one.  Weston, they don't

20       have it.  Maybe Framingham.

21  Q.   How did you decide which schools to call out of

22       all the schools in Massachusetts?

23  A.   Schools in the area, that they were closer to LS.

24  Q.   Was that something that Mr. And Mrs. ████ said

CURRAN COURT REPORTING

Aida Ramos
June 27, 2019

84

 1       was important, that it be geographically close?

 2   A.  It was important for ██████ because she liked to

 3       play at the LS, at LS.

 4   Q.  Oh, so she liked to play sports at LS, so it would

 5       have to be someplace close?

 6   A.  Otherwise, she would not make it to the practices

 7       on time.

 8   Q.  Do you know about how many other schools you

 9       called?

10   A.  I don't know.

11   Q.  Was it more than 10?

12   A.  No.

13   Q.  What was the outcome of your looking into other

14       schools?

15   A.  There were no other schools that they had a

16       therapeutic day program, which was the

17       recommendation in the IEP.

18   Q.  And did you communicate that conclusion to anyone?

19   A.  I don't recall.

20   Q.  Do you remember discussing it with Mr. And Mrs.

21       ██████?

22   A.  I don't recall.

23              (Document marked Exhibit 24 for

24                 identification.)

CURRAN COURT REPORTING

Aida Ramos
June 27, 2019

98

1      with ████ at the end of the 2013-2014 school

2      year?

3   A.  My understanding is the parents pulled her from LS

4      to go to -- oh, God -- the private school.

5   Q.  Lawrence Academy?

6   A.  Lawrence Academy.

7   Q.  I'll help.

8          MR. BARNETT:  I'll let her help.

9   A.  I couldn't remember.

10  Q.  That's fine.  And when did you find out that that

11     had happened?

12  A.  I'm not sure.

13  Q.  Was it before school ended in 2014 or after?

14  A.  I'm not sure.  Probably very close to the letter

15     that I sent saying that we will not fund Lawrence

16     Academy because legally speaking, I have five days

17     after I learn that, to send that letter.

18  Q.  Right.  And so was there, like, a specific request

19     made to you for the school to fund Lawrence

20     Academy?

21  A.  I don't remember.

22  Q.  But you have five days to respond?

23  A.  Yeah.

24  Q.  Did you discuss whether or not to fund Lawrence

Aida Ramos
June 27, 2019

99

1     Academy with anyone?

2  A.  No.

3  Q.  Was it your decision?

4  A.  It's not an appropriate placement.  She was -- the

5     IEP called for a therapeutic day program.  So

6     Lawrence Academy is not a therapeutic day program.

7     So there is nothing to discuss.  That was not the

8     recommendation.

9  Q.  And you had the authority to make that decision?

10  A.  I did.  I didn't make the decision.  The team made

11     the decision that she needed a therapeutic day

12     program.

13  Q.  But you had the authority to determine that

14     Lawrence Academy didn't fit that criteria?

15  A.  Correct.  I do in all the cases.

16  Q.  You --

17  A.  I send the letter.  I'm the one who sends the

18     letter.  I sent three last week.

19         MS. SCAMMON:  This is probably a good place

20     to take a break.

21            (Lunch recess taken.)

22         MS. SCAMMON:  We'll go back on the record.

23  Q.  At some point, did the Office of Civil Rights, the

24     Department of Education, conduct an investigation

Aida Ramos
June 27, 2019

100

1       involving this situation with ████████?

2   A.  After the parents filed the Complaint, yeah.

3   Q.  And when did you become aware that a Complaint had

4       been filed?

5   A.  When we got a copy of the Complaint.

6   Q.  Do you recall around when that was?

7   A.  No.

8   Q.  Was it after ████████ had left the school?

9   A.  I believe so.

10  Q.  And once you learned that the Complaint had been

11      filed, what was your involvement?

12  A.  I was the contact person for our attorneys.

13  Q.  And did you immediately pass the Complaint along

14      to attorneys to handle?

15  A.  We did.  I don't have the manpower to do it.

16  Q.  So you said you were the contact for the

17      attorneys?

18  A.  Yes.

19  Q.  And without telling me anything you discussed with

20      them, what did that entail?  What did you have to

21      do to assist the attorneys?

22  A.  Give them a lot of records, emails.

23  Q.  Did you ever have any contact directly with anyone

24      from the Office of Civil Rights?

Aida Ramos
June 27, 2019

103

1     attorney gave me the language and I wrote it.

2  Q.  But you reviewed it before it went out?

3  A.  I did, yeah.

4  Q.  And you signed it?

5  A.  Yes, I did.

6  Q.  And do you know if Peter reviewed it?

7  A.  Yes, he did.

8  Q.  And the second paragraph, you state, "After

9     conducting thorough interviews and review of

10    reports, Lincoln-Sudbury's investigation has been

11    determined inconclusive.  The District was not

12    able to reliably determine whether or not the

13    alleged incident reported by ███ actually

14    occurred as described."

15       Did you believe that to be accurate on

16    October 1, 2015?

17  A.  Yes.

18  Q.  Why?

19  A.  There were very confusing different stories of the

20    events that ███ shared with us.

21  Q.  I believe you agreed with me earlier that you

22    agreed with the conclusion of Miss Burke, that

23    something of an egregious nature had occurred.

24  A.  Something happened, yes.  But what exactly

Aida Ramos
June 27, 2019

104

```
 1       happened, we couldn't pinpoint what exactly
 2       happened.
 3  Q.   When you say "we," who are you referring to?
 4  A.   Me and the other people involved in the
 5       investigation, the attorney and Peter.
 6  Q.   Anybody else --
 7  A.   No.
 8  Q.   -- involved?  Just you, Peter and the attorney?
 9  A.   Um hmm.  Yes.
10  Q.   Would you agree with me that that's inconsistent
11       with Miss Burke's conclusion?
12           MR. BARNETT:  Objection.  You can answer.
13  A.   I disagree.
14  Q.   So Miss Burke concluded that something of an
15       egregious nature had occurred?
16  A.   Yes.
17  Q.   And disciplined two individuals as a result?
18  A.   Correct.
19           What exactly happened, we don't know.
20  Q.   Okay.  And was it your understanding, at the time
21       that you sent this letter, that in order to make
22       that -- to conclude that something happened, you
23       had to know exactly what happened?
24  A.   This letter was asked -- OCR asked us to send this
```

Aida Ramos
June 27, 2019

105

1          letter.

2     Q.   Does this type of letter have a name?  Does it

3          have a -- is it some sort of a required notice, or

4          does it have any legal significance?

5     A.   The what?

6     Q.   So you say OCR asked you to send this?

7     A.   That's right.  So OCR completed their

8          investigation.  OCR said that we did everything

9          that we needed to do to keep her safe, but the

10         part that we were missing was sending this letter,

11         and they ask us to send this letter.

12    Q.   So as of October 1, 2015, the OCR completed their

13         investigation?

14    A.   It took awhile, yes, for them to get back to us.

15    Q.   Okay.

16    A.   The change of person overseeing the case did not

17         help.

18    Q.   So it's your recollection that this letter, you

19         were told to send this by OCR?

20    A.   Through the attorney.

21    Q.   When did they tell you to send it?

22    A.   Don't remember.  Probably close to the date of the

23         letter.

24    Q.   Okay.  So the third paragraph, you say,

Aida Ramos
June 27, 2019

106

1     "Regardless, as you know, ███████ after concerns

2     with regard to her emotional state, was

3     recommended to attend an out-of-district

4     placement, EDCO Collaborative.  In addition, due

5     to unrelated factors, all LS students allegedly

6     involved in the 2013 incident are not currently

7     attending the same schools."

8  A.  Correct.

9  Q.  What did you mean by that?

10  A.  That all three kids were not in the same school.

11  Q.  And so this is as of October 1, 2015?

12  A.  Correct.

13  Q.  And where were the three kids at that time?

14     THE WITNESS:  Should I answer that?

15     MR. BARNETT:  Yes, you can answer that, and

16     if we identify them by names, we'll mark the

17     portion of the transcript, or you can just state

18     generally where the two boys were.

19  A.  One was at LS, ███████ was at EDCO, and the other

20     one was -- oh, gosh, out of district, but I don't

21     even remember the school.  He was at a different

22     school.

23  Q.  Okay.  So one was still -- one of the males was

24     still at LS?

Aida Ramos
June 27, 2019

107

1    A.   Yes.

2    Q.   The other one --

3    A.   Out of district.

4    Q.   Out of district.

5    A.   And ███████ out of district, but different

6         schools.

7    Q.   Right.  And ██████ by October 1st, was at

8         Lawrence Academy?

9    A.   Oh, well, but we recommended out of district for

10        her.

11   Q.   Right.  And then the other male, as of October --

12        do you know when he moved to an out of district?

13   A.   The incident happened in 2012, right?

14   Q.   2013.

15   A.   2013.  So probably by the end of that school year,

16        he was already out of district placed.

17   Q.   And he was placed by LS out of district?

18   A.   Yes.

19   Q.   And he never returned to LS?

20   A.   No.

21   Q.   Okay.

22             (Document marked Exhibit 35 for

23              identification.)

24   Q.   So Exhibit 35 is a letter from you and

Aida Ramos
June 27, 2019

108

1     Mr. Elenbaas dated August 24 of 2017 to

2     Mrs. ████.  Says, "former" next to Mr. Elenbaas.

3     Do you remember why it said that?

4  A.  Because he is an associate principal now.

5  Q.  Okay.  So why then did he sign this letter at all?

6  A.  Because he signed this letter (pointing).

7  Q.  Okay.

8  A.  He was the one involved in the case.

9  Q.  Okay.  So this letter is almost two years after

10     the letter that we marked as Exhibit 34?

11  A.  Correct.

12  Q.  And did you draft this particular letter, the

13     August 24, 2017?

14  A.  Under the advice of my attorney, yeah.

15  Q.  So you actually wrote it?

16  A.  Yes.

17  Q.  Okay.  You state that, in the first paragraph, "We

18     are writing to clarify the results of the

19     Lincoln-Sudbury's November 13 Title IX

20     investigation.  The District sent you a letter

21     about the investigation on October 1, 2015, which

22     incorrectly reported our findings."

23  A.  Correct.

24  Q.  What was incorrect about the October 1st, 2015

Aida Ramos
June 27, 2019

109

1     letter?

2  A.  Their finding.

3  Q.  And what finding is incorrect?

4  A.  That the allegation reported by ███ actually

5     occur as described inconclusive, they remain

6     inconclusive.

7  Q.  So it was incorrect to say that the investigation

8     was inconclusive?

9  A.  The Office of Civil Rights ask to us write this

10    letter, and then when the case kept moving forward

11    from one person to the other, the second person

12    ask us to resend the letter and send this letter.

13    So these two letters came as an advisement from

14    OCR for us to send this letter to the ███.

15  Q.  And is it your understanding that OCR directed

16    what the content of each letter should be?

17  A.  Correct.

18  Q.  So OCR advised you, in October of 2015, to send a

19    letter saying it was inconclusive?

20  A.  Advised by our attorney.

21  Q.  So OCR advised you, in October of 2015, to send a

22    letter to the ███ stating that the

23    investigation had been inconclusive?

24  A.  Correct.  To our attorney.  Not to me directly.

Aida Ramos
June 27, 2019

110

1  Q.  Right.  Did you ever have any discussion with

2      anybody at OCR directly about sending these

3      letters?

4  A.  No.

5  Q.  So anything you did was in response to your

6      attorney?

7  A.  Correct.

8  Q.  Between October of 2015 and August of 2017, did

9      you have any other communications from OCR about

10     what they wanted you to send to the █████?

11 A.  Me directly, no.

12 Q.  Or are you aware of any communications that OCR

13     had with your attorney?

14 A.  The attorney will call OCR and ask for closure,

15     like:  Close it; whatever we need to do, we'll do,

16     just close it.  But they kept saying it's still

17     sitting somewhere.

18 Q.  Okay.  And in the second paragraph of the August

19     24th, 2017 letter, you state, "It was reported to

20     an LS clinical counselor that one male student

21     restrained █████ while another boy assaulted her

22     at an LS home football game on the evening of

23     November 1, 2013.  After investigating this

24     allegation, both boys' offenses were categorized

CURRAN COURT REPORTING

Aida Ramos
June 27, 2019

111

1       as physical assault and inappropriate sexual

2       behavior.  LS found that there was sufficient

3       evidence that an interaction of an egregious

4       nature did occur on the evening of November 1st,

5       and that the boys' conduct substantially violated

6       one of the core values of LS."

7            Did you believe that to be accurate when you

8       sent this letter in August of 2017?

9   A.  I did what OCR ask us to do.

10  Q.  Did OCR provide you this language?

11  A.  I never talk to OCR.  So I talk to our attorney.

12      You will have to ask that to our attorney.

13  Q.  What was your understanding at the time?  Did you

14      understand that OCR provided the language?

15           MR. BARNETT:  To the extent your attorney

16      advised you, I instruct you not to answer, but you

17      can answer if you know.

18  A.  Sorry, can you repeat the question?

19  Q.  Sure.

20           Did you have any understanding as to who

21      provided the language to include in this letter?

22  A.  My understanding is that OCR explicitly said, for

23      us to be able to close the case, LS has to send

24      this letter.

Aida Ramos
June 27, 2019

121

1       program?

2              MR. BARNETT:  I guessed right.

3   A.  The BEACON program is a transition program for

4       students after long hospitalizations or absences.

5       Could be due to concussions, or due to social,

6       emotional, or due to -- we had a kid that was in

7       cancer treatment, so he was in the BEACON program.

8   Q.  Okay.  And were you involved in setting up the

9       BEACON program?

10  A.  Yes.

11  Q.  And who else was involved in that?

12  A.  Sue Leichtman.

13  Q.  Okay.  And when did you and Miss Leichtman start

14      discussing setting up what ultimately became the

15      BEACON program?

16  A.  So it was grant funded, so this program started

17      grant funded.  So she had brought that to my

18      attention fairly soon after I -- I did, how do you

19      call it, entry interviews with staff when I got

20      the job.  So I asked them, What do you think we

21      are missing, what do you think is working well,

22      what do you miss?

23              So a program like BEACON kept coming up, and

24      Sue Leichtman talked about that.  When the grant

CURRAN COURT REPORTING

Aida Ramos
June 27, 2019

122

1       was up for grabs, she told me, and I said, Well,

2       let's apply for the grant.  So it was grant funded

3       by the grant for three years.

4   Q.  Do you know about when you applied for the grant?

5   A.  I think it had to be like December/January.

6   Q.  Right after you started?

7   A.  Right after I started.

8   Q.  So was the BEACON program a name that you gave it,

9       or was that what the grant called it?

10  A.  No, we gave it.  We -- I think that we put a

11      survey out:  Give me names for the program.  And

12      then people check in.

13          So the winner was the most --

14  Q.  I just didn't know if the grant called it

15      something that you had to call it that.

16  A.  No.  No.

17  Q.  So you applied for the grant, and then, do you

18      remember about when you were notified that you

19      received the grant?

20  A.  Had to be prior to the end of the school year

21      because I hire the clinical counselor at the end

22      of the school year.

23  Q.  So prior to the end of the school year in the

24      spring of 2014 is when you would have received the

Aida Ramos
June 27, 2019

123

1        grant and hired the clinical counselor?

2    A.   Did I start in 2013, working there?

3    Q.   Yes, you did.

4    A.   Yes, so 2014.

5    Q.   Okay.  And when were you planning to roll out the

6         program?

7    A.   The following school year.

8    Q.   So that would have been the school year --

9    A.   14-15.

10   Q.   14-15.

11            When you were in the -- in the spring of

12        2014, when there were issues around, surrounding

13        ▓▓▓▓▓▓▓ placement, did you ever mention the

14        BEACON program as a possibility for her for the

15        following fall?

16   A.   No.

17   Q.   Why not?

18   A.   Because it's not a program.  It's not a placement.

19        Students are there only for eight to four weeks,

20        four to eight weeks.  It's not a special education

21        program at all.

22   Q.   Okay.  Describe for me a little bit about what the

23        program is.

24   A.   They have a full-time clinical counselor and a

CURRAN COURT REPORTING