# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **JANE ROE,**  ) | |
| ) | |
| **Plaintiff,**  ) | |
| ) | **Civil Action No.** |
| **v.**  ) | **18-10792-FDS** |
| ) | |
| **LINCOLN-SUDBURY REGIONAL**  ) | |
| **SCHOOL DISTRICT, BELLA WONG,**  ) | |
| **AIDA RAMOS, and LESLIE**  ) | |
| **PATTERSON,**  ) | |
| ) | |
| **Defendants.**  ) | |

## MEMORANDUM AND ORDER ON DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

**SAYLOR, C.J.**

This is an action involving a high school's response to a reported case of sexual assault of a student. Plaintiff Jane Roe filed suit against the Lincoln-Sudbury Regional School District and several officials alleging that they engaged in gender discrimination, and committed various other violations of law, based on the way they responded to her report.

The incident in question occurred on November 1, 2013, during a high-school football game. At the time, Jane was 15 years old and a sophomore. The two boys involved were then freshmen, approximately 14 or 15 years old. Jane and the boys dispute what occurred, although it is not disputed that there was sexual contact. The boys contend that the contact was consensual, and that Jane initiated it; indeed, one of them has filed a separate lawsuit in this Court alleging that the manner in which the school handled his subsequent discipline violated his rights. In any event, for purposes of this summary judgment motion in this lawsuit, the Court

assumes, as it must, that the contact was not consensual, and therefore an assault.

Jane reported the incident to a school counselor on November 7, who then notified Jane's mother (who was a teacher at the school) and the Sudbury police. The police asked that the school refrain from conducting any investigation until it had completed a criminal investigation. On November 12, the Juvenile Court issued Harassment Prevention Orders directing the boys not to have contact with Jane. On November 20, the police notified the school that its criminal investigation had been closed and the school could begin conducting its own investigation.

In the meantime, Jane and the two boys remained enrolled in the school, although they did not have any classes with one another. The school made efforts to ensure that they were kept separate in the hallways and at lunch. Although those efforts were not entirely successful, Jane and the boys had little contact with each other during that period. One boy was then suspended on November 22, and the other on November 26. The school held disciplinary hearings as to both; one did not return to school until January 2, and the other (who had a learning disability) did not return until March 10. Neither boy, however, was permanently expelled.

The school's handling of Jane's educational and emotional needs after the incident was considerably complicated by the fact that she also had a learning disability and was on an Individualized Education Plan ("IEP"). Jane's academic performance declined after she reported the incident, and she indicated that she did not feel safe in the building even if the boys were not present. Her special-education team met on multiple occasions in the wake of the reporting of the incident to discuss various alternatives. Eventually, Jane and her parents agreed to an "extended evaluation" at an out-of-district school program at EDCO North Crossing, which she began on December 3. After substantial subsequent interaction between the special-education team and the family over the course of many months, her parents decided to enroll her in

Lawrence Academy, a private school, which she began attending in the fall of 2014.

Jane has filed suit against the school district and three of its officials, alleging claims of discrimination on the basis of gender in violation of Title IX of the Educational Amendments of 1972 (20 U.S.C. § 1681); civil rights violations (42 U.S.C. § 1983); failure to train and supervise; and both negligent and intentional infliction of emotional distress.  Defendants have moved for summary judgment as to all counts.

It is not generally the role of the federal courts to second-guess the judgment calls of high-school administrators when it comes to student discipline, nor is it appropriate to assess their actions according to a platonic ideal.  Rather, the question is whether the conduct of those administrators falls below a statutory or constitutional floor, such that they may be found to have engaged in unlawful gender discrimination or otherwise violated a statutory or constitutional right.

Here, the principal question is whether the administrators ignored, or acted with deliberate indifference, to Jane's report of sexual assault and the issues that arose in the aftermath of her report.  Those administrators faced a series of difficult decisions, made more difficult by the fact that the students were immature adolescents, at least two of whom had special education needs.  However imperfect those administrators' decisions may have been, they cannot be said to have been the product of deliberate indifference.  Accordingly, and for the following reasons, the motion for summary judgment will be granted.

# Table of Contents

I.   Background ............................................................................................................. 6

   A.  Factual Background ........................................................................................... 6

      1.  The Parties ................................................................................................. 6

      2.  Jane's IEP and Disciplinary History Prior to the Incident ....................... 7

      3.  The November 1 Incident ........................................................................... 8

      4.  Jane's Report of the Incident ..................................................................... 9

      5.  Lincoln-Sudbury's Immediate Response ................................................. 10

      6.  Jane's Return to School and First Week Back .......................................... 11

      7.  The Second and Third Weeks after the Report ....................................... 14

      8.  Jane's Interactions with the Boys ............................................................ 15

      9.  The Decision to Send Jane for an Extended Evaluation at EDCO North Crossing ....... 17

      10.  Lincoln-Sudbury's Discipline of the Boys ............................................. 19

      11.  Jane's Evaluation at EDCO North Crossing ........................................... 23

      12.  Jane's Visits to Lincoln-Sudbury ........................................................... 28

      13.  Jane's February 2014 IEP and the Remainder of the 2013-2014 School Year .............. 29

      14.  Jane's Enrollment in Lawrence Academy ............................................... 34

      15.  The Department of Education's Office for Civil Rights Investigation ..... 36

      16.  Lincoln-Sudbury's Internal Procedures and Programs ............................ 39

   B.  Procedural Background .................................................................................... 42

II.  Legal Standard ..................................................................................................... 42

III.   Analysis .............................................................................................................. 43

   A.  Discrimination on the Basis of Gender, 20 U.S.C. § 1681 (Count 1) ............... 43

      1.  "Severe and Pervasive" Harassment ...................................................... 44

      2.  "Deliberate Indifference" ........................................................................ 45

   B.  Civil Rights Violation Under 42 U.S.C. § 1983 (Count 2) ............................... 62

      1.  Administrative Exhaustion ....................................................................... 62

      2.  The Substantive Due-Process Right to Personal Security and Bodily Integrity ........... 66

      3.  The Right to Equal Protection ................................................................. 71

   C.  Failure to Train and Supervise the Sexual Assault Response, 42 U.S.C. § 1983 (Count 3) ..... 77

   D.  Negligent Infliction of Emotional Distress (Count 4) ...................................... 79

      1.  The MTCA Presentment Requirement .................................................... 80

E.   Intentional Infliction of Emotional Distress (Count 5) ..................................................... 84

IV.   Conclusion ..................................................................................................................... 86

# I.   Background

## A.   Factual Background

The following facts are as set forth in the record and are undisputed except as noted.

### 1.   The Parties

In the fall of 2013, "Jane Roe" was a student at Lincoln-Sudbury Regional High School ("Lincoln-Sudbury").  (Def. Ex. 3 ("C. Roe Dep.") at 21).  She was then 15 years old.  (Compl. ¶1).[1]

Jane attended Lincoln-Sudbury for her freshman year (the 2012-2013 school year) and a portion of her sophomore year (the 2013-2014 school year).  (C. Roe Dep. at 31; Def. Ex. 30 at 2).  She began receiving special-education services under an Individualized Education Plan ("IEP") during middle school.  (C. Roe Dep. at 23).

Jane's mother is a chemistry teacher who worked at the high school during the relevant times.  (*Id.* at 19).

Lincoln-Sudbury Regional School District ("the District") is a regional school district created under Mass. Gen. Laws ch. 71, § 15 that operates Lincoln-Sudbury.  (Compl. ¶ 2).

Bella Wong is the superintendent of the District and the principal of the high school. (Def. Ex. 43 at 1).

Aida Ramos is the Director of Student Services at the high school.  (Def. Ex. 6 ("Ramos Dep.") at 11).  She supervises "special education, Section 504, nurses, guidance counselors, clinical counselors, . . . student interventions, Title I, and Title IX."  (*Id.*).[2]  She is involved in

---

[1] Jane turned 18 on August 26, 2016, and is currently 22 years old.  (Compl. ¶ 1).

[2] "Section 504" refers to Section 504 of the Rehabilitation Act of 1973, which requires that disabled children have equal access to the educational opportunities that non-disabled children enjoy.  29 U.S.C. § 794(a); *see also* 34 C.F.R. 104.4.  "Title I" refers to Title I of the Elementary and Secondary Education Act of 1965 ("ESEA"), which provides funding to schools and school districts based, in part, on the percentages of low-income children enrolled.  *See* 20 U.S.C. §§ 6301-6576.  "Title IX" refers to Title IX of the Education Amendments of 1972, which,

student disciplinary procedures only if the student is a special-education student and has been suspended (or potentially could be suspended) for more than ten days.  (Pl. Ex. 55 ("Ramos Dep.") at 26).  Both Wong and Ramos were new to the high school in the fall of 2013.  (*Id.* at 18; Pl. Ex. 60 ("Wong Dep.") at 85).

Leslie Patterson is the housemaster of the high school's East House.  (Def. Ex. 5 ("Patterson Dep.) at 12-13).[3]  In that role, Patterson is the primary administrative point of contact for 300 to 400 students.  (*Id.* at 13).  She also oversees student discipline, which typically involves investigating incidents, interviewing students, communicating with parents, and, in conjunction with the other housemasters, deciding on disciplinary outcomes.  (*Id.* at 13, 42; Pl. Ex. 59 at 3 n.1).

Patterson also supervises and evaluates approximately 30 faculty members working in East House.  (Patterson Dep. at 13).  Before Jane entered the high school and was assigned to East House, Patterson supervised Jane's mother.  (*Id.* at 16-17).  However, by school policy, upon Jane's matriculation into East House, her mother transferred to another House.  (*Id.* at 17).

### 2.    Jane's IEP and Disciplinary History Prior to the Incident

Jane first became eligible for an IEP in seventh grade after her mother requested that she be evaluated.  (C. Roe Dep. at 23).[4]  At that point, Jane reported being bullied and her mother was worried it was affecting her academics.  (*Id.*).  Jane continued to have an IEP throughout her time at Lincoln-Sudbury, and until February 2014 she qualified for special-education services

---

in relevant part, prohibits a student from being subject to discrimination under any education program receiving federal funds.  *See* 20 U.S.C. § 1681(a).

[3] Lincoln-Sudbury now refers to the role of "housemaster" as "associate principal."  (Patterson Dep. at 12).

[4] An IEP is a written statement detailing an individualized education plan for disabled children, which, at minimum, "must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide."  *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005).

based on a learning disability.  (Def. Ex. 30 at 2).

At one point prior to the incident, Jane's IEP included a proposal for individual in-house counseling.  (Def. Ex. 4).  However, her parents rejected the inclusion of individual counseling prior to the beginning of her sophomore year.  (*Id.*; C. Roe Dep. at 32-33; Def. Ex. 2 ("Jane Dep.") at 31-32).

During Jane's freshman year at Lincoln-Sudbury, she was suspended for two days after sending disparaging text messages about certain students at the school.  (Patterson Dep. at 14-15).  Patterson was involved in her discipline for that incident.  (*Id.*).  Ramos testified that she was aware of the incident, and that she had heard there were concerns about Jane having "boundary issues" with boys.  (Ramos Dep. at 23-24).

### 3.     The November 1 Incident

The complaint alleges that on November 1, 2013, Jane was sexually assaulted by two male Lincoln-Sudbury freshmen ("Perpetrator One" and "Perpetrator Two") while attending a football game at the school.  (Jane Dep. at 54).  She alleges that she was lured to an adjacent turf field, where the two boys digitally penetrated her and forced her to perform unwanted acts on them.  (*Id.* at 54-55; Def. Ex. 53 at 1-3).  She testified that no one else was present during the incident.  (Jane Dep. at 54).

The two boys dispute what transpired during the incident, including whether Jane was a willing participant and initiated the sexual contact.[5]  For summary judgment purposes, however,

---

[5] One of the boys, identified in this matter as Perpetrator One, has filed a separate lawsuit against the District and other parties, alleging that the manner in which his disciplinary case was handled violated his right to due process and Title IX.  *Doe v. Lincoln-Sudbury Reg'l Sch. Comm., et al.*, Civil Action No. 20-11564-FDS (D. Mass.).  The complaint in that action alleges that the boy was 14; that he and Jane had formerly been in a boyfriend-girlfriend relationship; that Jane had asked him to join her at a location away from the football game; that Jane had brought the other boy with her; that the sexual contact had begun as a game of Truth or Dare; that Jane consented to the contact and had indeed initiated it; that she was "giggling and 'Facetiming' on her phone with her girlfriend" while the contact was occurring; that Jane's girlfriend witnessed the episode over Facetime; and that the girlfriend later sent a message to the boy stating that Jane had "started the sexual s**t" and had "seduced" the boys.  (Doe

and because the focus of the claims in this proceeding is on the school's response, not the incident itself, the Court will assume that Jane's version of events is accurate.  It will therefore refer to the two boys as perpetrators.

Again, Jane was 15 and a sophomore at the time of the incident.  Both boys were freshmen; it appears that both boys were 14 or 15 years old at the time.  (*See* Pl. Resp. to Def. SMF ¶ 15).

In the days that followed, Jane exchanged text messages with the boys, at least one of whom apologetically acknowledged the sexual contact and begged her not to report it.  (Pl. Ex. 65 at Ex. 1; Jane Dep. at 59).  Jane did not initially report the incident to her parents.  (Def. Ex. 7 at No. 5).  Jane's mother testified that Jane seemed "angry, depressed, [and] didn't want to go to school" in the days immediately following the incident.  (C. Roe. Dep. at 43).

### 4.     Jane's Report of the Incident

On November 7, 2013, Jane reported the incident to Sue Leichtman, a clinical counselor at the high school.  (Def. Ex. 53).  Leichtman notified Jane's mother and Patterson of the report and called the Sudbury Police Department.  (*Id.* at 3; Def. Ex. 7 at No. 5).

Later that day, Leichtman, Patterson, and Jane's mother had a meeting, during which Patterson also contacted the police and recommended that Jane receive medical attention. (Patterson Dep. at 20).  Jane shared with Patterson a series of text messages between her and at least one of the boys.  (*Id.* at 63).  Patterson then notified Wong.  (*Id.* at 22).  At some point after the meeting, Leichtman and Patterson also informed Ramos of the allegations.  (Ramos Dep. at 24).

---

Complaint, ¶¶ 21-31, 37).  It also alleges that there were "numerous and substantial discrepancies" between descriptions of the incident given by Jane at different times.  (*Id.* ¶ 36).  For present purposes, however, the Court must assume the truth of Jane's statements.

Later that evening, Jane went to the emergency room, where she spoke with a social worker.  (Def. Ex. 8).  The following day, she met with an attorney and a detective, and later reported the alleged assault to the Middlesex County District Attorney's Office.  (*Id.*; Def. Ex. 7 at No. 5).

Jane did not attend school on Friday, November 8.  (Def. Ex. 18).  Monday, November 11 was Veterans Day, and Lincoln-Sudbury was closed.  (Pl. Resp. to Def. SMF ¶ 37; Def. Ex. 49 at 2).

### 5.     Lincoln-Sudbury's Immediate Response

On November 7, after Patterson informed the Sudbury Police Department of Jane's report, the police directed Lincoln-Sudbury officials to delay the school's investigation into the allegations pending the completion of the criminal investigation.  (Def. Ex. 22 at No. 2).

On November 9, Leichtman e-mailed Jane to check in and offer support.  (Def. Ex. 8). Two days later, Patterson e-mailed Jane's mother to ask how Jane was feeling and if she would be okay returning to school the following day.  (Def. Ex. 9).

On November 12, Patterson e-mailed the mother of Perpetrator One, stating that they should "plan on having [him] stay home tomorrow and connecting by phone during the day." (Def. Ex. 39).  Patterson testified that the "wording" of that e-mail indicated that it was not a suspension, but rather that she believed Perpetrator One should stay home because he was involved in an "unknown[,] unresolved incident."  (Pl. Ex. 54 ("Patterson Dep.") at 34).  The housemaster for Perpetrator Two also requested that he stay home from school on November 13. (Def. Ex. 44 at 5).

Also on November 12, the Middlesex County Juvenile Court issued Harassment Prevention Orders ("HPOs") that directed the boys not to have contact with Jane, to stay at least 50 yards away from her, and to "stay away to [the] extent possible because plaintiff and

defendant[s] attend [the] same school." (Def. Ex. 20). Copies of those orders were provided to Lincoln-Sudbury. (Patterson Dep. at 35-36).

### 6.    Jane's Return to School and First Week Back

On Wednesday, November 13, Jane returned to school for the first time since reporting the assault on November 7. (Def. Ex. 18).[6]

Lincoln-Sudbury did not have a formal plan in place at that time for dealing with the possibility that students who were the subject of an HPO might cross paths at the school. (Patterson Dep. at 37). However, Patterson testified that after she received the order, she asked Jane what times during the day it was possible for her to see the boys. (*Id.* at 36). She also checked the course schedules of Jane and the boys. (*Id.*).[7]

Jane did not share any classes with either boy. (Def. Ex. 22 at No. 6). She did, however, have the same lunch period as one of them. (*Id.*; Patterson Dep. at 36-37, 74).

Patterson testified that she spoke with Jane about the HPOs and that Jane said that she was not concerned about interacting with the boys in the cafeteria because she did not eat in there, but rather liked to eat with her mother. (Patterson Dep. at 37, 75).[8] According to Wong, school personnel monitored lunch periods and school classrooms to ensure that Jane and the boys were kept apart. (Def. Ex. 22 at No. 6).

Mary Jane Walsh was Jane's special-education liaison throughout her time at the high school. (C. Roe Dep. at 35). On November 13, Jane's first day back at school, Walsh e-mailed

---

[6] It appears that both Perpetrator One and Perpetrator Two did not attend school that day. (Def. Ex. 39; Def. Ex. 44 at 5).

[7] Patterson testified that after receiving an HPO the school "now" checks for the potential for the students to cross paths in the building, as well as informs the teachers who "need to know" of the order's existence. (Patterson Dep. at 35).

[8] Jane testified in her deposition that after the incident she ate lunch in the East House conference room, not with her mother, and that before the incident she usually ate lunch in the cafeteria and only occasionally ate with her mother. (Pl. Ex. 69 ("Jane Dep.") at 108).

Jane's teachers and informed them that Jane "was involved in an incident recently that has led to absences and some missed assignments," and that "[w]hile she has returned to school, she may not be fully \*present\* and engaged in classwork." (Def. Ex. 10).  She asked the teachers to send her a report on Jane's progress and priorities for work completion.  (*Id.*).  Jane's mother also spoke with at least some of Jane's teachers to inform them that there had been an incident.  (C. Roe Dep. at 75-76).  She also asked them to not make Jane the center of attention.  (*Id.* at 76).

Also on November 13, one of Jane's teachers informed Patterson that Jane was in class, but she had told him that she was not to do any work.  (Def. Ex. 16).  Patterson responded that she was not sure why Jane said she was not to be doing any work and that she would check in with her.  (*Id.*).

On November 14, Jane passed one of the boys in the hallway.  (Def. Ex. 14).  Jane's mother sent an e-mail to Patterson stating that because of that interaction it "was a really hard day for [Jane]."  (*Id.*).  The following day, Patterson responded to the e-mail.  She acknowledged the incident, noting that she had met with Jane, and that she would e-mail Jane's teachers to ask them to be flexible with assignment deadlines.  (*Id.*).  Patterson also noted that although Jane's father had expressed concern that Jane would run into the boys in the cafeteria, Jane had told her that she did not each lunch there.  (*Id.*).  She reported that Jane had agreed that she would let her know on the following school day what classes she would be attending, and that Patterson would then "do [her] best to ensure that [Jane] and the boys would not cross paths."  (*Id.*).  She finished the e-mail by stating:  "I asked [Jane] if there [were] any other ways she thought I could be helpful/supportive, and she said nothing was coming to mind at the moment."  (*Id.*).

Patterson testified that she worked with Jane on a day-by-day basis to ensure that Jane and the boys would not cross paths, although she did not remember the details of their plans.

(Patterson Dep. at 79-80). She also spoke with Perpetrator One's attorney about how he needed to stay away from Jane, although again she did not remember the details of that conversation. (*Id.* at 80).

On November 14, Lincoln-Sudbury scheduled a special-education team meeting for the following week with Jane, her parents, and various school officials, including Ramos and Patterson. (Def. Ex. 23).[9] It was described as a "reconvene" meeting for Jane's IEP development. (*Id.*). It appears that the meeting was convened in response to the incident. (Patterson Dep. at 107-08).

On the same day, Jane's parents met with Wong to ask whether the boys were being punished and how Jane could continue to attend classes at the high school in a safe environment. (C. Roe Dep. at 69). Jane's mother testified that Wong could not give them any update as far as the investigation was concerned and that there were privacy concerns regarding sharing details of the students' disciplinary histories. (*Id.* at 70).

On Friday, November 15, Walsh e-mailed Patterson and Leichtman. She told them that Jane did not want to attend her classes for the rest of the day and would work in the Learning Center, where Walsh worked. (Def. Ex. 15). Later that day, Walsh e-mailed Patterson, Leichtman, and Jane's mother, informing them that she told Jane she was welcome in the Learning Center at any time. (Def. Ex. 13).[10] She noted that if Jane did not attend her classes but was unable to be in the Learning Center, she could go to Leichtman's office and/or "East House." (*Id.*). Jane later testified that when she went to "East House" she went to either the East

---

[9] IEPs must be formulated through the participation of a team that includes, among others, the student's parents, regular-instruction teachers, and special-education teachers, and they must be revised "as appropriate." *See Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 988 (1st Cir. 1990); 20 U.S.C. § 1414.

[10] The Learning Center housed several offices of special-education liaisons, as well as some classrooms. (Patterson Dep. at 76). Patterson testified that in her discussions with Jane it was understood that Jane would go to Walsh's office within the Learning Center. (*Id.* at 77).

House common area or the East House conference room.  (Jane Dep. at 82).[11]

Also on November 15, Patterson e-mailed Jane's teachers, asking them to allow Jane to receive extensions on assignments through the following week.  (Def. Ex. 11).  She noted that Jane "has been told that if she is unable to be in class, she can meet with [Walsh] or with [Leichtman]," so that "if she asks to leave your class, please direct her to Learning Skills or Clinical Suite, and email us (when you're able) with the time of her departure."  (*Id.*).

Leichtman also e-mailed one of Jane's teachers on the same day.  She asked her to change the seats of all the students in the class because Jane was uncomfortable with a student who sat next to her, but did not want only her seat to be changed and thus be singled out.  (Def. Ex. 12).  She noted that Jane was struggling to complete work, but that they would "keep working to get her back to classes."  (*Id.*).

### 7.    The Second and Third Weeks after the Report

On Monday, November 18, one of Jane's teachers e-mailed Walsh with the assignments Jane should work on that day.  (Def. Ex. 17).  Walsh reported that Jane was working on the assignment in the Learning Center and would later move to East House.  (*Id.*).

On Tuesday, November 19, and Wednesday, November 20, Jane was absent from school. (Def. Ex. 18).

On Wednesday, November 20, the police notified Patterson that Lincoln-Sudbury could proceed with its investigation and interview the boys.  (Def. Ex. 38).[12]  The investigation began immediately; Perpetrator Two's housemaster interviewed the student who, according to

---

[11] The common area of East House included a few tables, offices for guidance counselors and the housemaster, and student mailboxes.  (Jane Dep. at 82; Patterson Dep. at 93).  East House also contained a conference room.  (Jane Dep. at 82).

[12] Ultimately, Jane's parents decided not to pursue charges against the boys because they believed it would have been very difficult for Jane emotionally.  (Jane Dep. at 11; C. Roe Dep. at 52).

Perpetrator One, was on FaceTime with Jane during the entire incident.  (Patterson Dep. at 50-51; Def. Ex. 49 at 4).

Also on November 20, the Middlesex County Juvenile Court extended the HPOs, again ordering the boys to "stay away to [the] extent possible at school and at least 50 yards away from [Jane] outside of school."  (Def. Ex. 21).[13]

On Friday, November 22, Eleanor Burke, the housemaster for Perpetrator Two, informed him that he would be suspended for at least four days while the school investigated Jane's allegations.  (Def. Ex. 45 at 2).[14]

On Tuesday, November 26, Patterson informed Perpetrator One's family that he would be suspended for at least two days while the investigation continued.  (Def. Ex. 40 at 1-2).[15]

On Thursday, November 28 and Friday, November 29, Lincoln-Sudbury was closed for Thanksgiving break.

### 8.    Jane's Interactions with the Boys

As noted, Jane returned to school on Wednesday, November 13.[16]  Perpetrator Two was suspended on Friday, November 22 (beginning the following Monday, November 25), and Perpetrator One was suspended on Tuesday, November 26 (beginning the following day, November 27).  (Def. Ex. 45 at 2; Def. Ex. 40 at 1-2)  During the period between November 13 and November 27, due to various absences, Jane overlapped at school with Perpetrator One on

---

[13] Those orders expired one year later, on November 20, 2014.  (Def. Ex. 21).

[14] On Thursday, November 21, Perpetrator Two was absent.  (Def. Ex. 44 at 5).  It appears he attended school on Friday, November 22.  (*Id.*).  He did not attend Lincoln-Sudbury on Monday, November 25, due to the suspension, and did not return again until March 10, 2014.  (*Id.* at 1, 5).

[15] On Wednesday, November 27, Jane did not attend school.  (Def. Ex. 18).

[16] Both boys were asked to stay home from school on that day.  (Def. Ex. 39; Def. Ex. 44 at 5).

seven days and with Perpetrator Two on four days.[17]  After November 26, she never overlapped with them again.[18]

On the days when they overlapped, Jane occasionally saw the boys in school, usually in the hallways.  (Jane Dep. at 86).  She stated in an interrogatory response that she reported repeated harassment from the boys' friends to Patterson and alleged that the boys and their friends would stare, laugh, and point at her.  (Def. Ex. 7 at No. 7, 13).  The same interrogatory response stated that one of the boys lingered around an area where she was and glared at her prior to rugby practice, which she reported to Patterson as a violation of the HPO.  (*Id.* at No. 7).

In her deposition, however, Jane gave conflicting testimony.  She testified that does not recall either of the boys saying "anything" to her when she saw them in school, and that she was "not sure" whether either did "anything verbally or physically to make [her] feel threatened or intimidated by them."  (Jane Dep. at 88).  She does not recall "any contact or interaction" with either of them outside of school.  (*Id.* at 97).  She also testified that she does not recall whether she had "any negative interactions" with the boys' friends after reporting the incident.  (*Id.* at 96).  She does not recall "any interactions that made [her] uncomfortable" involving "any of their . . . friends."  (*Id.* at 98).  And she testified that nobody at school teased her, called her names, or made unpleasant or unwelcome remarks after she reported the incident.  (*Id.* at 95).

---

[17] Jane was absent on November 19, 20, and 27.  (Def. Ex. 18).  Perpetrator One was asked to stay home on November 13, and then was absent due to suspension beginning on November 27.  (Def. Ex. 39; Def. Ex. 40 at 1-2).  Perpetrator Two was also asked to stay home on November 13, was absent on November 21, and then was absent due to suspension beginning on November 25.  (Def. Ex. 44 at 5).

[18] As set forth below, Jane left Lincoln-Sudbury on December 3, and never returned.  (Def. Ex. 25).  The suspension of Perpetrator One was eventually extended through January 1, 2014.  (Def. Ex. 43 at 1).  Perpetrator Two was suspended from November 25 until December 6, after which he left Lincoln-Sudbury for an extended evaluation, not returning until March 10, 2014.  (Def. Ex. 44 at 1, 4-5).

9. **The Decision to Send Jane for an Extended Evaluation at EDCO North Crossing**

In the meantime, the school and Jane's parents were attempting to address how to help Jane cope with her academic and emotional issues after the incident.

Jane testified that in the three weeks after she reported the incident, she felt that she was getting academic support from some of her teachers, but that at times she was not given work to complete by them. (*Id.* at 98-99). She understood that she was allowed to take a break from her classes and could not remember a teacher telling her that she could not do so, but she did not have an entirely clear understanding of where she was to go. (*Id.* at 105-06). She testified that it was not necessarily up to her whether she wanted to attend classes but could not recall if anybody told her that she was not allowed to attend them. (*Id.* at 82, 107).

Jane's mother testified that neither she nor Jane were ever told that Jane was not permitted to attend classes. (C. Roe Dep. at 58).

Jane testified that someone—although she could not recall who or when—told her that she had to go to East House instead of Walsh's or Leichtman's offices, and that originally she was not allowed to use the East House conference room and so was forced to sit in the main House area. (Jane Dep. at 82, 107-08). Any student could sit in that area whenever he or she wanted. (Patterson Dep. at 95-96). Patterson testified that while Jane was there a couple of students may also have been sitting there doing homework, serving a period of detention, or eating lunch. (*Id.* at 95). The students serving detention were not segregated from the students voluntarily spending time in the area. (*Id.* at 96). Patterson also testified that although the student mailboxes are located there, students do not often check them. (*Id.* at 94). Jane testified that she was not sure if one of the boys passed her to get his mail while she sat in the common area. (Jane Dep. at 86).

Jane's mother testified that teachers were instructed to find Jane and give her work only at her insistence, and that even if Jane had been given assignments, she could not do them because she had not been to class. (Pl. Ex. 70 ("C. Roe Dep"). at 65-66). She testified that Jane sometimes sat listening to music on her headphones all day. (*Id.* at 66). Patterson testified that she did not recall whether Jane was doing schoolwork while she was sitting in East House, but that Jane "had things open," so she thought she was doing her work. (Patterson Dep. at 106).

Jane did not receive in-house counseling at Lincoln-Sudbury during the period between November 13 and December 3. (Jane Dep. at 31). However, at some point after the incident, she began receiving therapy outside of school. (Def. Ex. 7 at No. 3).

On November 22, John Flynn, a counselor at the high school, e-mailed Jane's teachers. He informed them that Jane would be in the East House conference room catching up on work during the beginning of the following week. (Def. Ex. 19). He asked the teachers to stop in, if possible, to provide Jane with assignments to work on so that she could catch up in her classes, and included a tentative schedule of when the teachers could visit Jane. (*Id.*).

Also on November 22, Jane's special-education team reconvened. (Def. Ex. 23 at 2). Jane, her parents, most of her teachers, Walsh, Ramos, Patterson, Leichtman, and Lynn Carlson, an out-of-district coordinator and psychologist, all attended the meeting. (*Id.*). The team considered Jane's teachers' progress reports and the reports of Jane and her parents on her social and emotional concerns. (*See* Def. Ex. 24). The meeting resulted in a proposal by the District. The team was concerned with Jane's well-being due to the incident, and the District's proposal noted that she "reported not being able to focus and not feeling safe in the building regardless if the [boys] are in sight." (*Id.*). It noted that since the incident, Jane did not come to school or did not attend all classes, had seemed more disengaged in school, and her academic performance had

declined due to her mental state.  (*Id.*).

The team thus recommended an "extended evaluation" for Jane.  (*Id.*).  An "extended evaluation" is a 45-day program in which the student attends an out-of-district school program for a specific set of services.  (Ramos Dep. at 46-47).  The parents and student can visit the programs that review the student's information and believe they can provide appropriate services to the student, and the family can then choose which program they prefer.  (*Id.*).  While on an extended evaluation, a student's "placement" remains at her district school—in this case, Lincoln-Sudbury.  (*Id.* at 46).

The proposal submitted by the special education team discussed the possibility of home tutoring, but noted the team felt that Jane should be around other students, maintaining healthy relationships.  (Def. Ex. 24).  Ramos testified that at that time, Jane was having difficulty entering the school building, and that because that fear could develop into a "school phobia," home tutoring would not have been in her best interest.  (Ramos Dep. at 47-48).

Jane's parents agreed to the extended evaluation.  (C. Roe Dep. at 51, 96).  Although Jane testified that she was not aware that she had the option to reject leaving Lincoln-Sudbury, she was aware that her parents consented to her attending a different school.  (Jane Dep. at 110).  Her mother testified that "[i]mmediately following the incident, we agreed to have [Jane] placed at [an extended evaluation] to get her away from the boys because they were not removing them from the school, and that was the only way she could attend school was to be in the 45-day program."  (C. Roe. Dep. at 51).  According to her, the school should have "expelled" the boys.  (*Id.*).

### 10.     Lincoln-Sudbury's Discipline of the Boys

In the meantime, the school proceeded with the disciplinary process for the two boys.

### a.      **Perpetrator One**

On November 26, 2013, Patterson e-mailed the parents of Perpetrator One and copied his attorney.  (Def. Ex. 40).  She wrote that the school was investigating an alleged sexual assault and that she had received text messages in which he acknowledged his role in the incident.  (*Id.* at 1-2).  As noted, the e-mail also stated that he was suspended for at least the following two school days as the investigation continued.  (*Id.*).  She noted that in the text exchange Perpetrator One was "very apologetic" about the role he played.  (*Id.*).

In a follow-up e-mail, Patterson reported that she had not spoken with Perpetrator One because his attorney had instructed her not to.  (*Id.* at 1).

On December 2, Patterson sent a letter to the parents of Perpetrator One.  The letter notified them of Lincoln-Sudbury's decision to hold a disciplinary hearing pursuant to the school's handbook as a result of the investigation into the incident.  (Def. Ex. 41).  The letter categorized the alleged offenses as "physical assault and inappropriate sexual behavior."  (*Id.*).[19]

On December 4, Perpetrator One's attorney wrote a letter to Lincoln-Sudbury, contending that the allegations against Perpetrator One were false.  (Def. Ex. 42).

The disciplinary hearing for Perpetrator One was held on December 5.  (Def. Ex. 43 at 1).  Perpetrator One's attorney attended, as did an attorney from Lincoln-Sudbury.  (Patterson Dep. at 41-42).

At Lincoln-Sudbury disciplinary hearings, the housemasters make the final decision about the level of discipline, and the family can then choose to appeal through Wong.  (*Id.* at 42).

---

[19] Perpetrator One had the rights of a special-education student because he was in the process of being evaluated for special-education services at that time.  (Patterson Dep. at 43).  Thus, the letter stated that the school would hold a manifestation determination meeting before the disciplinary hearing, a special-education process to "consider the question of whether the behavior in the incident is related to or a consequence of the student's disability."  (Def. Ex. 41).  It does not appear that the school concluded that his disability played a role; Patterson could not recall what the outcome of the manifestation determination meeting was.  (Patterson Dep. at 43-44).

On December 6, Patterson sent a letter to Perpetrator One's parents.  (Def. Ex. 43).  The letter informed them that the housemasters had found that there was "sufficient evidence that an interaction of an egregious nature did occur on the evening of November 1st, and that [Perpetrator One's] role in the incident was one that substantially violated one of the core values of [Lincoln-Sudbury]."  (*Id.* at 1).  It stated that they had found that he was "an instigator of both physical and sexual harassment," and that he would be suspended through January 1, 2014.  (*Id.*).

The letter further stated that during his suspension, the school would provide Perpetrator One with tutoring.  (*Id.*).[20]  It noted that when he could return to school, he would have to spend his free blocks in a supervised-study location and could not participate in any extracurricular activities, but that the restrictions would be reconsidered at the beginning of the second semester pending good behavior.  (*Id.*).  It also noted that he had to continue to meet with a school counselor; recommended that he transition to the ACE program; and suggested that he receive some education from the school's Mentors in Violence Prevention group.  (*Id.*).[21]  The letter concluded by acknowledging that this was a "difficult time" for Perpetrator One and his family, and that it was her hope that he would "successfully recover from the results of his poor decisions."  (*Id.* at 2).

### b.      Perpetrator Two

On November 22, 2013, Burke sent an e-mail to Perpetrator Two's parents.  The e-mail informed them that due to Jane's allegations and the text messages shown to Patterson, he was

---

[20] Patterson testified that it is common practice for the school to provide tutoring for students who have a lengthy suspension.  (Patterson Dep. at 56).

[21] The Mentors in Violence Prevention group is a group of adults and students who help other students develop healthy relationships.  (Patterson Dep. at 61).  The ACE Program is "an on-site program . . . for students who have had difficulty succeeding in school in spite of good academic ability" that provides "on-going personal support and monitoring for students."  *ACE Program*, LINCOLN-SUDBURY REGIONAL HIGH SCHOOL (last visited Mar. 24, 2021), https://www.lsrhs.net/academics/ace.

suspended for at least four days while the school's investigation continued.  (Def. Ex. 45 at 2).

At the time, and for unrelated reasons, the school was in the process of finding a 45-day evaluation program for Perpetrator Two to determine the best educational services for him; the e-mail noted that that process would continue during the suspension period.  (*Id.*).  He was eventually suspended from November 25 through December 6, 2013.  (Def. Ex. 44 at 4-5).

On December 2, Burke sent an e-mail to the parents of Perpetrator Two that was identical to the e-mail sent to the parents of Perpetrator One, advising that the school was convening a disciplinary hearing.  (Def. Ex. 46).

Perpetrator Two was suspended from Lincoln-Sudbury until Friday, December 6, and left Lincoln-Sudbury for an extended evaluation the following week.  (Def. Ex. 47; Def. Ex. 44 at 1, 4).[22]  The disciplinary process concerning the incident was thus put on hold.  (Def. Ex. 47).

Perpetrator Two did not return to Lincoln-Sudbury until March 10, 2014.  (Def. Ex. 44 at 1).  On March 14, Burke sent a letter to his parents informing them that because he had returned to the school, the manifestation determination meeting and the disciplinary hearing would go forward.  (Def. Ex. 47).

The disciplinary hearing for Perpetrator Two was held on March 24, 2014.  (Def. Ex. 48 at 1).  Burke sent a letter to his parents on the same day, informing them that the housemasters had determined that there was "sufficient evidence that an interaction of an egregious nature did occur on the evening of November 1st, and that [Perpetrator Two's] role in the incident was one that substantially violated one of the core values of [Lincoln-Sudbury]."  (*Id.*).  The letter went on to state that while in a non-special-education situation, further discipline would be imposed,

---

[22] The record is unclear as to whether Perpetrator Two began his extended evaluation outplacement on Monday, December 9, or Tuesday, December 10, 2013.  (*Compare* Def. Ex. 44 at 4, *with id.* at 1).

the conduct was found by the manifestation determination team to be substantially related to his disability, and therefore the school was not imposing any further discipline beyond the suspension that Perpetrator Two had served from November 25 through December 6, 2013. (*Id.*). The letter concluded with language similar to that of the earlier letter: "[i]t is the hope of all those who work with [Perpetrator Two] that he is able to successfully recover from the results of his poor decisions." (*Id.*).

Perpetrator Two had been suspended from Lincoln-Sudbury on Friday, March 21, and Monday, March 24, for a separate, unrelated incident. (Def. Ex. 44 at 3). He was then schooled away from Lincoln-Sudbury from March 25 until April 10, when he was placed in an out-of-district placement for the remainder of the school year. (*Id.* at 1-3). It appears he then re-enrolled at Lincoln-Sudbury on September 4, 2014. (*Id.* at 1).

### 11.   Jane's Evaluation at EDCO North Crossing

Jane chose to enroll in EDCO Collaborative at North Crossing for her extended evaluation. (Def. Ex. 25). The curriculum at EDCO North Crossing included small-class instruction to address students' learning disabilities, as well as individual counseling and group therapy. (Ramos Dep. at 49).

Jane testified that she visited schools other than EDCO North Crossing, but could not recall if that was before she enrolled. (Jane Dep. at 109-10). Her mother also testified that she recalled being given the option to see at least one other school other than EDCO North Crossing, and her father remembers visiting another EDCO location. (C. Roe Dep. at 96; Pl. Ex. 71 at 34-35). Jane testified that she chose the program that she wanted to attend, although later stated that she had not wanted to go to there. (Jane Dep. at 110). She testified that when she visited EDCO North Crossing her impression was that it had small class sizes, and that was not something that

appealed to her then or later.  (*Id.* at 112).[23]

On December 2, 2013, Carlson e-mailed Jane's teachers and informed them that Jane had chosen to attend the 45-day program at EDCO North Crossing and would start the following day, December 3.  (Def. Ex. 25).  She noted that it was the school's hope that Jane would return to Lincoln-Sudbury for the third quarter, and that EDCO North Crossing would try to parallel Lincoln-Sudbury's curriculum as much as possible.  (*Id.*).  To that end, she requested that the teachers provide information regarding the topics they planned to cover for the rest of the semester.  (*Id.*).

Carlson noted, however, that they would "need to find a different solution for Spanish." (*Id.*).  EDCO North Crossing did not offer a Spanish class.  (Patterson Dep. at 112).  Ramos e-mailed Carlson, stating that she did not want to pay for a Spanish tutor for Jane.  (Ramos Dep. at 52).  She testified that Spanish was not a graduation requirement, that it was difficult to find a tutor, and that it was within her authority to decide whether to provide one.  (*Id.* at 52-53, 66).  The District did, however, ultimately provide a Spanish tutor for Jane during the length of her extended evaluation.  (*Id.* at 53; *see also* Def. Ex. 27).

On December 3, Jane's mother signed a consent form, allowing Jane to undergo an IEP reevaluation "to determine whether [Jane's] diagnosed disability continues to prevent [her] from making progress in the general curriculum."  (Def. Ex. 26).[24]  Jane started at EDCO North Crossing that day.  (Def. Ex. 25).

On December 17, Carlson e-mailed Jane's mother, asking how Jane was doing and

---

[23] Jane later testified, however, that she sought out Lawrence Academy in part because of its small class sizes.  (Jane Dep. at 112).

[24] Federal law mandates that an IEP reevaluation be performed every three years; Jane's proposed reevaluation was in keeping with that requirement.  (Ramos Dep. at 72).

whether she had any questions about EDCO North Crossing, as well as to set up a progress

meeting with Jane.  (Def. Ex. 27).  Jane's mother responded to the e-mail stating that Jane was

"doing fine" at EDCO North Crossing.  (*Id.*).  She asked Carlson how Jane would be assessed at

the school and inquired into whether anyone had looked into an alternative way to assess her so

that EDCO North Crossing would not show up on her transcript.  (*Id.*).[25]  She asked whether it

would be possible for Jane to receive incompletes until she completed the work required to

obtain grades from Lincoln-Sudbury teachers.  (*Id.*).[26]

Later that day, Carlson replied to the e-mail and copied Ramos.  (Pl. Ex. 64 at 1).  She

responded that as was discussed when they had met previously on December 6, EDCO North

Crossing would provide a parallel curriculum to that offered at Lincoln-Sudbury and would

administer its own assessments.  (*Id.*).  In addition, she suggested that if Jane felt comfortable,

she could meet with her Spanish tutor at Lincoln-Sudbury, as there "would be some benefit in

her trying this out before she return[ed] fully to [Lincoln-Sudbury]" for the third quarter.  (*Id.*).

She noted that Jane would receive a wellness credit through EDCO North Crossing.  (*Id.*).[27]

Finally, she noted that "[a]s we discussed on 12/6, [Jane's] grading will come through EDCO

and it will appear on her transcript."  (*Id.*).  She wrote that after the December 6 meeting she

informed Ramos of the parents' concerns, and she believed that Ramos and other staff would be

---

[25] Jane's mother testified that Carlson had originally told the parents that EDCO North Crossing would not appear on Jane's transcript, but the Lincoln-Sudbury academic office had later informed them that it would.  (C. Roe Dep. at 101).

[26] She also asked about scheduling Jane's meetings with her Spanish tutor and the transportation for such meetings and inquired whether Jane could receive a wellness credit by working with a Lincoln-Sudbury teacher. (Def. Ex. 27).

[27] Patterson testified that at some point Jane's parents were offered the option for Jane to receive either a wellness credit from EDCO North Crossing or a medical excuse from Lincoln-Sudbury in substitution for the credit. (Patterson Dep. at 142).  Jane would be unable to receive a wellness credit from Lincoln-Sudbury because the class met by the quarter as opposed to the semester, and so she would not have participated in any of the Lincoln-Sudbury class while she was at EDCO North Crossing.  (*Id.* at 133-34).

able to discuss it with her further.  (*Id.*).

Jane's parents also wrote an e-mail to Wong on December 17.  (Pl. Ex. 61).  They expressed concern that Jane's EDCO North Crossing outplacement would show up on her transcript, after school officials had told them that it would not.  (*Id.* at 1).  They also wanted to discuss with Wong what they perceived was a "lack of academic support" extended to Jane throughout "this entire process."  (*Id.*).  They stated that Jane was experiencing significant social, emotional, and health effects due to the incident.  (*Id.*).  They also expressed disappointment in the punishment received by the boys—they had heard from a housemaster that the boys had only been suspended for 18 days for the incident and were not required to undergo therapy, be placed in an outplacement program, or have a permanent record on their transcripts.  (*Id.*).

Wong forwarded the parents' e-mail to Patterson and Ramos.  (*Id.* at 1).  Patterson stated that she had been inaccurately quoted by them, and later testified that the details of the boys' suspensions, therapy, or what appeared on their transcripts was "not information that I would have shared with" Jane's parents.  (*Id.* at 1; Patterson Dep. at 115).[28]

At some point during this time period, Wong e-mailed the curriculum coordinator and registrar for Lincoln-Sudbury and asked if it was possible for Jane to receive grades of "incomplete" for the second quarter of the 2013-2014 school year, while she worked over winter break to complete her missing assignments so that she could receive Lincoln-Sudbury grades for the first semester of the school year.  (Patterson Dep. at 120-21).  Patterson and Ramos were copied on the e-mail.  (*Id.* at 123-25).  Patterson responded that Jane might require tutoring over the break to complete the work; Ramos responded that the school did not have to provide

---

[28] In their depositions, both Jane and Jane's mother testified that they were not informed about the discipline given to the boys.  (Jane Dep. at 147; C. Roe Dep. at 52, 69-70).  Jane testified, however, that she eventually became aware that the boys had been suspended.  (Jane Dep. at 92).

tutoring over a break and would not offer it.  (*Id.* at 124-25).[29]

Patterson also asked the curriculum coordinator and registrar if it was possible for Jane's transcript not to reflect the outside placement.  (*Id.* at 124).  She testified that the District's policy was that where the student was taking classes would appear on a student's transcript, and that this was the first time that the policy had been challenged.  (*Id.* at 122-23).  Ramos testified that currently, if a student is placed in an extended evaluation and receives credits from there, Lincoln-Sudbury will appear on the transcript for the quarter they are being evaluated.  (Ramos Dep. at 56).

On January 17, 2014, Jane's special-education team held another meeting, this time at EDCO North Crossing.  (Def. Ex. 28).  Jane, her parents, Carlson, Patterson, and EDCO North Crossing staff members were in attendance.  (*Id.* at 1).  The agenda included topics such as Jane's progress; the completion of her three-year IEP reevaluation assessments; the transportation schedule for Jane's meetings with her Spanish tutor; her wellness credit; and the plan for her return to Lincoln-Sudbury.  (*Id.* at 2).  Notes from the meeting indicate that Jane reported that she was still struggling with concentration; her mother reported that Jane seemed better than she was four weeks ago, but that it was hard to evaluate her concentration difficulties as she had not had homework.  (*Id.* at 3).  Jane reported that she felt like she needed more time at EDCO North Crossing rather than immediately returning to Lincoln-Sudbury.  (*Id.*).  The EDCO North Crossing staff agreed; they believed that it made sense for her to stay until the end of the assessment period, which was February 14.  (*Id.*).

Jane testified that she did not find EDCO North Crossing to be as academically

---

[29] Patterson testified that tutoring had been provided in the past to some students who were working to complete work over a break, and that there were also some students who did not attend all of their Lincoln-Sudbury classes but who worked with Lincoln-Sudbury teachers to receive Lincoln-Sudbury grades.  (Patterson Dep. at 125-26).

challenging as Lincoln-Sudbury.  (Jane Dep. at 115).[30]  She also reported that she had a three-hour commute to the school and that she had been harassed by a taxi driver during one of the trips.  (Def. Ex. 7 at No. 9).  She contends that the Lincoln-Sudbury administrators refused to change her transportation arrangement and rejected her requested accommodation for female drivers.  (*Id.* at No. 17).  She testified that at some point while she was at EDCO North Crossing she felt academically ready to return to Lincoln-Sudbury but could not recall whether she felt emotionally ready to do so.  (Jane Dep. at 115).

Jane's mother testified that she could not recall whether she expressed any concerns about Jane being placed at EDCO North Crossing to Lincoln-Sudbury officials, or whether she had concerns about the academic support Jane received at EDCO North Crossing.  (C. Roe Dep. at 98).  She testified that the parents were satisfied that Jane had a safe place to be, as Lincoln-Sudbury was not safe because "the boys were still attending" and "their friends were picking on her."  (*Id.* at 99).  Jane's father testified that EDCO North Crossing "did not really" provide Jane with any therapy.  (Pl. Ex. 71 at 31).  He stated that they felt that EDCO North Crossing was the "only option" because Jane was not receiving an education at Lincoln-Sudbury while sitting in the East House conference room, and she could not attend classes because the boys were still in the school.  (*Id.* at 32-34).

### 12.    Jane's Visits to Lincoln-Sudbury

On January 31 and February 5, 2014, Jane visited Lincoln-Sudbury in an effort to transition back to the school.  (Patterson Dep. at 92; Def. SMF ¶ 124).  Ramos suggested that a familiar adult be present in the classroom to take care of her should she require support.  (Ramos

---

[30] Jane wrote that "[t]he amount of social and academic support that [her EDCO North Crossing teacher] gave [her] during [her] stay there was just what [she] needed" in her personal statement for her Lawrence Academy application.  (Def. Ex. 33).

Dep. at 70).  As a result, on at least one of those days, Patterson escorted Jane to class and sat in on it so Jane would feel supported.  (Patterson Dep. at 92-93).[31]  It appears that Carlson and Flynn also agreed to attend classes with Jane on those days.  (Ramos Dep. at 71).  At one point Jane left a class while it was in progress.  (Patterson Dep. at 139-40).  She testified that she remembers being in a class and leaving because at least one of the boys' friends was also in the class and she felt uncomfortable.  (Jane Dep. at 123-24).

Jane initially reported that the boys' friends harassed her during those visits.  (Def. Ex. 49 at 5).  In her deposition, however, she testified that she remembered encountering the boys and their friends on the days she returned to Lincoln-Sudbury and that it was upsetting to her, but that she could not recall if she felt harassed.  (Jane Dep. at 122-24).

As noted, Perpetrator Two was not attending Lincoln-Sudbury at that time.  (Def. Ex. 44 at 4; Def. Ex. 49 at 5; Def. SMF ¶ 126).  Jane testified that she was not aware that he had left the school, but also that she believed he still attended rugby practice there.  (Jane Dep. at 122).  At the time of the visit, Perpetrator One was enrolled in a program that met in a specific part of the school building.  (Patterson Dep. at 77-78, 138; Def. SMF ¶ 126).[32]

### 13.   Jane's February 2014 IEP and the Remainder of the 2013-2014 School Year

On February 10, 2014, Jane's special-education team held a meeting for her three-year IEP reevaluation and transition.  (Def. Ex. 30 at 4).[33]  Jane, her parents, Ramos, Patterson, Carlson, Leichtman, and others were present.  (*Id.* at 17).  As a result of her 45-day extended

---

[31] Patterson testified that she had never otherwise been involved with accompanying a student to classes while they were still at an out-of-district program.  (Patterson Dep. at 137).

[32] The Department of Education's Office for Civil Rights ("OCR") investigators found that the school had "taken steps to ensure that" Jane did not see him on those days.  (Def. Ex. 49 at 5).

[33] Ramos testified that "transition" paperwork must be completed after a student turns 14 and has an IEP. (Ramos Dep. at 71).

evaluation at EDCO North Crossing, the team proposed a new IEP for Jane.  (*Id.* at 2).  Jane's

reevaluation assessments led the team to determine that her emotional disability—anxiety,

depression, and post-traumatic stress disorder—prevented her from making effective progress,

but that she no longer qualified for special-education services based on a learning disability.

(*Id.*).[34]

The team "determined that [Lincoln-Sudbury] did not have an appropriate program and

[Jane] required a therapeutic day school setting."  (*Id.*).  The IEP noted that Jane required small-

group instruction throughout the day "within a therapeutic environment that has ongoing access

to clinical supports."  (*Id.*).  Ramos testified that no one at the meeting, including Jane's parents,

disagreed with that conclusion.  (Ramos Dep. at 76).[35]  The IEP was effective until February 9,

2015.  (Def. Ex. 30 at 4).

The team determined that the services Jane required for her emotional disability would be

provided at EDCO North Crossing.  (*Id.* at 2).  That would constitute a placement as opposed to

an evaluation.  (Ramos Dep. at 75).

The District rejected Jane's request for a Spanish tutor for the spring 2014 semester.

(Def. Ex. 30 at 2).  It noted, however, that if she continued at EDCO North Crossing for the

upcoming fall semester and the team determined that she could attend mainstream classes, then

EDCO North Crossing could arrange for her to take Spanish at Watertown High School.  (*Id.*).[36]

---

[34] As to the process employed by Jane's special-education team at the meeting, Ramos testified that "first you determine reeligibility again for services, then you determine services that she might need, and then you determine if those services can be provided at [Lincoln-Sudbury] or not."  (Ramos Dep. at 69).  She added that "if not, then you determine the placement."  (*Id.*).

[35] Jane's mother testified that she disagreed that Jane needed a therapeutic setting by the fall of 2014.  (C. Roe Dep. at 124).  She did, however, testify that she believed Jane needed smaller class sizes after the incident.  (*Id.* at 123).

[36] Ramos could not remember if Jane continued receiving Spanish tutoring for the remainder of the 2013-2014 school year.  (Ramos Dep. at 77).  She testified that Spanish was a class, not a service, and therefore did not need to be provided for in an IEP.  (*Id.* at 77-78).

Patterson testified that she could not remember if Lincoln-Sudbury's BEACON or EXCEL programs had been discussed as options for Jane's IEP. (Patterson Dep. at 91, 146). Ramos did not suggest the BEACON program as a possibility for Jane for the 2014-2015 school year and does not recall discussing the program with the parents. (Ramos Dep. 123, 125). In an interrogatory response, Jane alleges that Carlson told her that Lincoln-Sudbury did not have additional support programs available to her "because [her] trauma was ongoing given the continued presence of the [p]erpetrators at the" school. (Def. Ex. 7 at No. 10).

The District offered to send Jane's referral packet to various therapeutic day schools in order to determine her placement, but Jane and her parents decided that she would prefer to be at EDCO North Crossing, as she was already comfortable there. (Def. Ex. 30 at 3). Jane's parents were informed that they could visit other out-of-district schools if they so chose. (*Id.*).

Jane's mother signed Jane's proposed IEP on February 25, and Jane's placement was changed to EDCO North Crossing. (*Id.* at 22-23). The parents were aware that they could reject any portion of the proposed IEP, as they had in the past. (Def. SMF ¶ 86; *see also* C. Roe Dep. at 31-32).

The District did not have the authority to prevent Jane from returning to Lincoln-Sudbury. (Def. SMF ¶ 87).[37] Jane's father testified that he felt they had "no choice" but to continue at EDCO North Crossing for the rest of the school year, but that he had concerns about Jane's academic progress at the school. (Pl. Ex. 71 at 46).

On March 13, Ramos e-mailed Carlson, Patterson, and Jane's mother, noting that the mother had expressed concerns that Jane was not being sufficiently challenged at EDCO North

---

[37] A student's parents always have the option, regardless of what the school team recommends, to exercise a "stay put" and not allow a student's placement to be changed while there is a disagreement about a new IEP. (Ramos Dep. at 52).

Crossing.  (Def. Ex. 31).  Ramos suggested that they reconvene Jane's special-education team to discuss the concerns and brainstorm solutions.  (*Id.*).  Ramos testified that she did not think the team did reconvene to discuss that topic.  (Ramos Dep. at 81).

At some point in April, Jane was admitted to a hospital to receive mental-health treatment.  (Def. Ex. 7 at No. 3).  On April 7, Jane's special-education team reconvened.  (Def. Ex. 34 at 1).  The meeting was a "readmit" meeting, which occurs after a student has been hospitalized.  (Ramos Dep. at 81-82).  The meeting notes indicate that Jane was currently playing on the Lincoln-Sudbury rugby team, and that transportation was provided for her to get dropped off at the high school.  (Def. Ex. 34 at 1).  At the meeting, Jane's parents asked about the possibility of Jane attending a different public school for the next school year.  (*Id.* at 2).  Ramos said she would look into it.  (*Id.*).

Ramos testified that after that meeting, she called different public schools to ask if they had a similar program to the one the IEP recommended for Jane.  (Ramos Dep. at 83).  She chose to call schools closer to Lincoln-Sudbury because Jane liked to play sports at the school.  (*Id.* at 83-84).  She concluded that there were no other nearby public schools that had a therapeutic day program, which was the recommendation in Jane's IEP.  (*Id.* at 84).

At the end of April 2014, Ramos received a call from an EDCO North Crossing staff member, who notified her that Jane's parents wanted a different placement and were requesting an emergency meeting.  (Def. Ex. 52 at No. 12; Ramos Dep. at 87-88).  Ramos testified that there was no need to have a meeting to look for other placements because all she needed was the parents' consent to send Jane's referral packet to other therapeutic schools for potential placements.  (Ramos Dep. at 88).

On April 29, Jane's father sent an e-mail to an EDCO North Crossing staff member,

reporting that one of Jane's teachers was creating a hostile environment for her after she reported him for a prior incident, and that he believed Jane should be removed from his class. (Def. Ex. 35). Ramos responded to the e-mail and copied, in part, Patterson, Wong, and Jane's mother. (*Id.*). She noted that she had previously advised him that they could send Jane's referral packet to other schools that could provide Jane with services if they had concerns with her placement at EDCO North Crossing. (*Id.*). She noted that although he had declined that option in the past, they could still look for other placements for Jane. (*Id.*).

On April 30, Jane's mother signed a consent form that allowed Lincoln-Sudbury to send Jane's information to other specified therapeutic schools and that prohibited the sharing of Jane's information with others. (Def. Ex. 36). On the same day, Carlson sent a letter with Jane's referral packet for an immediate placement to the two schools specified by the mother. (Def. Ex. 37). The letter noted that Jane's family was dissatisfied with EDCO North Crossing and the District had agreed to pursue a placement at a different therapeutic day school. (*Id.*).

On May 5, Ramos e-mailed Jane's father and asked him to direct all communication to her attorney. (Ramos Dep. at 92-93). She testified that the teachers were feeling "bombarded" with e-mails from Jane's parents. (*Id.* at 93). She noted that directing communication to an attorney was the protocol she had used in other situations in which parents were not respecting "boundaries" with Lincoln-Sudbury staff. (*Id.*). Wong testified that Jane's mother had to be "spoken to about accessing staff," because "you can't just barge in on staff and ask for things," and the mother was "asking for information without being announced or scheduling." (Wong Dep. at 49-50). Patterson testified that the fact Jane's mother was a teacher at the school made it more difficult to deal with Jane's situation because it was awkward being around her knowing that she was unhappy. (Patterson Dep. at 19). Wong testified that Jane's incident was not

handled any differently "from the perspective of protocols and review and investigation" due to the fact that Jane's mother was a faculty member. (Wong Dep. at 49).

On May 6, Anne O'Reilly, a Lincoln-Sudbury student services staff member, exchanged e-mails with Jane's parents about a transportation issue. (Pl. Ex. 63 at 1). Apparently, Jane's mother had at one point said that Jane no longer needed transportation. (*Id.*). However, she then e-mailed to report that because Jane was no longer playing rugby at Lincoln-Sudbury, Jane would need to be taken home instead, and that because she had already called the transportation company there was "no action needed on your part." (*Id.*). O'Reilly forwarded the exchange to Carlson and Ramos writing "FYI – Now what!" (*Id.*). Ramos replied to the e-mail: "Don't even respond." (*Id.* at 2).

At some point, according to Jane, she was "verbally harassed . . . repeatedly" by a taxi driver during one of her trips to EDCO North Crossing. (Def. Ex. 7 at No. 17). She requested, as an accommodation, that she have only "female drivers." (*Id.*). Ramos testified that the District contacted the transportation company, who interviewed the driver. (Ramos Dep. at 79). According to Ramos, "there were two stories to the alleged incident," and the driver reported that Jane had been kissing another student and he had asked them to stop. (*Id.*). Jane's requested accommodation was apparently denied. (*See id.*).

### 14.   Jane's Enrollment in Lawrence Academy

On February 16, 2014, Jane asked Walsh to fill out reference forms for her, as she had decided to apply to some private schools for the following year, including Lawrence Academy in Groton. (Def. Ex. 32 at 1-2). Walsh responded that she would be willing to fill them out, and subsequently told Ramos about the request. (*Id.* at 2; Ramos Dep. at 89). Ramos told Walsh that she had a right to decide to write the recommendation or not, that it was not part of her job responsibility to complete it if she did not feel comfortable doing so, and that she should

"disclose the services" that Jane was currently receiving in her recommendation.  (Ramos Dep. at 89-90).[38]  Wong testified that she was not aware of any sort of guidance given by administration to teachers who are asked to write recommendations for a student looking to go to private school, and that they are not encouraged or discouraged from doing so.  (Wong Dep. at 63-64).

On February 22, Ramos sent a letter to Jane's parents stating that Walsh was "unable to complete these forms as the schools are requesting specific staff to do so."  (Pl. Ex. 56).  The letter noted that Jane's IEP team had recommended a therapeutic day program for her, and thus the District did not support Jane attending any of the private schools she was applying to and would not fund any of their tuition or transportation costs.  (*Id.*).  It noted that Lincoln-Sudbury could submit Jane's referral packet to other therapeutic programs if she no longer wanted to attend EDCO North Crossing.  (*Id.*).

After Jane's parents decided to send Jane to Lawrence Academy, Ramos had five days in which to determine whether the District would provide funding for her to attend.  (Ramos Dep. at 98).  Ramos decided that it was not an appropriate placement because Jane's IEP called for a therapeutic day program, which Lawrence Academy was not.  (*Id.* at 99).  She therefore concluded that Jane would not receive funding to attend Lawrence Academy.  (*Id.*).  Wong testified that at times, when a private school offers programs that are "suitable" for a student, then the District has paid, at least in part, for the student to attend the school.  (Wong Dep. at 82).  She further testified that it has never paid for tuition where it "thought [the student] needed therapeutic supports."  (*Id.* at 84).

Jane enrolled in Lawrence Academy in the fall of 2014 at her family's expense.  (Def.

---

[38] According to Ramos, Walsh could only speak to how Jane was doing in the fall but not at the current moment.  (Ramos Dep. at 90-91).  Walsh did not work with Jane when she was hospitalized, and she had stopped working with her when her extended evaluation started.  (*Id.* at 91).

SMF ¶ 99; C. Roe Dep. at 124).  After she enrolled, her family moved to Groton, and thus out of

the District.  (C. Roe. Dep. at 8-9).  Jane's mother testified that when Jane attended Lawrence

Academy, her February 2014 IEP was still in effect for her first year, but she could not recall if

Jane met with a clinical psychologist there.  (*Id.* at 116).  Jane eventually graduated from

Lawrence Academy in 2017.  (Def. Ex. 7 at No. 22).

### 15.    The Department of Education's Office for Civil Rights Investigation

On May 30, 2014, Jane's parents filed a complaint with the Department of Education's

Office for Civil Rights ("OCR"), contending that the District discriminated against Jane by

failing to respond promptly and appropriately to her complaint of sexual assault.  (Def. Ex. 49 at

1; Def. SMF ¶ 134).  On June 18, 2014, the District received initial notification from OCR's

Boston Office that it was opening an investigation into allegations that it had violated Title IX in

its response to the incident involving Jane.  (Pl. Ex. 68 at 1).

The April 4, 2011 "Dear Colleague Letter" was in effect at the time of Jane's report.  (Pl.

Ex. 58).  The letter specifically stated that the outcome and certain consequences of an

investigation should be shared with the complainant.  (*Id.* at 13).  The letter also stated that if a

school is directed to temporarily delay its investigation of an incident by a request from the

police, the school must still take "interim steps to ensure the safety and well-being of the

complainant and the school community" while the police investigation is ongoing.  (*Id.* at 10).

On September 30, 2015, OCR asked the District's counsel to issue written notice to the

three students involved in the incident of the outcome of Lincoln-Sudbury's investigation.  (Pl.

Ex. 68 at 2).  Ramos testified that "OCR said that we did everything that we needed to do to keep

her safe, but the part that we were missing was sending [a] letter, and they ask[ed] us to send

th[e] letter."  (Ramos Dep. at 105).

The following day, October 1, Ramos and Peter Elenbaas sent a letter to Jane's mother,

informing her that a Title IX investigation had been conducted by the District concerning the

incident.  (Def. Ex. 50).[39]  The letter stated:

> After conducting thorough interviews and review of reports, Lincoln-Sudbury's
> investigation has been determined inconclusive.  The District was not able to reliably
> determine whether or not the alleged incident reported by [Jane] actually occurred as
> described.
>
> Regardless, as you know, [Jane], after concerns with regard to her emotional state, was
> recommended to attend an out of district placement, EDCO Collaborative.  In addition,
> due to unrelated factors, all [Lincoln-Sudbury] students allegedly involved in the 2013
> incident are not currently attending the same schools.  The alleged perpetrators should
> not, therefore, have any further contact with [Jane] in school.

(*Id.*).  Ramos testified that at the time she believed the letter was correct—she agreed with the

outcome of the disciplinary hearings that something egregious had occurred, but could not

determine what exactly happened.  (Ramos Dep. at 103-04).  Jane alleges that Lincoln-Sudbury

had not provided her with any notice of its findings prior to the October 1 letter.  (Def. Ex. 7 at

No. 12).

     On August 24, 2017—nearly two years later—Ramos sent Jane's mother another letter,

"clarify[ing]" the results of the November 2013 investigation.  (Def. Ex. 51).  The letter stated

that the October 1, 2015 letter "incorrectly reported [their] findings," and that the "District held

off on sending the corrected notice at the direction of the United States Department of

Education's Office for Civil Rights."  (*Id.*).  It further stated:

> It was reported to an [Lincoln-Sudbury] clinical counselor that one male student
> restrained [Jane] while another boy assaulted her at an [Lincoln-Sudbury] home football
> game, on the evening of November 1, 2013.  After investigating this allegation, both
> boys' offenses were categorized as physical assault and inappropriate sexual behavior.
> [Lincoln-Sudbury] found that there was sufficient evidence that an interaction of an
> egregious nature did occur on the evening of November 1st, and that the boys' conduct
> substantially violated one of the core values of [Lincoln-Sudbury] (promotion of caring
> and cooperative relationships among all members of the community).  The District

---

[39] Elenbaas was the Lincoln-Sudbury athletic director and the Title IX Co-Chair with Ramos.  (Ramos Dep.
at 102).  He started that position on November 1, 2013.  (*Id.* at 117).

subsequently recommended an out-of-district placement, EDCO Collaborative for [Jane] due to her emotional state.

(*Id.*).  Ramos drafted the letter at the advice of her attorney.  (Ramos Dep. at 108).  She testified that between October 2015 and August 2017, the District's attorney repeatedly called OCR to ask them to close its case, but that OCR said it was still open.  (*Id.* at 110).  She testified that her "understanding is that OCR explicitly said, for us to be able to close the case, Lincoln-Sudbury ha[d] to send" the August 24, 2017 letter.  (*Id.* at 111).

On September 7, 2017, OCR published a letter, noting that it had concluded its investigation of Jane's Title IX complaint and found insufficient evidence to support the allegations of discrimination or that the District "failed to promptly and equitably respond to [Jane's parents'] allegations."  (Def. Ex. 49 at 1, 6).  It found that while Lincoln-Sudbury did provide written notice of the investigation to the boys, it did not provide concurrent *written* notice to Jane's parents.  (*Id.* at 7).  The school nonetheless kept the parents informed of the investigation, however, and OCR found "no indication that by not providing formal written notice, the [s]chool failed to eliminate the hostile environment for [Jane]."  (*Id.*).  It noted that Lincoln-Sudbury's delay in rescinding the incorrect October 1, 2015 notice and providing the parents with the corrected August 24, 2017 notice was at OCR's request pending the conclusion of its own investigation.  (*Id.* at 7 n.1).

On September 22, 2017, two weeks later, the Department of Education rescinded the "Dear Colleague Letter."  *See Department of Education Issues New Interim Guidance on Campus Sexual Misconduct*, U.S. DEP'T OF EDUC. (Sept. 22, 2017), https://www.ed.gov/news/press-releases/department-education-issues-new-interim-guidance-campus-sexual-misconduct.

16.   **Lincoln-Sudbury's Internal Procedures and Programs**

a.   **Procedures**

During the period in question, Lincoln-Sudbury had designated two staff members as Title IX coordinators:  Ramos and Elenbaas.  (Pl. Ex. 68 at 16).  As coordinators, they were tasked with receiving Title IX complaints and ensuring that the school was complying with Title IX mandates.  (Ramos Dep. at 11; Pl. Ex. 57 at 5; Def. SMF ¶ 141).  Contact information for the Title IX coordinators was posted around the high school, on the District's website, and in the staff training materials.  (Pl. Ex. 68 at 16).

Ramos testified that when she arrived at Lincoln-Sudbury in 2013, the District "somewhat" had policies in place as far as how to conduct a Title IX investigation.  (Ramos Dep. at 18).  She testified that the District had no written policy, but that it followed protocols listed on TitleIX.gov.  (*Id.*).  She stated that she read the "Dear Colleague Letter" after she was first employed at Lincoln-Sudbury.  (*Id.* at 19).  She attended a training entitled "The Role of Special Education Teams and Schools When a Student with Disabilities is a Victim or Perpetrator of Bullying or Harassment – Meeting the Legal Requirements" on December 11, 2013.  (*Id.* at 21).  She also testified that she had been involved in sexual-assault cases with students with disabilities in her previous job.  (*Id.* at 118).  In addition, both she and Patterson have taken classes covering Title IX in their doctorate programs and have attended other Title IX training seminars.  (*Id.* at 21-23; Pl. Ex. 68 at 19-20; Def. SMF ¶ 140).  Wong testified that she delegated compliance with the "Dear Colleague Letter" to Ramos.  (Wong Dep. at 85).[40]

Title IX training was a part of Lincoln-Sudbury's annual mandated trainings for all teaching staff.  (Def. Ex. 52 at No. 7; Ramos Dep. at 20).  Ramos updated a presentation on the

---

[40] Ramos was also responsible for preparing the school's trainings on federal privacy laws relating to student information.  (Wong Dep. at 92).

topic each year and the teachers had to attest that they reviewed it.  (Ramos Dep. at 20).  She

updated the presentations without the advice of counsel.  (*Id.* at 119).

Lincoln-Sudbury promulgated a PowerPoint presentation entitled "Non-Discrimination,

Civil Rights, and Harassment and Bullying" for the 2013-2014 school year.  (Pl. Ex. 57).  The

presentation stated that the District does not discriminate on the basis of sex and will not tolerate

any discrimination against students based on that characteristic.  (*Id.* at 1).  It defined hate

crimes, bullying, and cyber-bulling; described signs of possible harassment or bullying; and

instructed that staff members must report incidents of bullying to the housemasters.  (*Id.* at 3-5).

It also included a slide on Title IX, setting forth the law's requirements.  (*Id.* at 5).  It stated that

teachers should report harassment to their supervisor, the principal, or Wong, and identified

Nancy O'Neil as the Title IX coordinator.  (*Id.*).[41]  The slide also provided a link to the Title IX

website for more information.  (*Id.*).

Patterson testified that Lincoln-Sudbury had a disciplinary code that set out practices

about how to handle reports of harassment.  (Patterson Dep. at 21).  She also testified that she

received training on how to respond to reports of sexual assault, in part through the school's

mandated trainings each fall.  (*Id.* at 21-22).  In addition, on October 17 and November 14, 2013,

she and other members of Lincoln-Sudbury staff participated in a six-hour training entitled

"Conducting Internal Investigations of Discrimination Complaints."  (Pl. Ex. 68 at 19).  Jane's

report was the first time she dealt with an incident involving a student who was sexually

assaulted on a school's campus.  (Patterson Dep. at 21).

Since November 1, 2013, the District has made two changes to its Title IX compliance

program:  "(1) letters to all students' families are written, providing them with a resolution to the

---

[41] O'Neil was replaced by Elenbaas in November 2013.  (Ramos Dep. at 119).

investigation; and (2) clinical counselors create a document on how to support alleged victims of sexual assaults and resources the victims can access." (Def. Ex. 22 at No. 11).

Aside from Jane's case, Lincoln-Sudbury has received other complaints of sexual assault or harassment by female students against male students. (*See* Pl. Ex. 59; Pl. Ex. 68). In one instance, in response to a complaint, Lincoln-Sudbury created a safety plan for the complainant and the alleged perpetrator that specified certain areas of the building as "safe spaces" for each individual, restricted the perpetrator's free blocks so that he had to be in a supervised setting at all times during the day, and banned the perpetrator from eating lunch in the cafeteria or participating in extracurricular events. (Pl. Ex. 59 at 6-7). In response to a different complaint, Lincoln-Sudbury created a safety plan that included escorting the complainant and alleged perpetrator during passing periods for a few days and asking the perpetrator to spend his free blocks in the office of his House. (Pl. Ex. 68 at 11). In at least two cases, the alleged perpetrator was suspended pending the school's investigation and disciplinary hearing. (Pl. Ex. 59 at 4, 7).

### b.   Programs

Ramos and other Lincoln-Sudbury staff members applied for funding to create the BEACON program in December 2013 or January 2014. (Ramos Dep. at 122). Lincoln-Sudbury was notified prior to the end of the 2013-2014 school year that it had received the funding, and it hired a clinical counselor for the program at that time. (*Id.* at 122-23). The program was launched in the fall of 2014. (*Id.*).

Ramos testified that the BEACON program is not a special-education program, but rather a transition program for students who return to school after long hospitalizations or absences. (*Id.* at 121-24). Examples of students who participate in the program include those returning from a concussion, from medical treatment, or from an absence due to social or emotional issues. (*Id.* at 121). Students in the program are provided counseling and are provided a room where

they can go if they are unable to completely reintegrate and return to all of their normal classes. (*Id.* at 124, 126). However, students are not given small-group instruction and still attend their regular classes to the extent possible. (*Id.* at 125-26). Because students are only part of the program for four to eight weeks, it is not considered a placement. (*Id.* at 123). Patterson testified that no student in her House has been at an out-of-district placement and then directly participated in the BEACON program. (Patterson Dep. at 89). She testified that when a student is at an out-of-district placement, they are not considered to have taken a break from academics. (*Id.*).

EXCEL is a special-education program for students with emotional learning disabilities. (*Id.* at 89-90). EXCEL students are in mainstream classes but take one class within EXCEL and have their learning skills block within EXCEL, in which they participate in group therapy sessions. (*Id.* at 91). Patterson testified that a student returning from an out-of-district placement may enter the EXCEL or ACE programs at Lincoln-Sudbury. (*Id.* at 89-90).

### B.    Procedural Background

Jane filed the complaint in this action on April 24, 2018. It alleges (1) a claim against the District for discrimination on the basis of gender in violation of Title IX of the Educational Amendments of 1972 (20 U.S.C. § 1681) (Count 1); (2) claims against all of the defendants for civil rights violations (42 U.S.C. § 1983) (Count 2); (3) a claim against the District for failure to train and supervise a sexual assault response (42 U.S.C. § 1983) (Count 3); (4) claims against all of the defendants for negligent infliction of emotional distress ("NIED") (Count 4); and (5) claims against defendants Patterson, Ramos, and Wong ("the individual defendants") for intentional infliction of emotional distress ("IIED") (Count 5).

Defendants have moved for summary judgment as to all pending claims.

## II.    Legal Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotations omitted). The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

## III.   Analysis

### A.      Discrimination on the Basis of Gender, 20 U.S.C. § 1681 (Count 1)

Count One is a claim for a violation of Title IX, 20 U.S.C. § 1681, against the District. Subject to certain exceptions not applicable here, the relevant provision of Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681.

To succeed on a Title IX claim against an educational institution, a plaintiff must show "(1) that [he or she] was a student, who was (2) subjected to harassment (3) based upon sex; (4)

that the harassment was sufficiently severe and pervasive to create an abusive educational environment; and (5) that a cognizable basis for institutional liability exists." *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 66 (1st Cir. 2002). To satisfy the fifth part of that standard, a plaintiff must show that a school official authorized to take corrective action had "actual knowledge" of the sexual harassment and either failed to act or exhibited "deliberate indifference" to it. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998); *Frazier*, 276 F.3d at 66; *Doe v. D'Agostino*, 367 F. Supp. 2d 157, 164-65 (D. Mass. 2005).

The District has moved for summary judgment on the Title IX claim. It contends that Jane cannot show (1) that she suffered sufficiently severe and pervasive harassment or (2) that the District was deliberately indifferent to the harassment.

### 1.    "Severe and Pervasive" Harassment

The District first contends that the "single isolated incident" of sexual misconduct was not sufficiently severe and pervasive to sustain her Title IX claim. (Def. Mem. at 3 n.1). But a "single instance of peer-on-peer harassment" can "form a basis for Title IX liability if that incident were vile enough and the institution's response, after learning of it, unreasonable enough to have the combined systemic effect of denying access to a scholastic program or activity." *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 172-73 (1st Cir. 2007), *rev'd on other grounds*, 555 U.S. 246 (2009). Thus, an instance of rape or sexual assault may serve as the basis for a Title IX claim. *See Doe1 v. Bos. Pub. Schs.*, 2019 WL 1005498, at *11 (D. Mass. Mar. 1, 2019) ("The Court disagrees that one incident . . . of sexual assault on an elementary school-aged child . . . could never, as a matter of law, constitute severe, pervasive, and objectively offensive harassment."); *T.K. v. Town of Barnstable*, 2018 WL 3748166, at *4 (D. Mass. Aug. 6, 2018) (noting the *Fitzgerald* standard and finding that a plaintiff's rape at a high school could constitute severe, pervasive, and objectively offensive harassment and thus could

serve as the basis for a Title IX claim); *Doe v. Pawtucket Sch. Dep't*, 969 F.3d 1, 9 (1st Cir. 2020) (noting that a plaintiff "may be able to make out a claim under Title IX based on the school's indifference" from the point after she was raped forward); *see also Carabello v. N.Y.C. Dep't of Educ.*, 928 F. Supp. 2d 627, 643 (E.D.N.Y. 2013) (noting that courts have found "sufficiently severe" harassment under Title IX from a single incident of extreme sexual assault or rape; *Farmer v. Kan. State Univ.*, 2017 WL 980460, at *13 (D. Kan. Mar. 14, 2017) ("Courts have consistently recognized that a student need not allege multiple instances of sexual assault to state a plausible Title IX claim.") (collecting cases).

Here, Jane alleges that she was sexually assaulted by other Lincoln-Sudbury students: that they restrained her, digitally penetrated her, and forced her to perform unwanted acts on them. As noted, that description of the incident is disputed, but the Court must assume that Jane's version is accurate. The Court will also assume that that "single instance of peer-on-peer harassment" was sufficiently severe, pervasive, and objectively offensive to form the basis of Title IX liability. *See Fitzgerald*, 504 F.3d at 172-73.

### 2. **"Deliberate Indifference"**

The District further contends that it did not fail to act in response, or exhibit deliberate indifference, to Jane's report of sexual assault. In particular, it contends that it "addressed the concerns that Jane felt unable to attend classes at times, convened her IEP team to identify specialized emotional support and programs for Jane, investigated Jane's report, and levied discipline." (Def. Mem. at 8).

As noted, to prove a claim of sexual harassment under Title IX against an educational institution, a plaintiff must show that an official authorized to take corrective action had "actual knowledge" of the sexual harassment and either failed to act or exhibited "deliberate indifference" to it. *See Gebser,* 524 U.S. at 290; *Frazier*, 276 F.3d at 66. In cases of student-

on-student sexual harassment, a school may be found to be deliberately indifferent only where its response "is clearly unreasonable in light of the known circumstances." *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999). Furthermore, to prove liability, a plaintiff must show that the school's deliberate indifference subjected him or her to harassment or made him or her vulnerable to it. *Id.* at 645. If an educational institution takes "timely and reasonable measures to end the harassment, it is not liable under Title IX for prior harassment." *Wills v. Brown Univ.*, 184 F.3d 20, 26 (1st Cir. 1999). But if earlier measures have proved inadequate to prevent further harassment, a school "may be required to take further steps to avoid new liability." *Id.*; *see also Porto v. Town of Tewksbury*, 488 F.3d 67, 74 (1st Cir. 2007) (stating that a school may be found deliberately indifferent "where it had notice of the sexual harassment" and "failed to take additional reasonable measures after it learned that its initial remedies were ineffective").

However, "Title IX does not require educational institutions to take heroic measures, to perform flawless investigations, to craft perfect solutions, or to adopt strategies advocated by parents." *Fitzgerald*, 504 F.3d at 174. It is sufficient if a school takes "timely and reasonable" measures to address the harassment, even if those measures fall short of perfection. *See Wills*, 184 F.3d at 26.

Here, Jane contends that the District failed to adequately respond to her report of sexual assault in multiple respects.

      a.      **The Alleged Failure to Suspend the Boys Immediately**

First, Jane alleges that the District acted inappropriately when it failed to suspend the boys immediately after she reported the assault on November 7.

After Jane reported the sexual assault on November 7, both Leichtman and Patterson notified the Sudbury Police Department. The police directed school officials to delay their

46

investigation into the allegations pending the completion of its criminal investigation.  The police did not notify Patterson that the school could interview the boys for a school-based investigation until Wednesday, November 20.

On Friday, November 22, two days later, Perpetrator Two was informed that he was suspended pending the school's investigation.  That suspension began on Monday, November 25.

Perpetrator One was represented by counsel, who instructed Patterson not to interview him.  On Tuesday, November 26, Perpetrator One was also notified that he was suspended for at least two days pending the school investigation.[42]  On Monday, December 2, after the Thanksgiving holiday, the school notified Perpetrator One that it was convening a disciplinary hearing on Thursday, December 5.  As a result of that hearing, the school concluded that "an interaction of an egregious nature" had occurred and suspended him through January 1, 2014. (Def. Ex. 43 at 1).[43]

Under the circumstances, it was not unreasonable for the District to respect the police's instructions to delay its investigation.  Once the police notified the school that the matter was closed, school officials thereafter proceeded reasonably promptly to gather evidence, impose suspensions, and hold disciplinary hearings; indeed, both boys were suspended within a matter of days.  The District was not required, under the circumstances, to suspend the two boys immediately, without the benefit of even a preliminary investigation.  In short, the brief delay in imposing suspensions does not amount to deliberate indifference.

---

[42] School officials also told both boys that they should not attend school on November 13, the day after the HPOs were issued and the first day that Jane returned to Lincoln-Sudbury.

[43] Perpetrator Two's disciplinary hearing was delayed until March 24, 2014, because he left Lincoln-Sudbury for an extended evaluation in early December 2013.  His hearing was held two weeks after he returned to Lincoln-Sudbury, where it was similarly determined that "an interaction of an egregious nature" had occurred.  (Def. Ex. 48 at 1).

### b.      The Alleged Forced Isolation of Jane

Jane next alleges that in the period between November 13 (when she returned to school after reporting the incident) and December 3 (when she began her extended evaluation at EDCO North Crossing), the District "isolated [her] from the rest of the student body and allowed the [p]erpetrators to freely roam the school grounds without supervision (despite having knowledge of court-ordered HPOs against them)."  (Pl. Opp. at 11).  That contention, however, substantially distorts the actual evidence concerning the school's response.

First, the District took multiple steps in an effort to avoid or mitigate the possibility that Jane would interact with the boys during the school day during the two-week period that they remained in school together.[44]  The most likely places in which that might occur were in the classroom, in the cafeteria during the lunch period, and in the hallways between classes.  After receiving the HPOs, Patterson checked to ensure that Jane did not share any classes with them, which she did not.  Patterson also testified that she had a conversation with Jane about where it was possible that she would see them, and specifically about the potential of interacting with them during the lunch period.  Jane did share a lunch period with one of the boys.  But Jane told Patterson that she was not concerned about seeing the boys in the cafeteria, because she liked to eat with her mother.  And, according to Wong, school personnel monitored lunch periods and classrooms to ensure that Jane and the boys were kept apart.

Jane did pass one of the boys in the hallway on at least one occasion, which resulted in a "really hard day" for her.  (Def. Ex. 14).  But Patterson met with Jane immediately following the incident.  And after that happened, Patterson testified that she worked with Jane on a daily basis

---

[44] As noted, Jane and Perpetrator One attended Lincoln-Sudbury together for only seven days after she reported the sexual assault until she left for EDCO North Crossing.  She attended school with Perpetrator Two for only four days.

to ensure that she and the boys would not cross paths.  Thus, the District did not do "nothing . . . after it learned that its initial remedies were ineffective."  *Porto*, 488 F.3d at 74.

Whether there were other encounters between Jane and the boys is unclear.  Jane originally stated in an interrogatory response that the boys and their friends would stare, laugh, and point at her, and that one of the boys lingered around an area where she was and glared at her prior to rugby practice.  But she later testified in her deposition that she does not recall either of the boys saying "anything" to her when she saw them in school, that she was "not sure" whether either did "anything verbally or physically to make [her] feel threatened or intimidated by them," and that she also she did not recall any interactions with their friends that made her uncomfortable.  (Jane Dep. at 88, 98).

In any event, "[t]o avoid Title IX liability, an educational institution must act reasonably to prevent future harassment; it need not succeed in doing so."  *Fitzgerald*, 504 F.3d at 175; *see also Porto*, 488 F.3d at 74 (noting that "the fact that measures designed to stop harassment prove later to be ineffective does not establish that the steps taken were clearly unreasonable in light of the circumstances known by [a defendant] at the time").  Here, the District took reasonable steps to minimize any possible interaction Jane could have with the boys.  It appears that the District did not always succeed, but the steps it took were reasonably directed at that outcome.[45]

Perhaps most importantly, Jane was not deliberately isolated from classrooms and the cafeteria against her will.  After she reported the incident, the District gave her the option of leaving classes, which she did on multiple occasions.  Jane's mother testified that neither she nor Jane were ever told that Jane could not attend her regular classes if she wanted.  Nor does Jane

---

[45] The HPOs stated that the boys had to stay away from Jane "to [the] extent possible" because they attended the same school.  (Def. Ex. 20).  The District was not, therefore, contravening the directive of the court in allowing Jane and the boys to remain together in the school building.

claim that anyone ever told her she was not allowed to attend class.  Again, she did not share any classes with the boys, and therefore she was not likely to encounter them in an academic setting.

The District also made available to Jane various educational accommodations and resources.  The day that she returned to school, Walsh e-mailed her teachers to inform them that she had been involved in an incident and to ask them to send her updates about Jane's work progress.  Later, Patterson asked Jane's teachers to allow her to receive extensions on assignments.  Jane was allowed to leave classes if she felt she was unable to attend and was provided with the option of working in either Walsh's office, Leichtman's office, the East House common area, or the East House conference room.  A school counselor e-mailed Jane's teachers with a tentative schedule of when they could visit Jane in East House to provide her with materials to catch up on work.  In addition, on at least one occasion a teacher e-mailed Walsh with the assignments Jane should work on that day.  Leichtman also arranged for one of Jane's teachers to change the seats of all the students in the class to ensure Jane felt comfortable.  Within a week after Jane reported the incident the District also scheduled a special-education team meeting for her, which occurred the following week.

Jane contends that her education suffered as a result of having to work outside of the classroom, particularly in the East House common area.  There is evidence that is true.  Jane testified that at times she was not given work by her teachers to complete.  Jane's mother testified that even if Jane was given assignments, she could not complete them because she had not been to class.  In addition, Patterson could not remember if teachers actually did visit East House after the counselor created a schedule for them to do so, and that in general she could not recall if Jane was doing schoolwork while sitting in East House.  (Patterson Dep. at 105-06).  And matters were surely complicated by the fact that Jane had a learning disability.  But the fact

that the school's response to Jane's educational issues may not have worked in every respect does not mean that it was deliberately indifferent or otherwise unreasonable under the circumstances.

Jane contends that the boys should have been required to stay in a certain area of the school building so that she could freely attend her classes in the period before the boys' disciplinary hearings. It is by no means clear that such an action was necessary or even appropriate, in light of the fact that Jane did not share classes with either boy. In any event, a plaintiff does not have the right to make particular remedial demands, and courts "should refrain from second-guessing" the decisions of school administrators when assessing their responses. *Davis*, 526 U.S. at 648. Thus, in *Fitzgerald*, the First Circuit found that a school did not exhibit deliberate indifference when, during the course of its investigation into alleged sexual harassment, it proposed to change the school bus of the victim but not the bus of the perpetrator and also denied other remedial measures proposed by the victim. 504 F.3d at 174, n.6, 174-75. Title IX "does not require an educational institution either to assuage a victim's parents or to acquiesce in their demands." *Id.* at 175; *see also Leader v. President & Fellows of Harvard Coll.*, 2018 WL 3213490, at *4 (D. Mass. June 29, 2018) (noting "the underlying principle that a remedial measure to separate the plaintiff and putative assailant is not unsuitable merely because it would place the burden on the plaintiff rather than the putative assailant before a finding of fault by the putative assailant").

In summary, the District did not exhibit deliberate indifference by allowing both the boys and Jane to attend their classes before the school completed its investigation. It did not act unreasonably in allowing Jane the opportunity, if she preferred, to complete her schoolwork in alternative areas from the classroom and providing opportunities for her teachers to both update

Walsh on her progress and directly provide Jane with schoolwork, even if in some instances Jane was not always provided with work to complete.  *See also Doherty v. Emerson Coll.*, 2017 WL 4364406, at *8 (D. Mass. Sept. 29, 2017) ("It is not enough for a plaintiff to show 'that the school system could or should have done *more*.'") (citing *Porto*, 488 F.3d at 73) (emphasis added).  Again, the fact that the school's plan was not entirely successful is not sufficient to establish that the school was deliberately indifferent to Jane's educational needs.

<strong>c.      <u>The Alleged Forced Removal of Jane from School</u></strong>

Jane next alleges that the District exhibited deliberate indifference by taking her out of Lincoln-Sudbury and forcing her to attend an extended evaluation at EDCO North Crossing.  Again, that claim distorts the evidentiary record.

First, Jane was not forced to withdraw from Lincoln-Sudbury, nor was she removed from school against her will.  Instead, at the special-education team meeting where the extended evaluation was proposed, Jane reported "not being able to focus and not feeling safe in the [Lincoln-Sudbury] building regardless if the [boys] are in sight."  (Def. Ex. 24).  The school thus effectively faced the choice of permanently expelling the two boys or working to find an alternative solution for Jane to continue her education.  It elected to pursue the latter course.  The team discussed the possibility of home-tutoring, but because there was concern about Jane developing a "school phobia," the team decided home tutoring would not have been in her best interest.  (Ramos Dep. at 47-48).  In addition, Jane's mother testified that Jane needed smaller class sizes after the incident.  After extended discussions, Jane's parents and the school agreed to a placement at EDCO North Crossing, which had a curriculum that included small-group instruction, individual counseling, and group therapy.

In its recommendation the District was not, therefore, indifferent to the effect that the incident was having on Jane and her educational experience, and did not force her to leave the

school to continue her education.  To the contrary, in a meeting attended by at least fourteen people, including Jane and her parents, the team recommended an extended evaluation because it was "concerned about [Jane's] current well-being due to the alleged incident."  (Def. Ex. 24; Def. Ex. 23 at 2).  Jane's parents consented at every step of the process that led to her enrollment at EDCO North Crossing.

Jane's mother nonetheless testified that she agreed to the outplacement only because the District was "not removing [the boys] from the school."  (C. Roe Dep. at 51).  Again, a plaintiff cannot prevail on a Title IX claim simply because the District did not comply with her specific remedial demands, particularly when it takes other reasonable actions in response.  *See also Davis*, 526 U.S. at 648 (noting that a school need not expel every student accused of misconduct in order to comply with Title IX).

Nor was the school required, under the circumstances, to expel both boys permanently after the disciplinary hearings, rather than impose temporary suspensions and other restrictions (such as requiring Perpetrator One to undergo counseling and training).  The school was not required to treat them like hardened criminals.  Both boys were freshmen, 14 or 15 years old, at the time of the incident.  As noted, there is a factual dispute as to what happened, and whether it was consensual—the school ultimately characterized it as "an interaction of an egregious nature"—but it does not appear that there was any ongoing danger of a repeat occurrence.  (Def. Ex. 43 at 1; Def. Ex. 48 at 1).  Perpetrator One, according to Patterson, was very apologetic, and one of the boys (it is unclear which) had apologized the next day to Jane.  Complicating matters further, Perpetrator Two was a special-education student, and the school eventually concluded that his conduct was substantially related to his disability.

In any event, the issue is not whether it might have been wiser to expel the boys, or to

impose a harsher discipline.  Again, it is whether the school failed to act, or was deliberately indifferent, in response to Jane's report of sexual misconduct.  Based on the undisputed evidence, she cannot make that showing here.

### d.     The Alleged Placement of Jane in an Inferior Learning Environment

Jane further alleges that the extended evaluation "punish[ed]" her academically because EDCO North Crossing had a different curriculum than did Lincoln-Sudbury, with "far fewer educational . . . opportunities and programs."  (Pl. Opp. at 6, 12).

To be sure, EDCO North Crossing had fewer resources than Lincoln-Sudbury.  But a Lincoln-Sudbury official requested that each of Jane's teachers provide her with information on the topics they planned to cover for the rest of the semester so that Jane's teachers at EDCO North Crossing could parallel Lincoln-Sudbury's curriculum as much as possible.  In addition, although initially Ramos did not want to pay for a Spanish tutor for Jane, the District did ultimately provide her with one during her extended evaluation.  Jane also contends that she had to "fight to ensure" that Lincoln-Sudbury grades, as opposed to EDCO North Crossing grades, would appear on her transcript for the extended evaluation, which was "an important consideration for college applications."  (Pl. Opp. at 6-7).  But at the time Jane was undergoing her extended evaluation, the District's policy was for the school where the student was taking classes to appear on the student's transcript.  And as demonstrated by the multitude of evidence in the record about the transcript issue, even if the outcome was not what Jane would have preferred, the District was hardly indifferent to the issue.  *See Doherty*, 2017 WL 4364406, at *9 (noting that with regard to educational accommodations, "[t]he extensive back-and-forth

between [the defendant] and [the plaintiff] belies an assertion of deliberate indifference").[46]

Furthermore, Jane's mother testified that she did not recall having any concerns about the academic support Jane received during her extended evaluation or whether she expressed any concerns about the placement to Lincoln-Sudbury officials.  And during those 45 days, officials at Lincoln-Sudbury checked in on Jane and her mother to ensure that Jane was progressing.

Jane further alleges that the District exhibited deliberate indifference after her special-education team decided that she required a therapeutic day school setting and provided for a permanent out-of-district placement away from Lincoln-Sudbury.[47]  She alleges that the District "continuously and systematically fought against providing her with the same educational programs and opportunities that they afforded both of the [p]erpetrators."  (Pl. Opp. at 12).  And she specifically alleges that the District should have presented her with the option of staying at Lincoln-Sudbury and participating in specific programs offered by the school, in particular the BEACON or EXCEL programs.

To begin, the BEACON Program was not even in existence when Jane's IEP was created in February 2014.  In addition, although Jane alleges that the BEACON program was designed specifically to help students with academic and emotional needs on a case-by-case basis, Patterson testified that no student in her House had participated in the BEACON program after

---

[46] Jane also alleges that there were instances of other students who did not attend Lincoln-Sudbury classes working with Lincoln-Sudbury teachers to receive Lincoln-Sudbury grades, or who received tutoring over a break to complete Lincoln-Sudbury work.  Patterson testified that there were some students for whom this was the case.  But the record contains no details of those students' circumstances, or whether they were determined by a special-education team to require the same services as Jane.  Thus, the simple fact that there were some other Lincoln-Sudbury students who received different accommodations from the school than did Jane does not demonstrate that the District exhibited deliberate indifference with regard to Jane.  See Doherty, 2017 WL 4364406, at *9 ("[The plaintiff's] own account of the accommodations she was given reveal that [the defendant] considered her requests, and that she was offered accommodations, just not every accommodation she wanted.").

[47] Notably, the District could not prevent Jane from returning to Lincoln-Sudbury if she so chose.  Jane's parents were aware that they could reject any portion of the proposed IEP, as they had done so in the past.  In addition, Jane's parents had the option to exercise a "stay put" and prevent Jane from being placed in an out-of-district program, regardless of what her IEP team recommended if there was a disagreement.

coming back from an out-of-district program.  And Ramos testified that it is not a special-education program.  Furthermore, even if the BEACON or EXCEL programs would have "been a perfect fit for Jane," (Pl. Opp. at 9), the District was not deliberately indifferent in outplacing Jane at a therapeutic day school instead of enrolling her in these programs.  Jane's special-education team determined that as a result of her "emotional disability (anxiety, depression and [post-traumatic stress disorder])" that stemmed from the incident, she required small group classes and access to clinical supports throughout the day.  (Def. Ex. 30 at 2).  No one at the meeting, including Jane's parents, disagreed with that conclusion.  And EDCO North Crossing satisfied her IEP requirement because it was a therapeutic day school.  As noted, a school does not demonstrate deliberate indifference by "failing to provide [a plaintiff] with a *particular* remedial measure," as long as it provides "suitable remedial measures."  *Leader*, 2018 WL 3213490, at *5 (emphasis added).

The same principle forecloses Jane's contention that the District demonstrated deliberate indifference when it refused to "find a school offering better educational opportunities than EDCO."  (Pl. Opp. at 12).  When Jane's parents expressed to Ramos in March 2014 that she was not being sufficiently challenged at EDCO North Crossing, Ramos suggested that they reconvene Jane's special-education team to discuss the concerns and brainstorm solutions.  On April 7, 2014, Jane's parents asked about the possibility of Jane attending a different public school for the following school year.  Ramos then called other public schools but concluded that they did not have a therapeutic day program.  Finally, when EDCO North Crossing staff notified Ramos that Jane's parents wanted a different placement, Ramos again informed them that although they had declined to have the District send Jane's referral information to other schools that could provide Jane with services in the past, they could still do so and thus find a different

placement for her.  And when Jane's parents did provide their consent for the District to try to find a different placement, a Lincoln-Sudbury staff member sent out Jane's information on the same day to the two potential schools specified by her parents.  The District was thus responsive to Jane and her parent's concerns about EDCO North Crossing.  Although Jane and her parents may have preferred that she attend a different school, because EDCO North Crossing was a suitable remedial measure, the District was not deliberately indifferent to her educational needs.

Jane also complains that the District refused to provide her with a Spanish tutor for the remainder of the 2013-2014 school year.  But Jane and her parents were aware that EDCO North Crossing did not have a Spanish class and still chose for Jane to attend that school.  The District offered to send Jane's referral information to other therapeutic day schools from which Jane could choose her out-of-district placement, but Jane and her parents declined that option.  In addition, Ramos testified that Spanish was a class, not a service, and therefore was not required to be provided for in an IEP.  The District was therefore not deliberately indifferent in declining to provide a Spanish tutor for her.[48]

Finally, Jane alleges that Ramos demonstrated deliberate indifference in connection with her application to Lawrence Academy.  Jane contends that Ramos "grew outright hostile" when she requested that Walsh write her a reference for her application to the private school.  (Pl. Opp. at 12).  But Ramos testified that she told Walsh that it was her decision whether to write the recommendation or not.  Ramos also told Jane and her parents that the District would not pay for the tuition or transportation costs for Lawrence Academy because it was not a therapeutic day school, which was the recommendation of Jane's IEP.

---

[48] In addition, Jane's IEP noted that if she continued at EDCO North Crossing for the fall 2014 semester and the team determined that she could attend mainstream classes, then EDCO North Crossing would arrange for her to take Spanish classes at a different high school.

Jane contends that this constituted deliberate indifference because Lincoln-Sudbury has in the past paid, at least in part, for a student to attend a private school. But Wong testified that the District has paid a private school tuition for a student only "[i]n circumstances where they offered programs that were *suitable* for the student." (Wong Dep. at 82) (emphasis added). And Jane provides no evidence of why Lawrence Academy was a "suitable" school for her; indeed, Wong testified that the District has never paid tuition costs where it "thought [the student] needed therapeutic supports." (*Id.* at 84).

In summary, the school neither ignored Jane's educational and emotional needs, nor was indifferent to them. Through the special-education team, and working with Jane's parents, the school developed a plan for an appropriate placement that met her various needs. The failure to meet all of her demands—including the permanent expulsion of both boys—does not constitute deliberate indifference.

### e.      The Alleged Failure to Address Transportation Issues

Jane next identifies two instances involving school transportation where she alleges that the District demonstrated deliberate indifference.

In the first example, Ramos told a Lincoln-Sudbury student services staff member not to respond to a May 6, 2014 e-mail from Jane's mother concerning Jane's transportation from EDCO North Crossing. The simple answer to that contention is that the e-mail from Jane's mother itself stated that "no action [was] needed" on the part of the school. (Pl. Ex. 63 at 1). If Jane's own mother thought that no action was needed, it is difficult to see how the school's failure to respond, or to take further action, can be fairly characterized as an instance of deliberate indifference.

In the second example, Jane alleges that she was verbally harassed by a driver during one of her trips to EDCO North Crossing. Ramos testified that the transportation company

interviewed the driver, who reported that Jane had been kissing another student and that he had asked them to stop.  Jane's requested accommodation, which was to have only female drivers, was then declined.  But the issue, again, is not whether that decision was correct; it is whether the administrators ignored, or were deliberately indifferent to, the issue.  They were not required by law either to accept Jane's version of events or accede to her request.

In short, neither example represents an instance of deliberate indifference by the school to her transportation issues.

### f.      The Alleged Failure to Inform Jane of the Discipline Given to the Boys

The complaint also alleges that the District "acted with deliberate indifference in deviating significantly from the standard of care outlined by the Dear Colleague letter of 2011." (Compl. ¶ 88).  In particular, Jane alleges that the District failed to inform her and her parents of the outcome of its investigation into her allegations and the resulting punishments of the boys.

The "Dear Colleague Letter" instructs that a complainant should be notified in writing, concurrently with the perpetrators, about the outcome of her complaint and any sanction imposed on the perpetrators that relate to her, including if the perpetrators are prohibited from attending school for a period of time.  It appears that the District did not do so, or at least not contemporaneously.  The record is not entirely clear as to whether Jane and her mother were informed of the boys' suspensions, but it is undisputed that they did not receive written notice.[49] The District did not send Jane's parents a letter on the investigation's outcome until October 1, 2015, and then subsequently clarified the investigation's results in an August 24, 2017 letter.[50]

---

[49] Jane testified that she understood that the boys were eventually suspended.

[50] OCR noted that the District delayed sending the clarifying letter at its request pending the conclusion of its own investigation.

OCR thus found that the District did not provide timely written notice to Jane's parents about the outcome of the investigation, although it also found that it did keep the parents informed of the investigation and thus found "no indication that by not providing formal written notice, the [s]chool failed to eliminate the hostile environment for [Jane]." (Def. Ex. 49 at 7).

It appears that the school did not advise Jane's parents of the suspensions and other requirements imposed on the boys because of concerns over protecting their rights to privacy. Whether that was the correct course or not, it is not a sign of utter indifference. Again, both boys were 14 or 15 years old, and one was a special-needs student; their privacy interests were legitimate areas of concern. The interest of Jane and her parents in knowing the results of the disciplinary process needed to be balanced against the interest of the school in protecting the privacy of juvenile offenders. Again, the question is not whether a different calibration of that balance might have been wiser, but whether the school's failure to do so constitutes deliberate indifference amounting to gender discrimination.

Furthermore, and in any event, the "Dear Colleague Letter" was not a federal regulation. It is certainly questionable whether it set the relevant "standard of care" during the relevant period; it was highly controversial, and has since been rescinded. But even a District's failure to comply with a federal regulation does not by itself constitute deliberate indifference and thus gender discrimination under Title IX. *See Porto*, 488 F.3d at 75 n.6 ("Likewise, the fact that [the defendant] did not have a sexual harassment policy that complied with Department of Education regulations is insufficient to establish deliberate indifference; the [plaintiffs] have not offered any evidence that would permit the inference that [the plaintiffs'] harassment was a known consequence of such noncompliance."); *see also Gebser*, 524 U.S. at 291-92 (finding that "[the defendant's] alleged failure to comply with the [Department of Education] regulations" to

publish grievance procedures for resolutions of discrimination complaints "does not establish the requisite actual notice and deliberate indifference" needed to sustain a Title IX claim); *Lopez v. City of Somerville*, 2018 WL 3104077, at *6 n.9 (D. Mass. June 21, 2018) (finding that a defendant's failure to follow the Department of Education's guidance about actions schools should take in response to allegations of sexual harassment does not, without a finding of deliberate indifference, make it liable under Title IX); *Doe v. Bradshaw*, 2013 WL 5236110, at *10 (D. Mass. Sept. 16, 2013) (finding that a defendant's failure to appoint a Title IX coordinator, in violation of a federal regulation, is not actionable under Title IX); *see Doherty*, 2017 WL 4364406, at *8 (finding that a plaintiff's claim of deliberate indifference with respect to a school not providing sufficient sexual assault education to its students failed when she alleged no evidence that the school knowingly ignored the alleged deficiencies in the education it provided).

Jane offers no evidence that would "permit the inference" that any harm to her was a "known consequence" of the District's noncompliance with the "Dear Colleague Letter," or that it knowingly ignored the deficiencies in its compliance. *Porto*, 488 F.3d at 75 n.6.  Thus, even if the District failed to adhere to the guidance in the "Dear Colleague Letter," that is insufficient to demonstrate that the District was deliberately indifferent to Jane's sexual assault.

### g.      <u>Conclusion</u>

In summary, the District's response to the incident may not have been completely successful in every respect, and may have occasionally fallen short of the best possible practice. Nonetheless, the overall record indicates that Lincoln-Sudbury staff worked, over the course of seven months, to try to respond to Jane's report of a sexual assault and provide an appropriate response to her educational and other needs.  Even considering the alleged deficiencies in the District's response in the light most favorable to Jane, the sum of the evidence fails to provide a

basis upon which a reasonable jury could conclude that the District failed to act, or was deliberately indifferent, such that it can be found liable for gender discrimination under Title IX. Deliberate indifference is a "stringent standard," and that standard has not been met here.  *See T.K. v. Town of Barnstable*, 2020 WL 3183164, at *6 (D. Mass. June 15, 2020) ("Deliberate indifference is a stringent standard of fault . . . .") (internal quotation omitted).  Accordingly, the defendants' motion for summary judgment as to Count One will be granted.

### B.   Civil Rights Violation Under 42 U.S.C. § 1983 (Count 2)

Count Two alleges a claim under 42 U.S.C. § 1983 based on an alleged violation of Jane's Fourteenth Amendment rights to personal security, bodily integrity, and equal protection of the laws.[51]  Defendants have moved for summary judgment on that claim, contending (1) that Jane failed to exhaust her administrative remedies; (2) that they did not violate her right to personal security and bodily integrity; and (3) that they did not violate her right to equal protection of the laws.

### 1.   Administrative Exhaustion

Defendants first allege that the § 1983 claims are subject to the exhaustion requirement of the Individuals with Disabilities Education Improvement Act of 2004 ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and that Jane failed to exhaust her administrative remedies under that Act.[52]

The IDEA conditions the provision of federal funds to public schools on compliance with a requirement to provide all disabled children with a "free appropriate public education" ("FAPE").  *See Parent/Pro. Advoc. League v. City of Springfield*, 934 F.3d 13, 19 (1st Cir. 2019) (citing 20 U.S.C. § 1412(a)(1)).  The IDEA's exhaustion provision provides as follows:

---

[51] The complaint states that Count Two is brought against all defendants.  (Compl. at 19).  Because § 1983 claims can only be brought against school districts in the limited circumstances discussed in Count Three, the Court will consider the individual defendants' alleged § 1983 violations in Count Two.

[52] Jane does not contend that she complied with the exhaustion requirements of the IDEA.

> Nothing in [the IDEA] shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(l).[53]  That exhaustion requirement "is not limited to claims based directly upon violations of the IDEA," and applies "even when the suit is brought pursuant to a different statute so long as the party is seeking relief that is available under subchapter II of [the] IDEA." *Frazier*, 276 F.3d at 59 (quoting *Rose v. Yeaw*, 214 F.3d 206, 210 (1st Cir. 2000)).  In particular, "where the underlying claim is one of violation of the IDEA, plaintiffs may not use § 1983 . . . in an attempt to evade the limited remedial structure of the IDEA."  *Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 29 (1st Cir. 2006).  In addition, "[t]he First Circuit has construed [the exhaustion requirement] broadly to include claims that seek monetary relief not available under the IDEA." *del Rosario ex rel. Burke v. Nashoba Reg'l Sch. Dist.*, 2020 WL 6909237, at *5 n.6 (D. Mass. Nov. 24, 2020) (citing *Frazier*, 276 F.3d at 64).

However, the IDEA's exhaustion requirement applies only where the plaintiff "seek[s] relief for the denial of a FAPE, because that is the only relief the IDEA makes available."  *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 752 (2017) (internal quotations omitted).  A FAPE comprises special education and related services.  *Id.* at 748-49.  If a plaintiff seeks redress for a school's conduct toward her that injures her in ways "unrelated to a FAPE," then the IDEA's exhaustion requirement does not apply.  *Id.* at 754-55.  Thus, although the "same conduct might violate" the IDEA, a plaintiff "might instead seek relief for simple discrimination, irrespective of

---

[53] The administrative procedures detailed under subsections (f) and (g) of the IDEA include a due process hearing before local and state educational agencies.  *See* 20 U.S.C. § 1415(f)-(g).

the IDEA's FAPE obligation." *Id.* at 756.

In order to determine whether a lawsuit seeks relief for the denial of a FAPE, "a court should look to the gravamen of the plaintiff's complaint—not the labels used in it." *Doucette v. Georgetown Pub. Schs.*, 936 F.3d 16, 23 (1st Cir. 2019) (quoting *Fry*, 137 S. Ct. at 752, 755) (internal quotations and alterations omitted). The Supreme Court recently identified two clues to help courts perform that inquiry:

> The first clue comes from the answers to a pair of hypothetical questions: (1) could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school? and (2) could an *adult* at the school have pressed essentially the same grievance? When the answer to each question is no, the complaint probably does concern a FAPE. On the other hand, if the answers are yes, a FAPE is unlikely the true subject of the complaint. The second clue involves the history of the case; a plaintiff's previous invocation of the IDEA's formal procedures may provide strong evidence that the substance of a plaintiff's claim concerns the denial of a FAPE.

*Doucette*, 936 F.3d at 23-24 (quoting *Fry*, 137 S. Ct. at 756-57) (internal quotations and alterations omitted).

The § 1983 claim here alleges that defendants violated Jane's Fourteenth Amendment rights to personal security, bodily integrity, and equal protection of the laws.[54] Her claim does not assert that the alleged discrimination was in any way related to the fact that she had a disability or that, as a disabled student, her right to a FAPE was denied by the defendants' actions. Instead, she alleges that she "suffered emotional distress and psychological damage, and her character and standing in her community have suffered from the harassment fostered as a direct and proximate result of [d]efendants' deliberate indifference to her rights under the Fourteenth Amendment." (Compl. ¶ 98); *see also E.T. ex rel. Doe v. Bureau of Special Educ. Appeals of the Div. of Admin. L. Appeals*, 91 F. Supp. 3d 38, 51 (D. Mass. 2015) (noting that

---

[54] The *Fry* framework should be applied separately to each claim alleged to fall within the IDEA's exhaustion requirement. *See Doucette*, 936 F.3d at 24.

"[t]o the extent that plaintiffs seek damages for humiliation, pain and suffering, and damage to emotional well-being separate from education-related issues, those claims are independent claims that do not arise under the IDEA") (internal quotations omitted).  Therefore, the gravamen of her claim is not that, as a disabled student, defendants denied her a FAPE.  Jane's claims are thus not "rooted in an alleged violation of the IDEA" and are not subject to its exhaustion requirement.  *See Bowden ex rel. Bowden v. Dever*, 2002 WL 472293, at *3 (D. Mass. Mar. 20, 2002) (internal quotation omitted).

To further illustrate that point, the Court will apply the "clues" identified in *Fry*.  Here, there is no evidence in the record that Jane previously invoked the IDEA's formal procedures in response to the defendants' actions.  In addition, Jane could have brought similar Fourteenth Amendment claims had she experienced a sexual assault at a public facility that was not a school.  *See Fry*, 136 S. Ct. at 756.  For example, Jane alleges that her equal-protection rights were violated because the school responded differently to her report of sexual assault than it did to similar reports by other students.  If she were subject to differential treatment by public actors in response to her report of sexual assault at a non-school public venue, such as at a government building, then she would be able to bring an equal-protection claim against those public actors.  In addition, an adult at the school, such as a teacher, could have also alleged a violation of her equal-protection rights had the school responded to her claims of sexual assault differently than those of other teachers.  *See Fry*, 136 S. Ct. at 756.

Defendants nonetheless allege that *Bowden* supports their contention that the IDEA's exhaustion requirement applies to cases in which the "underlying allegations involve physical abuse, which is non-educational."  (Def. Mem. at 10).  But in making that finding, the court was discussing a claim that physical abuse by a teacher denied plaintiffs their rights as disabled

students to a FAPE—precisely the right that the IDEA protects.  *Bowden*, 2002 WL 472293, at

*4.  Here, the § 1983 claim does not allege that Jane was denied the right to an equal education

as a disabled student.  In fact, *Bowden* specifically noted that "[d]efendants' exhaustion

argument does not extend to plaintiffs' § 1983 claim for violation of bodily integrity," as that

claim did "not allege a FAPE violation."  *Id.* at *5; *see also E.T. ex rel. Doe*, 91 F. Supp. 3d at

51-52 (finding that plaintiffs were not required to exhaust the IDEA administrative proceedings

with respect to their § 1983 claims that did not assert the denial of a FAPE).

Accordingly, the § 1983 claim is not subject to the IDEA's exhaustion requirement.

## 2.       The Substantive Due-Process Right to Personal Security and Bodily Integrity

Defendants next contend that they did not violate Jane's Fourteenth Amendment right to

personal security and bodily integrity and that therefore their motion for summary judgment

should be granted on that claim.  Jane does not seem to oppose the motion on that point; it

appears as though she no longer contends that she should be afforded relief under § 1983 for

defendants' alleged violation of that right.

Because Jane does not attempt to rebut defendants' motion for summary judgment on this

claim, the Court will treat it as unopposed.  *See Lam v. PNC Mortg.*, 130. F. Supp. 3d 429, 435

(D. Mass. 2015).  Nevertheless, the Court will still consider the merits of the claim, viewing the

record in the light most favorable to Jane.  *Aguiar-Carrasquillo v. Agosto-Alicea*, 445 F.3d 19,

25 (1st Cir. 2006) ("It is well-settled that before granting an unopposed summary judgment

motion, the court must inquire whether the moving party has met its burden to demonstrate

undisputed facts entitling it to summary judgment as a matter of law.") (internal quotations

omitted).

"To establish a substantive due process claim, a plaintiff must show deprivation of a

protected interest in life, liberty or property that was caused by government conduct." *Thomas v. Town of Chelmsford*, 267 F. Supp. 3d 279, 296-97 (D. Mass. 2017) (citing *Rivera v. Rhode Island*, 402 F.3d 27, 33-34 (1st Cir. 2005)).  The right to bodily integrity is such a protected interest.  *See Albright v. Oliver*, 510 U.S. 266, 271-72 (1994).  Jane contends that the defendants violated that right by (1) "failing to investigate the [p]erpetrators' misconduct"; (2) "failing to appropriately discipline the [p]erpetrators"; (3) "failing to adequately train and supervise [the individual defendants]"; and (4) "manifesting deliberate indifference to the sexual assault and ongoing harassment of Jane by other students."  (Compl. ¶ 93).

Jane thus does not allege that the defendants themselves, as the government actors, took any affirmative action that violated her right to bodily integrity.  Instead, she contends that other students inflicted bodily injury upon her, and that the government actors failed to protect her from that violence and ongoing harassment.  But as a general matter, "a [s]tate's failure to protect an individual against private violence . . . does not constitute" a due-process violation. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989).  And while there are two potential exceptions to that general rule—the "special relationship" exception and the "state-created danger" exception—neither applies here.

First, a government actor may be liable for failing to prevent a private violent act when there is a "special relationship" between the government actor and the victim.  *See Raymond v. Maine Sch. Admin. Dist. 6*, 2019 WL 2110498, at *7 (D. Me. May 14, 2019).  The special relationship is one in which "the [s]tate takes a person into its custody and holds him there against his will" and thus "by the affirmative exercise of [the state's] power so restrains an individual's liberty that it renders him unable to care for himself." *DeShaney*, 489 U.S. at 199-200.  Thus, "a state's affirmative duty to protect an individual arises out of the state's exercise of

its power to place an individual under incarceration, institutionalization, or other similar restraint of personal liberty." *Thomas*, 267 F. Supp. 3d at 297 (internal quotations omitted).

As a general matter, courts have found that public schools do not have "such a degree of control" over students as to create a special relationship, such that schools can be liable for a due-process violation for failing to prevent a private violent act against a student. *See Hasenfus v. LaJeunesse*, 175 F.3d 68, 71-72 (1st Cir. 1999) (quoting *Veronia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655 (1995)); *see also Thomas*, 267 F. Supp. 3d at 297-98 (citing cases). But the First Circuit has acknowledged the possibility that a school could have a constitutional duty to protect a student in certain "narrow circumstances." *See Hasenfus*, 175 F.3d at 72 ("If [the plaintiff] had suffered a heart attack in the classroom, and the teacher knew of her peril, could the teacher merely leave her there to die without summoning help? If a six-year old child fell down an elevator shaft, could the school principal ignore the matter?").

The second possible exception is the "state-created danger" theory. Some courts have recognized this exception "based on language in *DeShaney* that 'suggested, but never expressly recognized, the possibility that when the state creates the danger to an individual, an affirmative duty to protect might arise.'" *Irish v. Maine*, 849 F.3d 521, 525 (1st Cir. 2017) (quoting *Rivera*, 402 F.3d at 34-35); *see also Hernandez v. City of Boston*, 2017 WL 1496920, at *5 (D. Mass. Apr. 25, 2017) ("The state-created-danger theory creates a duty for state actors to protect citizens from harm ultimately caused by other sources when the state actor takes an affirmative action that makes that harm more likely."). But while the First Circuit has "discussed the possible existence" of that theory, it has "never found it applicable to any specific set of facts." *Abdisamad v. City of Lewiston*, 960 F.3d 56, 60 (1st Cir. 2020) (quoting *Irish*, 849 F.3d at 526); *see also Pollard v. Georgetown Sch. Dist.*, 132 F. Supp. 3d 208, 227-28 (D. Mass. 2015) (noting

that federal courts have rejected application of the state-created danger theory in physical assault and bullying cases).

Ultimately, the Court need not decide whether this case falls within the "narrow circumstances" where either the special-relationship or state-created danger theory may apply. That is because "[e]ven if there exists a special relationship between the state and the individual or the state plays a role in the creation or enhancement of the danger, under a supposed state[-]created danger theory, there is a further and onerous requirement that the plaintiff must meet in order to prove a constitutional violation: the state actions must shock the conscience of the court." *Rivera*, 402 F.3d at 35.

Only conduct that is "truly outrageous, uncivilized, and intolerable" shocks the conscience. *Hasenfus*, 175 F.3d at 72. The test is "primarily concerned with violations of personal rights so severe[,] so disproportionate to the need presented, and so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 881 (1st Cir. 2010) (internal quotations and alterations omitted). Thus, "[t]he burden to show state conduct that shocks the conscience is extremely high, requiring stunning evidence of arbitrariness and caprice that extends beyond mere violations of state law, even violations resulting from bad faith to something more egregious and more extreme." *J.R. v. Gloria*, 593 F.3d 73, 80 (1st Cir. 2010) (internal quotations omitted). "Conduct *intended* to injure in some way *unjustifiable* by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Rivera*, 402 F.3d at 36 (quotation omitted).[55]

---

[55] The First Circuit has cautioned that "[i]n situations where actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior *may* suffice to shock the conscience." *Rivera*, 402 F.3d at 36 (emphasis added) (internal quotation omitted). But it has never found such a case. *See Gloria*, 593 F.3d

Here, defendants' behavior—even assuming the truth of Jane's allegations—did not

constitute "truly outrageous, uncivilized, [or] intolerable" behavior. *Hasenfus*, 175 F.3d at 72;

*see also Doe v. City of New Bedford*, 2015 WL 13229204, at *4 (D. Mass. Dec. 4, 2015)

("School officials' actions that shock the conscience typically involve directly inflicting physical

injury.") (citing cases).  In analogous circumstances, courts have found that similar behavior to

that alleged here did not meet the "extremely high" conscience-shocking standard. *Compare*

*Morgan v. Town of Lexington*, 823 F.3d 737, 743 (1st Cir. 2016) (finding that a school's alleged

failure in investigating a bullying incident, punishing the alleged perpetrators, and preventing

further bullying that included both physical and verbal assaults, as well as delaying an

investigation into the bullying did not shock the conscience); *Pollard*, 132 F. Supp. at 228-29

(finding that a school that failed to prevent repeated physical assaults on a student and

investigate the abuse, affirmatively contributed to the student's harm when a teacher referred to

him as a female and forced him to work in isolation during group projects, and threatened that it

would punish the student for "retaliation" when he reported the threats of physical violence that

he received did not shock the conscience), *with Doe1*, 2019 WL 1005498, at *5 (finding that,

although it was a "close question," a school that affirmatively suppressed and delayed the filing

of a report with the Massachusetts Department of Children and Families ("DCF"), as well as

retaliated, including firing a teacher that filed such a report, which impeded DCF from

investigating complaints surrounding a student who abused other students over a series of

multiple years shocked the conscience).

Accordingly, defendants' motion for summary judgment will be granted on Count Two to

---

at 80 n.4 ("This circuit has never found on the facts of a case that deliberately indifferent behavior was sufficiently conscience-shocking to violate a plaintiff's substantive due process rights.").

the extent that it relates to a claim for a violation of Jane's substantive due-process right to bodily integrity and personal security.

### 3.     The Right to Equal Protection

Defendants have also moved for summary judgment on Count Two to the extent it alleges a claim for a violation of Jane's right to equal protection.  They contend that Jane has produced no evidence that she was treated differently than similarly situated persons on the basis of her sex, and that the record "is absent any admissible evidence of similarly situated comparators" or evidence that her differential treatment was motivated by bad faith on which Jane could base her "class of one" claim.  (Def. Mem. at 11-12).

The Equal Protection Clause of the Fourteenth Amendment generally provides that similarly situated persons are entitled to receive similar treatment at the hands of government actors.  *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  To prevail on an equal-protection claim, a plaintiff must show that she "was treated differently from others similarly situated based on impermissible considerations."  *Clark v. Boscher*, 514 F.3d 107, 114 (1st Cir. 2008) (internal quotation and alteration omitted).  In addition, a plaintiff must show that a defendant acted with discriminatory intent.  *See Hayden v. Grayson*, 134 F.3d 449, 453 (1st Cir. 1998) ("[U]nless these plaintiffs established the requisite discriminatory intent, their equal protection claim cannot succeed . . . .").

The record is devoid of any evidence that Jane was treated differently from other similarly situated Lincoln-Sudbury students based on an impermissible consideration.  While the complaint alleges that "[t]he District's policies and/or practices constituted disparate treatment of females and had a disparate impact on female students," Jane has produced no evidence of that claim.  (Compl. ¶ 96).

A plaintiff may also proceed on an equal-protection claim on the theory that she was

arbitrarily and unfavorably singled out as a "class of one."  *See Freeman v. Town of Hudson*, 714

F.3d 29, 38 (1st Cir. 2013).  To prevail on a "class-of-one" claim, a plaintiff must show that she

"has been intentionally treated differently from others similarly situated and that there is no

rational basis for the difference in treatment."  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564

(2000).  To show that there was no rational basis for the decisions leading to differential

treatment, the plaintiff must show that the decisions were "not motivated by any conceivable

legitimate reason."  *Toledo v. Sanchez*, 454 F.3d 24, 33 (1st Cir. 2006).  In addition, "a plaintiff

not relying on 'typical' impermissible categories, such as race or religion" must also show that

the differential treatment was "based on a malicious or bad faith intent to injure."  *Buchanan v.

Maine*, 469 F.3d 158, 178 (1st Cir. 2006); *see also Zell v. Ricci*, 957 F.3d 1, 13 (1st Cir. 2020);

*Snyder v. Gaudet*, 756 F.3d 30, 34 (1st Cir. 2014).

The first requirement in a class-of-one claim is that the "plaintiffs must show an

extremely high degree of similarity between themselves and the persons to whom they compare

themselves[,] . . . without such distinguishing or mitigating circumstances as would render the

comparison inutile."  *Cordi-Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2007) (internal

quotations omitted).  "The standard for determining whether individuals are similarly situated 'is

whether a prudent person, looking objectively at the incidents, would think them roughly

equivalent and the protagonists similarly situated."  *Pollard*, 132 F. Supp. 3d at 223 (quoting

*Mulero-Carrillo v. Roman-Hernandez*, 790 F.3d 99, 106 (1st Cir. 2015)).

Here, Jane contends that she was treated differently than other students who reported a

sexual assault at Lincoln-Sudbury.  In particular, she points to documents sent by the District to

OCR during the course of OCR's investigation of Jane's Title IX claim that detail the District's

response to other reports of sexual assault by female students.  Jane alleges that she and the other

sexual-assault victims were "similarly situated in all material respects" because they were sexually assaulted by a classmate and reported it to officials at Lincoln-Sudbury.  (Pl. Opp. at 14).[56]

Jane identifies the case of OB as an example of a similarly situated student being treated differently than she was after reporting a sexual assault.[57]  In particular, she notes that when OB and the alleged perpetrator, NG, were in school at the same time, "Wong and Patterson created a safety plan that provided that NG would be escorted during some passing periods, OB would be escorted during others, and NG would be asked to spend his free blocks sitting in the house office."  (Pl. Mem. at 14).  In contrast, after Jane reported her incident, the defendants did not institute a written safety plan that included hallway escorts, and the boys were not restricted from spending time in places such as the cafeteria.  But in OB's situation, a court had issued a temporary restraining order that prevented NG from attending Lincoln-Sudbury.  (Pl. Ex. 68 at 10).  After NG asked the court to be allowed to return to school before a full hearing was held on the restraining order, the court directed that a protection plan be put in place for the three days in which NG could attend Lincoln-Sudbury before the full hearing was held.  (*Id.* at 11).  Here, the boys were never ordered to stay away from Lincoln-Sudbury, and therefore Jane and OB's situations do not share an "extremely high degree of similarity."  *Cordi-Allen*, 494 F.3d at 251.[58]  Furthermore, and at a minimum, the fact that a court ordered the defendants to enact a specific

---

[56] It is not clear that all of the sexual-assault reports to which Jane points can be used against each individual defendant—Patterson, Wong, and Ramos—because some of the defendants were not involved in responding to some of the reports.  (*See, e.g.*, Pl. Ex. 59 at 6-7).  Because the claim fails on other grounds, the Court need not resolve that issue.

[57] All of the alleged victims and perpetrators in the OCR investigation documents are referred to by their initials.  (*See* Pl. Ex. 59; Pl. Ex. 68).

[58] At NG's full hearing, the court declined to extend the restraining order; there is no indication that the same safety plan stayed in effect after the hearing.  (Pl. Ex. 68. at 11).

protection plan in OB's case, but not in Jane's, provides a rational basis for the differential response the defendants had to the two students' reports. *See Priolo v. Town of Kingston*, 839 F. Supp. 2d 454, 461 (D. Mass. 2012) ("The [plaintiffs'] equal protection claim also fails because the basis for their different treatment is not irrational."); *see also Jeneski v. City of Worcester*, 476 F.3d 14, 17 (1st Cir. 2007) ("The question is not what went on in the mind of the state actor but whether anyone, including the judge, can conceive of a rational reason for such a classification.").

Jane also identifies the case of SH as an instance of differential treatment.  In that case, Lincoln-Sudbury created a safety plan that "specified certain areas of the building as 'safe spaces' for both" the victim and alleged perpetrator and directed that each could not visit the other's safe space.  (Pl. Ex. 59 at 7).  In addition, the alleged perpetrator was prohibited from eating lunch in the cafeteria and his free blocks were restricted so that he was in a supervised setting at all times during the day.  (*Id.*).  Here, in contrast, there is no evidence that the defendants restricted where the boys could be within the school building in order to ensure that they would not come into contact with Jane.  But Jane and SH were not similarly situated when the defendants implemented the safety plan for SH:  the defendants implemented that plan *after* the alleged perpetrator returned from his suspension, after a disciplinary hearing was held in which the school found that he had committed a violation.  (*See id.* at 6-7).  But in Jane's case, the disciplinary hearing for Perpetrator One did not occur until December 5, 2013, and for Perpetrator Two until March 24, 2014.  Jane's first day of her extended evaluation at EDCO North Crossing was on December 3, 2013.  Thus, unlike SH—who was still attending Lincoln-Sudbury when the alleged perpetrator of her sexual assault returned to school—Jane had stopped attending the school after the boys had their disciplinary hearings.  That is a "distinguishing"

circumstance that prevents Jane from using this response by the defendants as evidence of her "class of one" claim. *Cordi-Allen*, 494 F.3d at 251. Notably, part of Perpetrator One's punishment after his December 5, 2013 disciplinary hearing was that upon his return to school, he would have to spend all of his free blocks in a supervised study location and could not participate in any extracurricular activities until he was able to demonstrate a pattern of good behavior.

There is some evidence that Lincoln-Sudbury officials responded differently in at least one respect to Jane's report than to those of other similarly situated female students—specifically, how they handled the suspensions of the alleged perpetrators. For example, in SH's case, one of the alleged perpetrators was suspended starting the day after she reported the sexual assault, even though the police requested that Lincoln-Sudbury delay its school-based investigation, and he remained suspended until after the school held his disciplinary hearing. (Pl. Ex. 59 at 4, 6). And after KF reported a sexual assault, the alleged perpetrator was suspended four days later. (*Id.* at 5, 7). In contrast, Jane first reported the incident to the defendants on November 7, 2013, but Perpetrator Two was not suspended until November 22, and Perpetrator One was not suspended until November 26.[59]

But even if such evidence were sufficient to demonstrate that Jane was treated differently than similarly situated female students who reported a sexual assault to the defendants, she must still produce evidence sufficient to establish that the defendants were motivated by malice, bad faith, or an intent to injure her. *See Buchanan*, 469 F.3d at 178. The "malice/bad faith test" is "an exceptionally deferential one"—the standard is "very high" and must be "scrupulously met."

---

[59] Both boys were asked by their housemasters in an e-mail to stay home from school on November 13, 2013, the day Jane returned to school for the first time since reporting the incident. But Patterson testified that the wording of the e-mail indicated that that was not a suspension, and in Lincoln-Sudbury records Perpetrator Two was reported "absent," not suspended, on that day. (Def. Ex. 44 at 5).

*Walsh v. Town of Lakeville*, 431 F. Supp. 2d 134, 145 (D. Mass. 2006) (internal quotations

omitted).  A plaintiff must demonstrate that she was subjected to a "gross abuse of power,

invidious discrimination or fundamentally unfair procedures."  *Baker v. Coxe*, 230 F.3d 470, 474

(1st Cir. 2000) (citation omitted).  Thus, she must show "utterly unjustified, malignant, and

extreme actions":  the "inevitable misjudgments, wrongheadedness, and mistakes" of

government actors will not suffice.  *Id.*  In addition, "[w]here the evidence is circumstantial, the

inference of ill-will or improper motive 'must flow rationally from the underlying facts.'"

*Portland Pipe Line Corp. v. City of S. Portland*, 288 F. Supp. 3d 321, 453 (D. Me. 2017) (citing

*Rubinovitz v. Rogato*, 60 F.3d 906, 911 (1st Cir. 1995)).

Jane contends that the record contains such evidence of malice or bad faith.  First, she

notes that Ramos testified that she was aware of the prior incident where Jane had sent

disparaging text messages about certain students at the school and that she had heard that "there

were concerns" about Jane's "boundary issues" with boys.  (Ramos Dep. at 23-24).  She also

notes that Patterson testified that the situation with Jane was "awkward" because Jane's mother

was a teacher at the school.  (Patterson Dep. at 19).[60]  Finally, she notes that Wong testified that

Jane's mother had to be spoken to about contacting Lincoln-Sudbury staff inappropriately

regarding Jane's incident.

Even viewing that evidence in the light most favorable to Jane, that evidence does not

meet the "very high" standard required to demonstrate that the defendants subjected her to

differential treatment based on malicious intent.  For example, in *Rubinovitz*, "a city official was

alleged to have engaged in a vendetta against a landlord who had evicted her friend by enlisting

---

[60] Wong testified that even though Jane's mother was a teacher at the school, Jane's situation was not handled any differently "from the perspective of protocols and review and investigation."  (Wong Dep. at 49).

other government officials from various departments to cut off the landlord's gas, water, and sewage services, to charge the landlord with building code violations, and to frustrate relations with a contractor," even though "there was not the slightest vestige of any legitimate government purpose served." *Baker*, 230 F.3d at 474.  In addition, the plaintiffs could also show further malice on the part of the defendant because he called the plaintiffs "bad people" and the female plaintiff "a bitch." *Rubinovitz*, 60 F.3d at 909.  But even with all of that evidence, the court found that the plaintiffs had proffered "only barely enough" to demonstrate a "malicious[ly] orchestrated campaign" and survive the defendant's motion for summary judgment on their class-of-one claim. *Id.* at 912.

The record here contains nothing that approaches that level of evidence of a "malignant" intent on the part of the defendants toward Jane. *See Baker*, 230 F.3d a 474.  Even assuming that the defendants acted arbitrarily, the evidence "does not support a claim of an orchestrated and spiteful effort to 'get'" her.  *Salvucci v. Watertown Police Dep't*, 2006 WL 8458358, at *7 (D. Mass. Oct. 31, 2006) (internal quotation and citation omitted); *see also Mimeault v. Peabody*, 2010 WL 2724002, at *7 (D. Mass. Jul. 8, 2010) (granting a defendant's motion for summary judgment on a class-of-one claim when the plaintiff failed to produce evidence of bad faith or malice).

Accordingly, defendants' motion for summary judgment will be granted on Count Two to the extent that it alleges an Equal Protection Clause violation.[61]

### C.      Failure to Train and Supervise the Sexual Assault Response, 42 U.S.C. § 1983 (Count 3)

Count Three alleges a claim under 42 U.S.C. § 1983 against the District based on its

---

[61] The individual defendants contend that they are also entitled to qualified immunity on Jane's equal-protection claim.  Because the Court finds that Jane has not provided sufficient evidence of an equal-protection violation to defeat defendants' motion for summary judgment, it does not reach that issue.

failure to train its employees on how to conduct a Title IX investigation.  A school district may

not be held vicariously liable under § 1983 for the acts of its employees or agents.  *See Monell v.*

*New York City Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978).  However, under *Monell* and its

progeny, it may be held liable for alleged constitutional deprivations that arise from a policy or

practice.  In addition to establishing a constitutional deprivation, a plaintiff must show (1) that

the entity had a custom, policy, or practice of failing to investigate, discipline, supervise, or train

its employees; (2) that the custom, policy, or practice was such that it demonstrated a "deliberate

indifference" to the rights of those students with whom its employees came into contact; and (3)

that the custom, policy, or practice was the direct cause of the alleged constitutional violation.

*DiRico v. City of Quincy*, 404 F.3d 464, 468-69 (1st Cir. 2005) (internal quotations omitted); *see*

*also City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989); *Monell*, 436 U.S. at 690-92.

      As noted, a reasonable jury could not find that the individual defendants violated Jane's

constitutional rights.  Therefore, she has failed to show that there is a genuine issue of material

fact on the first prong of the *Monell* inquiry—that she suffered a constitutional deprivation.  The

District therefore cannot be found liable under § 1983 on a *Monell* theory.  *See Young v. City of*

*Providence ex rel. Napolitano*, 404 F.3d 4, 26 (1st Cir. 2005) ("The finding that [the individual

officer] violated [the plaintiff's] constitutional rights is necessary for any finding that the City is

liable, . . . and thus causally, any basis for municipal liability must run through [the individual

officer's] actions.") (internal citation omitted); *Evans v. Avery*, 100 F.3d 1033, 1039 (1st Cir.

1996) ("[T]he fact that [the individual defendants] did not violate [the plaintiff's] constitutional

rights means that the City is not liable to her under section 1983."); *see also City of Los Angeles*

*v. Heller*, 475 U.S. 796, 799 (1986).

      Accordingly, the defendants' motion for summary judgment as to Count Three will be

granted.

### D.       Negligent Infliction of Emotional Distress (Count 4)

Count Four asserts a claim for negligent infliction of emotional distress.  To succeed on a

claim for NIED under Massachusetts law, a plaintiff must show "(1) negligence; (2) emotional

distress; (3) causation; (4) physical harm manifested by objective symptomology; and (5) that a

reasonable person would have suffered emotional distress under the circumstances of the case."

*Conley v. Romeri*, 60 Mass. App. Ct. 799, 801 (2004) (citing *Payton v. Abbott Labs*, 386 Mass.

540, 557 (1982)).  "It is fundamental that there must be a showing of a duty of care owed to the

plaintiff, because 'there can be no negligence where there is no duty.'"  *Conley*, 60 Mass. App.

Ct. at 801 (quoting *McHerron v. Jiminy Peak, Inc.*, 422 Mass. 678, 681 (1996) (alteration

omitted)).  Although Massachusetts courts have broadened the definition of physical harm, they

have not eliminated the requirement, but instead have merely "expanded the range of symptoms

that may provide the type of objective evidence to prove physical harm to include symptoms that

could be classified as more 'mental' than 'physical.'"  *Gutierrez v. Mass. Bay Transp. Auth.*, 437

Mass. 396, 412 (2002) (quotation omitted).

The individual defendants have moved for summary judgment on the NIED claim on the

basis of personal immunity.  Under the Massachusetts Tort Claims Act ("MTCA"), individual

public employees are immune from suits stemming from negligent conduct committed within the

scope of their office or employment.  *See* Mass. Gen. Laws ch. 258, § 2; *Wiesman v. Hill*, 629 F.

Supp. 2d 106, 113 (D. Mass. 2009) (citing *Jackson v. Town of Milton*, 41 Mass. App. Ct. 908,

908-09 (1996)).  The individual defendants are "public employees" as defined by the MTCA

because they are employees of a public employer—the District.  *See* Mass. Gen. Laws ch. 258, §

1.[62]  Furthermore, the complaint alleges that the individual defendants were "acting within the scope of their employment when they engaged in the actions alleged" in the complaint.  (Compl. ¶ 7).  Jane thus concedes that they are immunized from her negligence claim.  Accordingly, the motion for summary judgment as to Count Four will be granted as to the individual defendants.

The District has also moved for summary judgment on the NIED claim.  It contends (1) that Jane failed to comply with the MTCA's presentment requirement and (2) that it is immune from the claim because its actions fall within an exception to the limited abrogation of sovereign immunity under the MTCA.

### 1.        The MTCA Presentment Requirement

First, the District contends that Jane failed to comply with the presentment requirement of the MTCA.  It alleges that Jane was required to present her claim upon the Lincoln-Sudbury Regional School District School Committee and not upon Superintendent Wong.

According to the MTCA, a plaintiff may not institute a civil action against a public employer until (1) he has "presented his claim in writing to the executive officer of such public employer within two years" of the offending incident, and (2) the executive officer has denied the claim in writing or failed to issue a denial within six months.  *See* Mass. Gen. Laws ch. 258, § 4.  "Presentment is . . . a statutory condition precedent to recovery under [the MTCA]."  *Vasys v. Metro. Dist. Comm'n*, 387 Mass. 51, 55 (1982).

The MTCA "requires presentment to be made to the official with the capacity to negotiate or settle the claim."  *Holahan v. City of Medford*, 394 Mass. 186, 189 (1985).  For a regional school district, that capacity resides within the regional school district school

---

[62] A "public employer" includes any educational collaborative or district.  Mass. Gen. Laws ch. 258, § 1; *see also Doe v. Town of Blandford*, 402 Mass. 831, 834 (1988) ("The Gateway Regional School District comes within the meaning of the word 'district.'").

committee.  *See* Mass. Gen. Laws ch. 71, § 16A ("The powers, duties and liabilities of a regional

school district shall be vested in and exercised by a regional district school committee . . . ."); *see*

*also* Mass. Gen. Laws ch. 258, § 1 (defining an "[e]xecutive officer" of a district as "the board,

directors, or committee" of the district).  Accordingly, Jane was required to present her claim to

the District's School Committee.  *See Blandford*, 402 Mass. at 838 (noting that presentment has

to be made to the appropriate members of a regional school district school committee and that

presentment to various other members of a district, including a superintendent, is insufficient

under the MTCA).

Jane presented her claim in a letter addressed to Superintendent Wong—not to the

District's School Committee.  (*See* Pl. Ex. 65 at 1).  She does not appear to dispute the fact that

initial presentment of her claim was not made directly to the appropriate executive officer.

Instead, she contends that she satisfied the "purpose" of the presentment requirement because

"the appropriate individuals clearly had actual notice of [her] claim."  (Pl. Opp. at 18-19).

Presentment must be made "in strict compliance with the statute."  *Weaver v.*

*Commonwealth*, 387 Mass. 43, 47 (1982).  "Without such compliance, 'the executive officer

with the authority to settle a claim could not be assured of an adequate opportunity to investigate

the circumstances surrounding that claim in order to determine whether an offer of settlement

should be made.'"  *Lopez v. Lynn Hous. Auth.*, 440 Mass. 1029, 1030 (2003) (quoting *Weaver*,

387 Mass. at 47).  In particular, courts have held the "strict compliance precept" applicable to the

requirement that presentment be made to the proper executive officer.  *See Martin v.*

*Commonwealth*, 53 Mass App. Ct. 526, 529 (2002).

Failure to satisfy the presentment requirement is not always fatal to a plaintiff's MTCA

claim, however.  Massachusetts courts have recognized the "actual notice exception," under

which "the presentment requirement will be deemed fulfilled if the plaintiff can show that, despite defective presentment, the designated executive officer had actual notice of the written claim." *Bellanti v. Bos. Pub. Health Comm'n*, 70 Mass. App. Ct. 401, 407 (2007) (citing *Lopez*, 440 Mass. at 1030). But that exception "is narrow." *Bellanti*, 70 Mass. App. Ct. at 407; *see also Lopez*, 440 Mass. at 1030 (noting that it "continue[d] to stand firmly behind" the principle that "the plaintiff must present his or her claim to the executive officer of a public employer prior to filing suit"); *Drake v. Town of Leicester*, 484 Mass. 198, 200 n.4 (2020) (noting that "the presentment letter must still be addressed to the proper executive officer"). The Supreme Judicial Court has noted that the liberal construction of the presentment requirement adopted in *Lopez* and extended in certain cases was confined to the "unique circumstances of those particular cases," as in those cases the "the purposes underlying the presentment requirement were satisfied: the proper executive officer was notified of the claims within the statutory deadline." *Drake*, 484 Mass. at 201-02.

In *Lopez*, the court found that it was "apparent that the purpose of the presentment requirement ha[d] been fulfilled" despite the plaintiff presenting his claim to the Lynn Housing Authority as opposed to the Housing Authority's executive officer, because after presentment, the executive officer sent the plaintiff a letter in which he "acknowledged not only that he had actual notice of [the plaintiff's] claim, but also that the claim had been investigated, evaluated, and eventually denied." *Lopez*, 440 Mass. at 1030. Therefore, the court found it was "undisputed that the claim was ultimately received in writing and acted on by the appropriate executive officer, notwithstanding the fact that the presentment letters were not addressed directly to" him. *Id.*

Jane's letter to Wong contained a draft complaint that listed her, the District, Ramos, and

Patterson as defendants.  (*See* Pl. Ex. 65 at 3).  In a March 10, 2017 letter to Jane, the

Massachusetts Interlocal Insurance Association ("MIIA") stated that it was the insurance

administrator for the District and "acknowledge[d] receipt" of her February 2017 letter.  (Pl. Ex.

66).[63]  It further stated that it had engaged counsel for the purpose of representing the District

and was in the process of investigating the allegations.  (*Id.*).[64]  Five months later, on July 14,

2017, counsel for the District and the individual defendants sent a letter to Jane denying all

liability for the claims in the draft complaint and noting that it was "not prepared" to respond to

Jane's settlement demand at that time.  (*See* Pl. Ex. 67 at 1-2).

 In that correspondence, however, the Lincoln Sudbury Regional School District School

Committee is never mentioned.  Thus, unlike in *Lopez*, there is no indication that the proper

executive officer had actual notice of Jane's written claim; the case does not then fit within the

"actual notice" exception to the presentment requirement.  That is so even though it is obvious

from the letters Jane received that attorneys for the District were investigating Jane's claim and

evaluating whether to make a settlement offer.  *See Bellanti*, 70 Mass. App. Ct. at 408 ("Under

our precedents, notice to the executive officer will not be inferred or imputed from the fact that

others with responsibility of investigation and settlement of the dispute received the plaintiff's

presentment letter and were in contact with the plaintiff."); *see also Garcia v. Essex Cnty.

Sheriff's Dep't.*, 65 Mass. App. Ct. 104, 108-09 (finding that a plaintiff failed to make proper

presentment of his claim against a sheriff's department when he sent claim letters to the

---

[63] While the MIIA referred to Jane's letter as being dated February 26, 2017, the letter was actually dated February 6.  (*Compare* Pl. Ex. 66, *with* Pl. Ex. 65 at 1).

[64] The MIIA is a non-profit insurance provider for the Massachusetts Municipal Association, a non-profit organization of Massachusetts cities and towns and to which both Lincoln and Sudbury belong.  *See About*, MASSACHUSETTS INTERLOCAL INSURANCE ASSOCIATION (last visited Mar. 24, 2021), https://www.emiia.org/about; *Member Communities*, MASSACHUSETTS MUNICIPAL ASSOCIATION (last visited Mar. 24, 2021), https://www.mma.org/members/member-communities/.

department's chief fiscal officer and received correspondence from a department attorney who investigated the case and made an offer of settlement because written notice was not sent to the sheriff himself as executive officer); *Holahan*, 394 Mass. at 189 ("[W]e discern that the Legislature did not intend presentment to a public employer's attorney to suffice under [Mass. Gen. Laws ch. 258, § 4], unless it specifically so indicated.").

As Massachusetts courts have acknowledged, strict adherence to the presentment requirement may produce a "harsh result." *Bellanti*, 70 Mass. App. Ct. at 408. It appears that attorneys for the District were responding to Jane's claims even without any evidence that the School Committee was aware of the allegations. But in the context of presentment under the MTCA "[i]t is irrelevant that the defendant may not have suffered any prejudice by reason of the lack of actual notice." *Robinson v. Commonwealth*, 32 Mass. App. Ct. 6, 10 (1992). Because there is no evidence that the District School Committee had actual notice of the claim, Jane failed to satisfy the MTCA presentment requirement.

Accordingly, the motion for summary judgment as to Count Four will be granted as to the District.[65]

## E.    Intentional Infliction of Emotional Distress (Count 5)

Count Five asserts a claim for intentional infliction of emotional distress against the individual defendants. To succeed on a claim for IIED under Massachusetts law, a plaintiff must show:

> (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous, was beyond all possible bounds of decency[,] and was utterly intolerable in a civilized community; (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the

---

[65] The District also contends that the MTCA would shield it from liability as to the substance of Jane's negligence claim. Because the Court finds that Jane failed to comply with the MTCA's presentment requirement, it need not reach that issue.

plaintiff was severe and of a nature that no reasonable [person] could be expected to endure it.

*Agis v. Howard Johnson Co.*, 371 Mass. 140, 144-45 (1976) (internal quotation marks and citations omitted); *accord Brown v. Hearst Corp.*, 54 F.3d 21, 27 (1st Cir. 1995).

Courts apply a "very high" standard to IIED claims, especially as to the nature of the conduct. *See Doyle v. Hasbro, Inc.*, 103 F.3d 186, 195 (1st Cir. 1996). Conduct is "'extreme and outrageous' only if it is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Lozano v. Suffolk Superior Ct.*, 2015 WL 5684071, at *4 (D. Mass. Sept. 28, 2015) (quoting *Foley v. Polaroid Corp.*, 400 Mass. 82, 99 (1987)). Recovery for an IIED claim generally "requires more than 'that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.'" *Doyle*, 103 F.3d at 195 (quoting *Foley*, 400 Mass. at 99). "[L]iability cannot be predicated upon 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" *Foley*, 400 Mass. at 99 (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). Even the "fact that the defendants' conduct may turn out to be violative of the plaintiff['s] civil rights does not, in and of itself, necessitate a finding that the conduct is sufficiently egregious to state a claim for [IIED]." *Guckenberger v. Bos. Univ.*, 957 F. Supp. 306, 319 (D. Mass. 1997) (citing *Marques v. Fitzgerald*, 99 F.3d 1, 6-7 (1st Cir. 1996)); *see also Sinai v. New England Tel. & Tel. Co.*, 1990 WL 150015, at *5 (D. Mass. Sept. 13, 1990) (concluding that a defendant's repeated denials of the plaintiff's employment application based on the plaintiff's religion and national origin "may have been discriminatory, but . . . were not utterly intolerable in a civilized community") (internal quotation

85

omitted).

Here, a reasonable jury could not find that the individual defendants engaged in intentional acts sufficient to rise to the level required under an IIED claim.  Massachusetts courts have found that the "passive conduct" of "fail[ing] to act in preventing or remedying the bullying" of a student by other students is insufficient to state a claim for IIED.  *Morgan v. Town of Lexington*, 138 F. Supp. 3d 82, 94 (D. Mass. 2015); *see also Pollard*, 132 F. Supp. 3d at 232; *Bradshaw*, 2013 WL 5236110, at *13 (finding that a plaintiff did not adequately state a claim for IIED where she alleged that a school did not investigate her allegations of a coach's sexual assault, did not prevent other students from bullying her, and failed to determine her eligibility for special-education services).

Jane contends that a jury should decide whether the individual defendants' "conduct in isolating, stigmatizing, outplacing[,] and ultimately forcing [her] to enroll in a private school to receive an education on par with what [Lincoln-Sudbury] offered to her was extreme and outrageous."  (Pl. Opp. at 20).  But even assuming that defendants' actions may have been unreasonable or unfair, the bar for asserting an IIED claim is considerably higher.  A reasonable jury, even putting "as harsh a face" on the individual defendants' actions as "the basic facts would reasonably allow," *Richey v. American Auto Ass'n*, 380 Mass. 835, 839 (1980), could not find that the defendants' actions were the sort of targeted, deliberate, and malicious conduct that is required for an IIED claim.  *See Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 617 (D. Mass. 2016).

Accordingly, the defendants' motion for summary judgment as to Count Five will be granted.

## IV.   <u>Conclusion</u>

For the foregoing reasons, the defendants' motion for summary judgment is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated: March 24, 2021                         Chief Judge, United States District Court